## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MAZZONI CENTER** and | : | |
| **1334-48 BAINBRIDGE STREET LLC** | : | |
| | : | |
| Plaintiffs, | : | |
| | : | CASE NO. _____ |
| v. | : | |
| | : | |
| **LCF GROUP, INC., AKF, INC.** | : | |
| **d/b/a FUNDKITE, ALEKSANDER** | : | |
| **SHVARTZ, ROBERT KLEIBER,** | : | |
| **ANDREW PARKER, AND JOHN** | : | |
| **AND JANE DOES,** | : | |
| | : | |
| Defendants. | : | |
| | : | |

## COMPLAINT

Plaintiffs Mazzoni Center (hereinafter "Mazzoni Center," "Mazzoni," "the Center" or the "Organization") and 1334-48 Bainbridge Street LLC (hereinafter "1348 Bainbridge") (collectively the "Plaintiffs"), file their Complaint against Defendants LCF Group. Inc. (hereinafter "LCF"), AKF Inc. d/b/a Fundkite (hereinafter "Fundkite"), Aleksander Shvartz (hereinafter "Shvartz"), Robert Kleiber (hereinafter "Kleiber"), Andrew Parker (hereinafter "Parker") and the John and Jane Doe Defendants (the "John and Jane Doe Defendants"), and allege the following upon personal knowledge as to themselves and their own acts and experience, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## NATURE OF THE ACTION

1.     Plaintiffs bring this action seeking relief related to usurious and illegal loan agreements that they never entered into or authorized, and which Defendants have improperly

asserted against them.  In their attempts to enforce these illegal and unauthorized loan agreements, Defendants LCF and Fundkite have frozen and/or diverted Mazzoni Center's accounts receivable through the assertion of improper UCC liens. Defendants LCF and Fundkite have also instituted legal actions against Plaintiffs seeking to enforce their illegal loan agreements.

2.     The loan agreements asserted by Defendants LCF and Fundkite are void as usurious under New York law, and the Defendants' actions in seeking to collect on them and block rightful payments to Mazzoni Center violate the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"). Moreover, the agreements are invalid because neither Mazzoni Center nor 1348 Bainbridge entered into them, authorized them or were aware of their existence when they were signed; they are invalid on this basis as well.

3.     Accordingly, the Court should declare the loans null and void, enjoin Defendants' attempts to enforce them, enjoin the pending legal actions that Defendants LCF and Fundkite have brought against Plaintiffs seeking enforcement of these illegal loans, award treble damages to Mazzoni Center as civil RICO fines in addition to attorneys' fees and costs in pursuing this action, and their defense in the other pending legal matters to vindicate their rights, and award any and all other relief that is just and proper.

**JURISDICTION AND VENUE**

4.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims asserted under federal law, which include claims for RICO violations.

5.     The court additionally has jurisdiction over this matter under 28 U.S.C. § 1332

as there is diversity of the parties – Plaintiffs are Pennsylvania corporate entities and Defendants are New York corporations or individuals who are domiciled in states other than Pennsylvania and the controversy involves amounts greater than $75,000.00.

6. This Court has jurisdiction over Plaintiffs' claims asserted under state law pursuant to 28 U.S.C. § 1367 because they are so related to claims in the action within such original jurisdiction of the Court that they form part of the same case or controversy.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial part of property that is the subject of the action is located within this district.

## THE PARTIES

8. Plaintiff Mazzoni Center is a 501(c)(3) non-profit corporation organized under the laws of the Commonwealth of Pennsylvania, with a principal place of business at1348 Bainbridge Street, Philadelphia, PA 19147.

9. Plaintiff 1334-48 Bainbridge Street LLC is a Pennsylvania limited liability company whose sole member is Mazzoni Center, with a principal place of business at 1348 Bainbridge Street, Philadelphia, PA 19147.

10. Defendant LCF is a New York corporation with a principal place of business at 3000 Marcus Avenue, Suite 2W15, Lake Success, NY 11042.

11. Defendant Kleiber is Defendant LCF's Chief Operating Officer and, upon information and belief, is a citizen of a state other than Pennsylvania.

12. Defendant Parker is Defendant LCF's Chief Executive Officer and, upon information and belief, is a citizen of a state other than Pennsylvania.

13. Defendant FundKite is a New York corporation with a principal place of

business at 88 Pine Street, 2430, New York, NY 10005.

14. Defendant Shvartz is Defendant Fundkite's CEO and, upon information and belief, is a citizen of a state other than Pennsylvania.

15. Upon information and belief, each of the John and Jane Doe Defendants are brokers and/or investors in one or more of the LCF or Fundkite enterprises and are citizens of states other than Pennsylvania.

## FACTUAL ALLEGATIONS

16. Mazzoni Center is a respected and nationally recognized healthcare non-profit that has served the health and wellness needs of the LGBTQIA+ community and other underserved communities in the Philadelphia region and beyond for over forty years.

17. The organization does not turn away patients and clients who cannot afford health care and was recently designated a Federally Qualified Health Center ("FQHC") look-alike, recognizing the quality of the care and services it provides, its mission to provide care regardless of the ability to pay, and the critical need for the services it provides in the Philadelphia region.

18. Mazzoni Center's services are essential to the local and regional communities it serves, with the organization offering primary health care, behavioral health services, HIV and STI community testing and treatment, psychiatry, and other ancillary health and wellness services. Indeed, in the period from October 1, 2023 to September 30, 2024, Mazzoni Center conducted over 22,000 medical visits for over 8,000 unique patients, nearly 6,000 behavioral health and therapy visits, and performed HIV and STI testing for nearly 7,000 individuals. The organization also runs a housing program, an education program, a free legal services program, and a food bank for food insecure community members.

19.     The organization relies on grant funding, government reimbursements, third party billing, and revenue from the federal 340(b) drug program to support the free and reduced cost care it offers to the communities it serves and to continue operations.  As a non-profit, any income earned is reinvested into its programming and to pay operating expenses such as payroll, employee benefits, and overhead.

20.     As with a great number of other non-profit health care institutions, Mazzoni Center faced financial difficulties during and in the aftermath of the COVID-19 pandemic and has worked to recover from the fiscal ravages of this difficult period.  While there is a favorable long term economic picture for the organization, it has continued in 2024 to struggle with cash flow issues.

21.     Defendants LCF and Fundkite are businesses that operate in the merchant cash advance ("MCA") industry. This industry preys upon cash-strapped and struggling small businesses by offering so-called future accounts receivable purchase agreements, also called merchant cash advance agreements.  These MCA agreements purport to evade usury laws and other regulation by framing themselves as sales agreements when, in actuality, they function as illegal and usurious loans.

22.     Although for a long while the MCA business model flew under the radar of regulators, courts and government actors have begun to see through the illusory nature of MCA agreements for what they really are – illegal loans.[1]  Indeed, earlier this year, the New York Attorney General filed a $1.4 billion lawsuit against MCA lenders after obtaining a successful $77 million judgment against another group of such lenders.[2]

---

[1] https://www.jdsupra.com/topics/merchant-cash-advance-mca/ (Last visited November 4, 2024).
https://www.jdsupra.com/legalnews/new-york-state-attorney-general-wins-77-8389935/ (Last visited November 4 2024).
[2] https://www.jdsupra.com/legalnews/new-york-attorney-general-brings-1-4-2153020/ (Last visited November 4,

23.     What's more, a number of courts, including this one, have upheld usury and RICO claims brought by Plaintiffs suffering under the yoke of MCA agreements similar to those at issue in the instant matter.  See Fleetwood Servs., LLC v. Complete Bus. Sols. Grp., 374 F. Supp. 3d 361 (E.D. Pa. 2019) (denying motion to dismiss and permitting RICO and usury claims brought against MCA agreements to go forward); see also Lateral Recovery LLC v. Funderz.Net, LLC, No. 1:22-cv-02170 (JLR), 2024 U.S. Dist. LEXIS 10134 (S.D.N.Y. Jan. 19, 2024) (denying motion for judgment on the pleadings and upholding civil RICO conspiracy and collection of unlawful debt claims related to MCA agreements); New Y-Capp v. Arch Cap. Funding, LLC, No. 18-cv-3223 (ALC) 2022 U.S. Dist. LEXIS 180309 (S.D. N.Y. Sept. 30, 2022) (finding plaintiffs had pled adequate facts to establish MCA agreements were, in actuality, loans, and upholding RICO claims on motion to dismiss); Haymount Urgent Care PC v. GoFund Advance, LLC, 609 F. Supp. 3d 237 (S.D. N.Y. 2022) (same).

24.     Upon information and belief, on or about September 10, 2024, Mazzoni Center's now-former Executive Financial Officer, Rachelle Tritinger ("Ms. Tritinger") purported to enter into a loan transaction with Defendant LCF on behalf of Mazzoni Center, despite not having the authority or approval to do so, and without the knowledge of Plaintiffs at the time. See Exhibit A to Shakir Declaration.

25.     Upon information and belief, on or about September 11, 2024, Ms. Tritinger purported to enter into a loan transaction with Defendant Fundkite on behalf of Mazzoni Center, despite not having the authority or approval to do so, and without the knowledge of Plaintiffs at the time. See Exhibit B to Shakir Declaration.

26.     Under Mazzoni Center's internal policies, Ms. Tritinger did not have authority to enter into contracts with a value of greater than $10,000.00 absent the advance approval of

2024).

Mazzoni Center's President and Executive Officer. In addition, internal practice required approval from Mazzoni Center's General Counsel prior to entering into an agreement on behalf of the organization.

27.     Moreover, Mazzoni Center at no time made any affirmative representations to Defendants LCF or Fundkite that Ms. Tritinger had the authority to act on its behalf.

28.     On or about September 12, 2024, Mazzoni Center became aware that Ms. Tritinger appeared to have signed MCA agreement[3] paperwork with the LCF and Fundkite Defendants and that she had submitted paperwork to those companies in support of such agreements with false or facially inaccurate representations.

29.     For instance, in the LCF Loan document (the "LCF Loan"), Ms. Tritinger is noted repeatedly to be an "Owner" of Mazzoni Center, despite its facially apparent identity as a non-profit corporation which has no individual ownership.  See Exhibit A to Shakir Declaration at pp. 4, 13. As part of the LCF Loan, Ms. Tritinger also apparently signed a Power of Attorney purportedly on behalf of Mazzoni Center, holding herself out as the organization's "principal and/or sole proprietor" and "Owner."  Id. at pp. 24-25.  Ms. Tritinger also signed paperwork as a guarantor of the LCF Loan, and a security agreement purportedly on behalf of the organization, again identifying herself on the signature lines of both documents as an "Owner" of Mazzoni Center.  Id. at pp. 17, 23.

30.     With regard to the Fundkite Loan document (the "Fundkite Loan"), Ms. Tritinger was also listed as an "Owner" of the non-profit organization.  See Exhibit B to Shakir Declaration at p. 11.  Ms. Tritinger also, apparently, applied to obtain the Fundkite Loan, holding

---

[3] To the extent Plaintiffs refer to the documents signed by Ms. Tritinger with Defendants LCF and Fundkite as an "agreement" this is for convenience, and does not imply or indicate any valid or legally binding agreement was formed; to the contrary, and as set forth in great detail throughout Plaintiffs' filings in this matter, no valid agreement was formed between Plaintiffs and Defendants at any time.

herself out as the Executive and Owner of Mazzoni Center.  See Exhibit C to Shakir Declaration. She also listed herself on the application materials as having 100% ownership of the corporation, and/or as a "majority owner." Id.

31.     Upon information and belief, Ms. Tritinger submitted other documents and information, such as the organization's bylaws, which would have further indicated contradictions as to her ability to bind Plaintiffs to loans in such large amounts with Defendants LCF and Fundkite.

32.     Upon information and belief, as part of the loan application process with Defendants, Ms. Tritinger submitted an outdated Certificate of Incumbency that was nearly two years old and contained individuals who were no longer on Mazzoni Center's Board or Executive team.  The accuracy of this listing could have easily been verified by Defendants if they had merely gone onto Mazzoni Center's website.

33.     The LCF and Fundkite Defendants failed to conduct reasonable due diligence in ascertaining whether Ms. Tritinger had authority to enter into the LCF Loan and Fundkite Loan agreements on behalf of Plaintiffs and to enter security agreements, powers of attorney, and any other ancillary documents related to or in furtherance of these unlawful agreements.

34.     Indeed, it appears that Defendants LCF and Fundkite essentially took Ms. Tritinger's word for it, despite the fact that a simple internet search, and other documents reviewed in the application process or publicly available, would have revealed that Mazzoni Center is clearly a non-profit that she did not own the organization nor was she its sole proprietor.

35.     Moreover, neither Defendant LCF nor Defendant Fundkite made any inquiries to the members of Plaintiff's leadership team or Board, despite being able to contact any of these

individuals and verify Ms. Tritinger's authority via the Mazzoni Center website.

36.     In addition to the facially inaccurate representations Ms. Tritinger made to Defendants in seeking to acquire money under the LCF Loan and Fundkite Loan with Defendants, Ms. Tritinger's actions in applying for, signing for, or otherwise submitting information and making representations to the Defendants were unknown, unauthorized, and unapproved by Plaintiffs.

37.     Ms. Tritinger's actions in this regard also violated Plaintiffs' internal policies regarding the authorization and approval of contracts and entering into business transactions on behalf of Mazzoni Center or 1348 Bainbridge.

38.     Ms. Tritinger did not have actual or apparent authority to bind Plaintiffs to the LCF Loan or the Fundkite Loan.

**A.  The LCF LOAN**

39.     The LCF Loan was, in actuality, a usurious loan agreement.

40.     The LCF Loan purported to be in the form of an agreement to purchase Mazzoni Center's future receivables.  See Exhibit A to Shakir Declaration. The LCF Loan provides that, in exchange for providing $234,570.00 in cash, which constituted a purchase price of $250,000.00 minus "origination fees" of $15,430.00, Mazzoni Center was to remit $6,041.67 to LCF daily, a supposedly "good faith estimate of the monetary value of the purchased percentage of [Mazzoni Center's] daily receipts[,]" until LCF received the full "Purchased Amount," defined as $362,500.00, as well as monthly maintenance fees of $195.00, subject to a set of ambiguous reconciliation provisions.  Id. at pp. 1-2.

41.     Setting aside the origination and maintenance fees contemplated in the agreement, the cost of LCF's cash advance was $127,930.00, according to the LCF Loan

document.  This amount equates to an interest rate of approximately 55%.  Including the origination and other fees, the interest rate jumps to approximately 61% of the principal under the LCF Loan.

42.     New York's usury law provides that an interest rate above 16% is usurious and voids any agreement that contemplates it.  <u>See</u> N.Y. Gen. Oblig. L. § 5-501; <u>see also</u> <u>Adar Bays, LLC v. GeneSYS ID, Inc.</u>, 28 F.4th 379, 382 (2d Cir. 2022); <u>Adar Bays, LLC v. GeneSYS ID, Inc.</u>, 179 N.E.3d 612 (2021).  New York's penal law provides that any interest rate above 25% is criminally usurious. <u>Id.</u>; <u>see also</u> N.Y. Penal Law § 190.40.

43.     Significantly, and apparently in recognition of the true nature of the document, the LCF Loan noted that:

> [I]n the event a court of competent jurisdiction determines...that Company has charged or received interest hereunder in excess of the highest rate allowed by applicable law, then the Purchased Amount shall be adjusted automatically...so that the difference between the Purchased Amount and the Purchase Price shall, if expressed as an interest rate over such term of this Agreement as the ruling court has determined to apply, yield a rate equivalent to the maximum rate permitted by applicable law.

<u>See</u> Exhibit A to Shakir Declaration at p. 6, Sec. 1.10, ¶ 2.

44.     This language does not cure the issue – by setting a criminally usurious interest rate, the contract is void *ab initio*.  <u>See</u> N.Y. Gen. Oblig. L. § 5-501; N.Y. Penal Law § 190.40; <u>see also</u> <u>Adar Bays, LLC</u>, 28 F.4th 379, 382 (2d Cir. 2022); <u>Adar Bays, LLC</u>, 179 N.E.3d 612.

45.     The LCF Loan also included a power of attorney provision, whereby the signer appointed LCF as its agent and attorney-in-fact with "full authority to take any action or execute any instrument or document to settle all obligations due to [LCF]" under the LCF Loan. <u>See</u> Exhibit A to Shakir Declaration at pp. 6-7, Sec. 1.17.

46.     The LCF Loan also apparently required Ms. Tritinger to turn over Mazzoni Center's bank account information and to authorize unfettered access to such account for

purposes of repayment of the "Purchased Amount" under the agreement.

47.     Under the LCF Loan, failure to ensure the daily fixed payment to LCF was made was considered an act of default, regardless of whether Mazzoni Center had receivables that day or a reconciliation request was pending.  <u>See, e.g.</u>, Exhibit A to Shakir Declaration at pp. 1-2, 7, Sec. 1.13(b).

48.     Although the LCF Loan contained a reconciliation provision, such provision could only be utilized every 15 days, was ineffective absent affirmative action taken by the borrower, was subject to unilateral review and approval of LCF, and set a limited time to submit supporting documents to justify reconciliation.  <u>See</u> Exhibit A to Shakir Declaration at p. 5, Sec. 1.4.  Moreover, according to the LCF Loan, pending LCF's review of any request for reconciliation, the daily drawdown remained the pre-set daily amount determined unilaterally by LCF as the lender. <u>Id.</u>

49.     In the event of a default, the LCF Loan also contains an acceleration clause, contemplating that the specified "Purchase Percentage shall be increased to 100% and any undelivered Purchased Amount shall become immediately due in its entirety together with any additional liquidated default and collection fees."  <u>See</u> Exhibit A to Shakir Declaration at p. 2, final paragraph.

50.     Other remedies set out in the LCF Loan in the event of a breach include, in pertinent part, liquidated damages in the amount of 33.33% of any amounts due to LCF under the LCF Loan.  <u>Id.</u> at p. 8, Sec. 1.14(II).

51.     In addition, other substantial fees could be assessed against a debtor under the LCF Loan, including, but not limited to a "Default Fee" of $2,500.00, a "Stop Payment Fee" of $2,500.00, a "Closed Account Fee" of $2,500.00, and a "Subordination Fee" of $500.00.  <u>See</u>

Exhibit A to Shakir Declaration at p. 1.

52.     The LCF Loan also included an "Origination Fee," which is typically defined as a charge that a lender makes to a borrower for processing a loan application and setting up a loan.  Id. at p. 1.

53.     Under the LCF Loan, the purported fair market value of Mazzoni Center's future receivables was unilaterally dictated by LCF.  Id. at p. 1.  The LCF Loan purported to purchase 12% of Plaintiff Mazzoni Center's future receivables; however, under its terms, Mazzoni Center was required to pay the fixed daily debits set forth in the LCF Loan, subject to the ambiguous and unilateral LCF-dependent reconciliation provisions noted above.  Id. at 1-2.

54.     The LCF Loan did not provide an appeal process should LCF deny a reconciliation request or reject it, nor did it freeze the daily deductions from the debtor pending the review of the reconciliation request.  Id.

55.     Under the LCF Loan, the supposed "Purchased Amount" is also a complete fiction, set unilaterally by LCF based, upon information and belief, in large part on the credit worthiness of Mazzoni Center.

56.     Indeed, eligibility determinations by LCF for MCA funding are based on the borrower's credit history.  To wit, LCF specifies on its website that the determination of eligibility for a loan depends on a number of factors, including, "LCF Group...obtain[ing] an investigative or consumer report from a credit bureau or a credit agency..."[4]  The LCF website goes on to state: "[t]he actual terms for which your business may qualify will depend on various things about your business and you, including...verified revenue" and "credit history." [5]

57.  The LCF Loan's "Daily Remittance" is allegedly based on a good faith estimate

---

[4] https://thelcfgroup.com/legal-information/ (last visited November 5, 2024).
[5] https://thelcfgroup.com/legal-information/ (last visited November 5, 2024).

of Mazzoni Center's daily future receivables but, in actuality, it is a knowingly false term unilaterally dictated by LCF in an attempt to avoid usury laws. In fact, the payment is based on the value of the loan, not Mazzoni Center's daily receivables.

58. Under the LCF Loan, Mazzoni Center would be required to pay the "Daily Remittance" until LCF received the "Purchased Amount" in full.

59. In other words, the terms of the LCF Loan provided for absolute payment from Mazzoni Center.

60. Although the LCF Loan provided for termination should the debtor declare bankruptcy or go out of business, it also contained a broad Power of Attorney provision permitting LCF to take control of Mazzoni Center and perform any action necessary to "settle all obligations" under the LCF Loan. Compare Exhibit A to Shakir Declaration at p. 5 with Exhibit A at pp. 6-7. In other words, despite all the song and dance, the LCF Loan contemplates absolute payment.

61. In order to obtain the LCF loan, Ms. Tritinger was, apparently, also required to sign a security interest in her and Mazzoni Center's accounts and Mazzoni Center's "personal property...inventory, contract rights, accounts...accounts receivable, deposit accounts, lease rights, and payments due from credit card and bank card companies..." Id. at p. 18, ¶¶ 2-3.

**B. THE FUNDKITE LOAN**

62. The Fundkite Loan is, in actuality, a usurious loan agreement.

63. The Fundkite Loan purported to be in the form of an agreement to purchase Mazzoni Center's future receivables. See Exhibit B to Shakir Declaration. The Fundkite Loan provided that, in exchange for providing $479,815.00 cash, which constituted a purchase price of $500,000.00 minus an "origination fee" of $20,185.00, Mazzoni Center was to remit $24,642.86

weekly, a "Remittance Percentage" supposedly based upon Mazzoni Center's "actual receipts prior to the date of the [Fundkite Loan,]" until Fundkite received the full "Purchased Amount," defined as $690,000.00. Id. at pp. 1-2, 18.

64. Setting aside the origination fee contemplated in the agreement, the cost of Fundkite's cash advance was $210,185.00, according to the Fundkite loan. This amount equates to an interest rate of approximately 44%. Including the origination fee, the interest rate jumps to approximately 48% of the principal under the Fundkite Loan.

65. New York's usury law provides that an interest rate above 16% is usurious and voids any agreement that contemplates it. See N.Y. Gen. Oblig. L. § 5-501; see also Adar Bays, LLC v. GeneSYS ID, Inc., 28 F.4th 379, 382 (2d Cir. 2022). New York's penal law provides that any interest rate above 25% is criminally usurious. Id.

66. The Fundkite Loan also apparently required Ms. Tritinger to turn over Mazzoni Center's bank account information and to authorize unfettered access to such account for purposes of repayment of the "Purchased Amount" under the agreement. See Exhibit B to Shakir Declaration at pp. 2, 19.

67. Under the Fundkite Loan, failure to make the weekly remittance amount to Fundkite was an act of default, regardless of whether Mazzoni Center had receivables that day or a reconciliation request was pending. Id. at pp. 1, 6.

68. Although the Fundkite Loan contained a reconciliation provision, it is illusory. Aside from being vague – it provides for "periodic" reconciliation by Fundkite plus a request process that could be initiated by the debtor "between" the periodic reconciliations – it is discretionary on the part of Fundkite. Id. at p. 3, Sec. 1.3. Moreover, it is prospective only – adjusting "subsequent withdrawals" while the weekly drawdown remains the same in the past

and up until the time Fundkite adjudicates the request, potentially, to honor a request for reconciliation. Id. It also provides that, if the debtor does not provide "Banking records" – a broad, ill-defined term that seems to mean anything Fundkite deems appropriate – within seven (7) days of the request, the weekly withdrawal amount by Fundkite remains the same. Id.

69. In the event of a default on "any term or covenant" of the Fundkite Loan agreement, the Fundkite Loan also contains an acceleration clause, contemplating that the "full unremitted Purchased Amount [of $690,000.00] shall become due and payable in full immediately." Id. at p. 6, Sec. 3.1(a).

70. Other remedies set out in the Fundkite Loan in the event of a breach include, in pertinent part, a "Breach Administration Fee" that is a clause providing for liquidated damages in the amount of 25% of any outstanding "Purchased Amount." Id. at p. 18, App. A, Sec. D.

71. In addition, The Fundkite Loan included an "Origination Fee" of over $20,000.00. Id. at p. 18, App. A, Sec. A. An origination fee is typically defined as a charge that a lender makes to a borrower for processing a loan application and setting up a loan. Id.

72. Under the Fundkite Loan, the purported fair market value of Mazzoni Center's future receivables was unilaterally dictated by Fundkite. Id. at p. 1. The Fundkite Loan purported to purchase 9% of Plaintiff Mazzoni Center's future receivables; however, under its terms, Mazzoni Center was required to pay the fixed weekly debits set forth in the Fundkite Loan, subject to the ambiguous and unilateral Fundkite-dependent reconciliation provisions noted above. Id. at pp. 1, 3. The Fundkite Loan did not provide an appeal process should Fundkite deny a reconciliation request or reject it, nor did it freeze the weekly deductions from the debtor pending the review of the reconciliation request. Id. at 3. Moreover, there were no provisions for retroactive corrections, and any reconciliation request for which paperwork was

not submitted within seven calendar days could, apparently, be denied. Id.

73. Under the Fundkite Loan, the supposed "Purchased Amount" is also a complete fiction, set unilaterally by Fundkite based on an unspecified "dollar value" but more likely based upon the credit worthiness of Mazzoni Center, as with any other loan.

74. Indeed, upon information and belief, Fundkite pulled Mazzoni Center's credit report as part of the loan application process.

75. The Fundkite Loan document itself indicates that the debtor's financial condition was part of its review prior to offering the loan and during its administration. Id. at p. 3, Sec. 1.5.

76. The Fundkite Loan's weekly "Remittance Amount" is allegedly based on a good faith estimate of Mazzoni Center's daily future receivables but, in actuality, is a knowingly false term unilaterally dictated by Fundkite in an attempt to avoid usury laws. In fact, the payment is based on the value of the loan, not Mazzoni Center's weekly receivables.

77. Under the Fundkite Loan, Mazzoni Center would be required to pay the weekly remittance until Fundkite received the "Purchased Amount" in full. Id. at pp. 1-2.

78. In other words, the terms of the Fundkite Loan provided for absolute payment from Mazzoni Center.

79. The Fundkite Loan also provided for protections for Fundkite in the event of a Bankruptcy by the debtor, namely that Fundkite could seek any amounts discharged in Bankruptcy or a similar proceeding from Ms. Tritinger or Mazzoni Center's affiliated LLC, 1348 Bainbridge, as Guarantors. See Exhibit B to Shakir Declaration at p. 13, Section B ("Guarantor(s) Waivers"). Moreover, the Fundkite Loan provided for a security interest in Mazzoni Center's future receivables "securing all of [Fundkite's] entitlements under the

Fundkite Loan document.  Id. at pp. 6-7.

80.   In other words, the Fundkite Loan contemplates absolute payment, one of the central essential terms of a loan.

81.   If Mazzoni Center were to miss a payment, it would be in default of the agreement and Fundkite would be entitled to accelerate the loan, seek fees and costs, and potentially confess judgment against Mazzoni Center, where permitted.  Id. at p. 6, Sec. III.3.1a).

### C.  MS. TRITINGER'S ADDITIONAL ACTIONS AND MAZZONI CENTER'S OFFERS TO RETURN ANY PRINCIPAL SHE HAD ACQUIRED FROM DEFENDANTS

82.   Upon information and belief, Ms. Tritinger accepted payments from LCF in the amount of $234,570.00 and from Fundkite in the amount of $479,815.00 but spent the bulk of these funds prior to Mazzoni Center's discovery of her actions.

83.   Subsequently, Mazzoni Center placed the remaining amount of these funds into a secure account and conducted an investigation to determine Ms. Tritinger's actions in regard to Defendants LCF and Fundkite.

84.   In addition, Mazzoni Center made offers to Defendants Fundkite and LCF to repay the amounts they had transferred to its accounts at the direction of Ms. Tritinger, but these offers were both rejected by Defendants LCF and Fundkite in lieu of enforcing the entirety of their illegal loan agreements.

### D. DEFENDANTS LCF AND FUNDKITE'S COLLECTION EFFORTS AND ASSERTION OF ILLEGAL UCC LIENS

85.   Defendants LCF and Fundkite have attempted to draw funds out of Mazzoni Center's operating account with Bank of America, in attempts to enforce the illegal loan agreements that were signed by Ms. Tritinger.  See Exhibit D to Shakir Declaration; Exhibit E to

Shakir Declaration at ¶ 30.

86.     In addition, in October 2024, Mazzoni Center received notice from a number of business partners that Defendants LCF and Fundkite had asserted UCC liens against Mazzoni Center's receivables, resulting in such business partners either withholding payments owed to Mazzoni Center or diverting such payments to Defendant LCF in at least two instances. Specifically:

a.  On October 17, 2024, the City of Philadelphia notified Mazzoni Center that it had been directed to withhold all of the organization's invoice payments due to a lien notice received from a funder.  <u>See</u> Exhibit G to Shakir Declaration.

b.  On October 21, 2024, Walgreens notified Mazzoni Center that it had also received a lien notice from Defendant LCF, directing it to divert funds owed to Mazzoni Center to LCF.  <u>See</u> Exhibit H to Shakir Declaration.

c.  On October 28, 2024,  Stripe, another business partner, notified Mazzoni Center that it was holding funds owed to the organization due to a directive from Defendant LCF to divert payments owed to the organization to Fundkite.  <u>See</u> Exhibit I to Shakir Declaration.

d.  On October 14, 2024 and again on October 21, 2024, insurance carrier CIGNA sent notice to Mazzoni Center that it had diverted payments owed to Mazzoni Center to Defendant LCF based on Defendant LCF's directive pursuant to its bogus lien. <u>See</u> Exhibit J to Shakir Declaration.

87.     Upon information and belief, Defendants LCF and Fundkite have asserted their UCC Lien filings to other funders, payers, business partners, and entities that owe Mazzoni Center money, further impacting Mazzoni Center's cash flow, as part of their unlawful collection

efforts to block or divert Mazzoni Center's accounts receivables.

88.     Upon information and belief, Defendants LCF and Fundkite asserted such liens in attempts to collect on the illegal loans via interstate telephone and internet communications.

89.     Defendants LCF and Fundkite have thereby sought to collect illegal debts pursuant to usurious agreements that were not entered into by Plaintiffs and now seek to pressure Plaintiffs by cutting off critical cash flow for Plaintiffs to continue offering critical services to the thousands of patients and prospective patients who rely on Mazzoni Center's services.

90.     As of the date of this filing, Mazzoni Center is aware of over $790,000.00 in payments owed to it but being withheld due to Defendants' unlawful assertion of the invalid UCC liens related to their illegal loans.  See Shakir Declaration at ¶¶ 24, 26.

91.     These withheld funds are critical to the continuation of Mazzoni Center's ability to perform health and wellness services and to meet payroll, pay employee benefits, and manage its programming for the regional community.

92.     Defendants LCF and Fundkite have also instituted legal actions against Plaintiffs seeking enforcement of the illegal LCF Loan and illegal Fundkite Loan.  See Exhibits E and F to Shakir Declaration.  To wit, Defendant LCF has filed a legal action in Nassau County in the State of New York, seeking to enforce the LCF Loan against Plaintiffs.  See Exhibit E to Shakir Declaration.  Defendant Fundkite filed and then withdrew an action to freeze Mazzoni Center's bank accounts, and has a current demand for arbitration pending before an organization called "Rapid Ruling" against Mazzoni Center.  See Exhibit F to Shakir Declaration. Mazzoni Center has challenged such legal actions and is defending itself in those actions in the New York courts.

**COUNT I**

**(against Defendants LCF, Kleiber, Parker, John and Jane Doe Brokers and John and Jane Doe Investors)**

**RICO (18 U.S.C. §§ 1961-68)**

93.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

**A. The Unlawful Activity**

94.     Many states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan. Specifically New York defines interest rates above 16% as usurious, and above 25% criminally so.  See N.Y. Gen. Oblig. L. § 5-501; see also Adar Bays, LLC v. GeneSYS ID, Inc., 28 F.4th 379, 382 (2d Cir. 2022).

95.     The effective interest rate on the LCF Loan was at a minimum 55%, and increases to 61% when the other fees are added to the principal as an additional cost on its borrowing.

96.     Thus, the LCF Loan is a usurious loan purporting to charge more than twice the maximum amount of interest allowable under New York law.

**B. Culpable Persons.**

97.     Defendants Kleiber and Parker are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is an individual capable of holding a legal interest in property.

98.     Defendant Parker is the Chief Executive Officer of Defendant LCF.

99.     Defendant Kleiber is the Chief Operating Officer of Defendant LCF and the signatory on the LCF Loan.

**C. The Enterprise.**

100.     Defendants LCF, Kleiber, Parker, John and Jane Doe investors, and John and Jane Doe Brokers constitute an Enterprise (the "LCF Enterprise") within the meaning of 18 U.S.C. §§

1961(4) and 1962(c).

101.    The LCF Enterprise is associated in fact through relations of ownership and/or control for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the LCF Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

102.    The members of the LCF Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the LCF Enterprise to small businesses throughout the United States.

103.    The LCF Enterprise consists of at least the following entities: LCF Group, Inc., Kleiber, Parker, John and Jane Doe Investors, and John and Jane Doe Brokers.

104.    The debt, including such debt evidenced by the LCF Loan, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York law.

105.    Since at least 2011 and continuing through the present, the members of the LCF Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

106.    The LCF Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the LCF Enterprise

constitutes a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**D.    The Roles of the RICO Persons in Operating the LCF Enterprise, and the roles of Defendant LCF and John and Jane Doe Brokers and Investors within the Enterprise.**

107.    The RICO Persons have organized themselves and the LCF Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

**i.    The LCF Enterprise Principals: Defendants  Kleiber and Parker**

108.    Kleiber and Parker are principals of the LCF Enterprise ("the Principals"). Together they are responsible for the day-to-day operations of the LCF Enterprise and have final say on all business decisions of the LCF Enterprise including, without limitation, which usurious loans the LCF Enterprise will fund, how such loans will be funded, which of John and Jane Doe Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

109.    In their capacity as principals, Kleiber and Parker are responsible for creating, approving and implementing the policies, practices and instrumentalities used by the LCF Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the LCF Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the LCF Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) the form and process(es) used by the LCF Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, the LCF Loan extended to Ms. Tritinger.

110. Kleiber and Parker have taken actions and, directed other members of the LCF Enterprise to take actions necessary to accomplish the overall goals and purposes of the LCF Enterprise including directing the affairs of the LCF Enterprise, funding the LCF Enterprise, directing members of the LCF Enterprise to collect upon the unlawful loans and executing legal documents in support of the LCF Enterprise.

111. Kleiber and Parker have ultimately benefited from the LCF Enterprise's funneling of the usurious loan proceeds to the other LCF Enterprise members.

### ii. The Enterprise MCA Company: Defendant LCF

112. Defendant LCF is a distinct corporate entity and maintains officers, books, records, and bank accounts independent of the other LCF Enterprise members ("the LCF Enterprise MCA Company").

113. The Principals have operated the LCF Enterprise MCA Company as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the LCF Enterprise, the LCF Enterprise MCA Company has: (i) entered into contracts with brokers to solicit borrowers for the LCF Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determined the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant credit agreements or so-called agreements for purchase and sale of future receivables ("PSFRA") on behalf of the LCF Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the LCF Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

114. In this case, the LCF Enterprise MCA Company, through Defendants Kleiber and

Parker and/or John and Jane Doe Brokers: (i) solicited Ms. Tritinger as a borrower; (ii) pooled funds from Investors to fund the agreement; (iii) underwrote the agreement; (iv) entered into the agreement; and (v) collected upon the unlawful debt evidenced by the agreement by instituting legal actions, filing unlawful UCC Liens to block payments to Mazzoni Center, and sent correspondence to Mazzoni Center's business partners, payers, and funders diverting payments lawfully due to Mazzoni Center to LCF Group.

### E. Interstate Commerce

115.    The LCF Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

116.    Specifically, members of the LCF Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the LCF Enterprise to entities in New York, and throughout the United States via extensive use of interstate emails and other electronic communications, mail, internet solicitation, wire transfers and bank withdrawals processed through an automated clearing house.

117.    In the present case, all communications between the members of the LCF Enterprise, the LCF Enterprise MCA Company, John and Jane Doe Investors, and John and Jane Doe Brokers were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the LCF Enterprise used interstate emails and/or telecommunications to originate, underwrite, service and seek collection upon the agreements, fund the advances under each of the agreements and assert the UCC liens in connection with the unlawful LCF Loan, and communicate with Ms. Tritinger and, ostensibly, other potential borrowers across the country.

118.    In addition, at the direction of Defendants, the LCF Loan was executed in a state

outside of New York, and a copy of the signed LCF Loan was sent from Pennsylvania by Ms. Tritinger to the LCF Enterprise, through Defendants, at their offices in New York via electronic mail and/or other electronic telecommunications.

**F. Injury and Causation.**

119.     Plaintiffs have and will continue to be injured in their business and property by reason of the LCF Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

120.     The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to thousands of dollars in improperly collected criminally usurious loan payments through diversion of funds owed to Mazzoni Center, and hundreds of thousands of dollars in withheld payments to Plaintiffs due to Defendants' collection efforts. Plaintiffs cannot meet their operational costs such as payroll and other programmatic expenses due to the diverted and/or withheld third party accounts payable funds.

121.     Under controlling New York law, the LCF Loan is void *ab initio*. See N.Y. Gen. Oblig. L. § 5-501; see also Adar Bays, LLC v. GeneSYS ID, Inc., 28 F.4th 379, 382 (2d Cir. 2022).

122.     Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendant LCF's criminal activities and defending the lawsuits and other legal actions initiated by Defendant LCF in its assertion of the illegal LCF Loan.

123.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## COUNT II

**(against Defendants LCF, Kleiber, Parker, John and Jane Doe Brokers and John and Jane Doe Investors)**
**Conspiracy under 18 U.S.C. § 1962(d)**

124.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

125.   Defendants LCF, Kleiber, Parker, John and Jane Doe Brokers, and John and Jane Doe Investors have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with members of the LCF Enterprise to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

126.   By and through each of the LCF Enterprise members' business relationships with one another, their close coordination with one another in the affairs of the LCF Enterprise, and frequent email communications among the LCF Enterprise members concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, Defendants LCF, Kleiber, Parker, John and Jane Doe Brokers, and John and Jane Doe Investors knew the nature of the LCF Enterprise and Defendant knew that the LCF Enterprise extended beyond each LCF Enterprise Member's individual role. Moreover, through the same connections and coordination, these Defendants knew that the other LCF Enterprise Members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

127.   Defendants LCF, Kleiber, Parker, John and Jane Doe Brokers, and John and Jane Doe Investors each agreed to facilitate, conduct, and participate in the conduct, management, or operation of the LCF Enterprise's affairs in order to collect upon unlawful debts, including the LCF Loan, in violation of 18 U.S.C. § 1962(c). In particular, each of these Defendant was a knowing, willing, and active participant in the LCF Enterprise and its affairs, and each of the LCF Enterprise members shared a common purpose, namely, the orchestration, planning,

preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the LCF Loan.

128. Defendants LCF, Kleiber, Parker, John and Jane Doe Brokers, and John and Jane Doe Investors agreed to facilitate, conduct, and participate in the conduct, management, or operation of the LCF Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

129. The participation and agreement of Defendants LCF, Kleiber, Parker, John and Jane Doe Brokers, and John and Jane Doe Investors and each LCF Enterprise Member was necessary to allow the commission of this scheme.

130. Plaintiffs have been and will continue to be injured in their business and property by reason of Defendants LCF, Kleiber, Parker, John and Jane Doe Brokers, and John and Jane Doe Investors' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

131. The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected loan payments through diversion of accounts receivable, lost profits, lost operating funds and accounts receivable, lost good will, frozen or withheld assets in the amounts of thousands of dollars, and attorney's fees and costs in defending the legal action brought by Defendant LCF to enforce its illegal LCF Loan.

132. Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities in this matter.

133. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

**COUNT III**
**(against Defendants Fundkite, Shvartz, John and Jane Doe Brokers and John and Jane Doe**
**Investors)**
**RICO (18 U.S.C. §§ 1961-68)**

134.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

**A. The Unlawful Activity**

135.    Many states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan. Specifically New York defines interest rates above 16% as usurious, and above 25% criminally so.  See N.Y. Gen. Oblig. L. § 5-501; see also Adar Bays, LLC v. GeneSYS ID, Inc., 28 F.4th 379, 382 (2d Cir. 2022).

136.    The effective interest rate on the Fundkite Loan was, at minimum, 44% and increased to 48% when adding in the fees contemplated as an additional cost of borrowing the principal.

137.    Thus, the Fundkite Loan is a usurious loan purporting to charge more than twice the maximum amount of interest allowable under New York law.

**B. Culpable Persons.**

138.    Defendant Shvartz is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is an individual capable of holding a legal interest in property. Defendant Shvartz is the CEO of Fundkite.

**C. The Enterprise.**

139.    Defendants Fundkite, Shvartz, John and Jane Doe Investors, and John and Jane Doe Brokers constitute an Enterprise (the "Fundkite Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

140.    The Fundkite Enterprise is associated in fact through relations of ownership

and/or control for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Fundkite Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

141. The members of the Fundkite Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Fundkite Enterprise to small businesses throughout the United States.

142. The Fundkite Enterprise consists of at least the following entities: AKF, Inc. d/b/a Fundkite, Shvartz, John and Jane Doe Investors, and John and Jane Doe Brokers.

143. The debt, including such debt evidenced by the Fundkite Loan, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Law.

144. Since at least 2015 and continuing through the present, the members of the Fundkite Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees and illegal loans through electronic wires.

145. The Fundkite Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Fundkite Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**D. The Roles of the RICO Person in Operating the Enterprise, and the roles of Defendant Fundkite and John and Jane Doe Investors and John and Jane Doe Brokers within the Enterprise.**

146. The RICO Person has organized himself and the Fundkite Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

**i. The Enterprise Principal: Shvartz**

147. Shvartz is a principal of the Fundkite Enterprise ("the Principal"). He is responsible for the day-to-day operations of the Fundkite Enterprise and has final say on all business decisions of the Fundkite Enterprise including, without limitation, which usurious loans the Fundkite Enterprise will fund, how such loans will be funded, which of John and Jane Doe Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

148. In his capacity as Principal, Shvartz is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Fundkite Enterprise to accomplish its common goals and purposes including: (i) the form of merchant cash advance agreements used by the Fundkite Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Fundkite Enterprise's collection of an unlawful debt; (ii) the method of collecting the weekly payments via ACH withdrawals; and (iii) forms used by the Fundkite Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make and collect upon the unlawful loans issued to borrowers from Fundkite including, without limitation, the Fundkite Loan extended to Ms. Tritinger.

149.     Defendant Shvartz has taken action and, directed other members of the Fundkite Enterprise to take actions necessary to accomplish the overall goals and purposes of the Fundkite Enterprise including directing the affairs of the Fundkite Enterprise, funding the Fundkite Enterprise, directing members of the Fundkite Enterprise to collect upon the unlawful loans and executing legal documents in support of the Fundkite Enterprise.

150.     Shvartz has ultimately benefited from the Fundkite Enterprise's funneling of the usurious loan proceeds to the other Fundkite Enterprise members.

### ii. The Enterprise MCA Company:  AKF, Inc. d/b/a Fundkite.

151.     AKF, Inc. d/b/a Fundkite, is a distinct corporate entity and maintains officers, books, records, and bank accounts independent of the other Fundkite Enterprise members ("the Fundkite Enterprise MCA Company").

152.     The Principal has operated the Fundkite Enterprise MCA Company as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Fundkite Enterprise, the Fundkite Enterprise MCA Company has: (i) entered into contracts with John and Jane Doe brokers to solicit borrowers for the Fundkite Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of John and Jane Doe Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determined the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant cash advance or PSFRA agreements on behalf of the Fundkite Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Fundkite Enterprise to collect upon unlawful debts; and (v) obtained judgments in its name to further collect upon the unlawful debts.

153.     In this case, the Fundkite Enterprise MCA Company, through Defendant Shvartz:

(i) solicited Ms. Tritinger as a borrower; (ii) pooled funds from John and Jane Doe Investors to fund the agreement; (iii) underwrote the agreement; (iv) entered into the agreement; and (v) collected upon the unlawful debt evidenced by the agreement by instituting legal actions, filing unlawful UCC Liens to block payments lawfully due to Mazzoni Center, and to divert them to Fundkite.

### G. Interstate Commerce

154.    The Fundkite Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

155.    Specifically, members of the Fundkite Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Fundkite Enterprise to entities in New York, and throughout the United States via extensive use of interstate emails, mail, internet solicitation, wire transfers and bank withdrawals processed through an automated clearing house. Upon information and belief, Fundkite also maintains offices in the state of Florida.

156.    In the present case, all communications between the members of the Fundkite Enterprise, Defendant Shvartz, the Fundkite Enterprise MCA Company, John and Jane Doe Investors, and John and Jane Doe Brokers were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Fundkite Enterprise used interstate emails and/or telecommunications to originate, underwrite, service and seek collection upon the agreements, fund the advances under each of the agreements and assert the UCC liens in connection with the unlawful Fundkite Loan against Mazzoni Center.

157.    In addition, at the direction of Defendants Fundkite and Shvartz and other members of the Fundkite Enterprise, the Fundkite Loan was executed in a state outside of New

York, and a copy of the signed Fundkite Loan was sent from Pennsylvania by Ms. Tritinger to the Fundkite Enterprise, through Defendants, at their offices in New York and/or Florida via electronic mail and/or other electronic communications.

### H. Injury and Causation.

158.    Plaintiffs have and will continue to be injured in their business and property by reason of the Fundkite Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

159.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, thousands of dollars in improperly collected criminally usurious loan payments through diversion of funds owed to Mazzoni Center, and hundreds of thousands of dollars in withheld payments to Plaintiffs due to Defendants unlawful collection efforts. Plaintiffs cannot meet their operational costs such as payroll and programmatic expenses due to the diverted and/or withheld third party accounts payable funds being blocked by Defendants' actions.

160.    Under controlling New York law, the Fundkite Loan is void *ab initio*. <u>See</u> N.Y. Gen. Oblig. L. § 5-501; <u>see also</u> Adar Bays, LLC v. GeneSYS ID, Inc., 28 F.4th 379, 382 (2d Cir. 2022).

161.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendant Fundkite's criminal activities and defending the lawsuits and other legal actions initiated by Defendant Fundkite.

162.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**COUNT IV**
**(against Defendants Fundkite, Shvartz, John and Jane Doe Brokers and John and Jane Doe Investors)**
**Conspiracy under 18 U.S.C. § 1962(d)**

163.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

164.     Defendants Fundkite, Shvartz, John and Jane Doe Brokers, and John and Jane Doe Investors have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with members of the Fundkite Enterprise to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

165.     By and through each of the Fundkite Enterprise Member's business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among them concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Fundkite Loan, Defendants Fundkite, Shvartz, John and Jane Doe Brokers, and John and Jane Doe Investors knew the nature of the Fundkite Enterprise and these Defendants knew that the Fundkite Enterprise extended beyond each Fundkite Enterprise Member's individual role. Moreover, through the same connections and coordination, these Defendants knew that the other Fundkite Enterprise Members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

166.     Defendants Fundkite, Shvartz, John and Jane Doe Brokers, and John and Jane Doe Investors each agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Fundkite Enterprise's affairs in order to collect upon unlawful debts, including the Fundkite Loan, in violation of 18 U.S.C. § 1962(c). In particular, each of these Defendants was a knowing, willing, and active participant in the Fundkite Enterprise and its affairs, and each of the Fundkite Enterprise Members shared a common purpose, namely, the orchestration,

planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Fundkite Loan.

167. Defendants Fundkite, Shvartz, John and Jane Doe Brokers, and John and Jane Doe Investors agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Fundkite Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

168. The participation and agreement of Defendants Fundkite, Shvartz, John and Jane Doe Brokers, and John and Jane Doe Investors and each Fundkite Enterprise Member was necessary to allow the commission of this scheme.

169. Plaintiffs have been and will continue to be injured in their business and property by reason of the Fundkite Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

170. The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected loan payments through diversion of accounts receivable, lost profits, lost operating funds and accounts receivable, lost good will, and attorney's fees and costs in defending a legal action to enforce the illegal Fundkite Loan.

171. Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting the Fundkite Defendants' criminal activities in this action.

172. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Fundkite Defendants.

## COUNT V
## FIFTH CAUSE OF ACTION
### (Against All Defendants)
### DECLARATORY JUDGEMENT

173.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

174.     A declaratory judgment is required by this Court to determine the rights and obligations of the parties with respect to the LCF Loan and Fundkite Loan Agreements, which are void as a matter of law.

175.     A declaratory judgment is required by this Court declaring that the Defendants have no right to enforce any purported security rights against Plaintiffs and that Defendants are barred from enforcing the unconscionable and illegal loans with usurious interest rates.

176.     Under controlling New York law, both the LCF Loan and Fundkite Loan are void *ab initio*. See N.Y. Gen. Oblig. L. § 5-501; see also Adar Bays, LLC, 28 F.4th at 382.  In other words, they are usurious and, thus, void.

177.     A declaratory judgment is also required by this Court to determine the rights and obligations of the parties in light of the fact that Ms. Tritinger purported to bind Plaintiffs to the illegal loan agreements issued by Defendants without authority.

178.     To wit, Ms. Tritinger made facially apparent misrepresentations in applying for the LCF Loan and Fundkite Loan and Defendants LCF and Fundkite failed to perform reasonable diligence in determining whether she had the authority to act on behalf of Plaintiffs in entering into loan agreements in the amounts of hundreds of thousands of dollars with them.

179.     Because the LCF Loan and Fundkite Loan are void, illegal, usurious loans, and because Ms. Tritinger did not have actual or apparent authority to bind Plaintiffs to those agreements, the Court should enter declaratory judgment on behalf of Plaintiffs, declare the LCF

Loan and Fundkite loan void, and order Defendants to cease and desist from any and all legal and collection actions and activities to enforce them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, individually, jointly and/or severally as follows:

(a)     Declare that the LCF Loan and the Fundkite Loan are null and void because they are usurious loans under New York law;

(b)     Declare that the LCF Loan and Fundkite Loan are null and void because Defendants' attempts to enforce them are illegal under the federal RICO statute;

(c)     Declare that the LCF Loan and Fundkite Loan are null and void because Plaintiffs never entered into them, nor did anyone with the actual or apparent authority on their behalf do so;

(d)     Permanently enjoin Defendants, or anyone acting in concert with or on behalf of Defendants, from enforcing or seeking to collect on the LCF Loan and Fundkite Loan, including the immediate withdrawal and rescission of requests to freeze or divert Plaintiffs' accounts receivable related to such illegal loans and/or based upon the filing of improper UCC liens in connection with them, asserting any security interest in Plaintiffs' current and future assets, accounts, and receivables, and from prosecuting any and all legal actions, including court actions or private arbitration actions in other forums, against Plaintiffs to enforce the illegal agreements at issue;

(e)     Issue a preliminary injunction prohibiting Defendants, or anyone acting in concert with or on behalf of Defendants, from enforcing or seeking to collect on the LCF Loan and Fundkite Loan and/or asserting UCC Liens or other security interests against

Plaintiffs' current and future assets, accounts, and receivables, and prosecuting any and all

legal actions, including court actions or private arbitration actions, against Plaintiffs to enforce

the illegal agreements at issue, and ordering the immediate withdrawal of any such actions

with prejudice;

      (f)      Award Plaintiffs treble damages arising out of their RICO claims;

      (g)      Award Plaintiffs direct and consequential damages as appropriate, including pre-

judgment interest;

      (h)      Order Defendants Shvartz, Kleiber, and Parker, and John and Jane Doe

Investors and Brokers to divest from any and all financial interest in Defendants LCF and

Fundkite and any other RICO-violative enterprises pursuant to 18 U.S.C. § 1961(a).

      (i)      Award Plaintiffs their costs and reasonable attorneys' fees incurred in this

action;

      (j)      Award pre-judgment interest; and

      (k)      Award all such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of eight (8) members on all counts so triable.

Respectfully submitted,

Dated:  November 5, 2024        /s/  *Geoffrey D. Bruen*
                    Geoffrey D. Bruen, Esq. (Pa. I.D. No. 205956)
                    **MAZZONI CENTER**
                    1348 Bainbridge Street
                    Philadelphia, PA 19147
                    (267) 419-9849 (tel)/(215) 563-0664 (fax)
                    Email: gbruen@mazzonicenter.org
                    **Attorney for Plaintiffs**

**CERTIFICATE OF SERVICE**

I, Geoffrey D. Bruen, Esquire, Attorney for Plaintiffs in the above-named matter, do hereby certify that on this 5th day of November, 2024 or as soon thereafter as service could be effectuated, the foregoing Complaint was served on the following parties via the method set forth below:

***VIA PERSONAL SERVICE/HAND DELIVERY:***

        The LCF Group, Inc.
        3000 Marcus Ave., Suite 2W15
        Lake Success, NY 11042

        Robert Kleiber, Chief Operating Officer
        LCF Group, Inc.
        3000 Marcus Ave., Suite 2W15
        Lake Success, NY 11042

        Andrew Parker, Chief Executive Officer
        LCF Group, Inc.
        3000 Marcus Ave., Suite 2W15
        Lake Success, NY 11042

        AKF, Inc. d/b/a Fundkite
        88 Pine Street, Suite 2430
        New York, NY 10005

        Aleksander Shvartz, Chief Executive Officer
        AKF, Inc. d/b/a Fundkite
        88 Pine Street, Suite 2430
        New York, NY 10005

        /s/ *Geoffrey D. Bruen*
        Geoffrey D. Bruen, Esq. (Pa. I.D. No. 205956)
        **MAZZONI CENTER**
        1348 Bainbridge Street
        Philadelphia, PA 19147
        (267) 419-9849 (tel)/(215) 563-0664 (fax)
        Email: gbruen@mazzonicenter.org
        **Attorney for Plaintiffs**