## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MAZZONI CENTER** and **1334-48 BAINBRIDGE STREET LLC** | : | |
| | : | |
| Plaintiffs, | : | |
| | : | CASE NO. _____ |
| v. | : | |
| | : | |
| **LCF GROUP, INC., AKF, INC. d/b/a FUNDKITE, ALEKSANDER SHVARTZ, ROBERT KLEIBER, ANDREW PARKER, AND JOHN AND JANE DOES**, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs Mazzoni Center ("Mazzoni Center") and 1334-48 Bainbridge Street LLC ("1348 Bainbridge"), by and through their undersigned counsel, hereby submit this Memorandum of Law In Support of their Motion For A Temporary Restraining Order and Preliminary Injunction (the "Motion").

As set forth in the accompanying Complaint and the supporting Declaration of Sultan Shakir, President and Executive Officer of Mazzoni Center, Defendants' assertion of illegal and usurious loans against Plaintiffs, and their actions in freezing Plaintiffs' receivables violate the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO") and New York law. The underlying agreements are also usurious and void *ab* initio under New York law. Moreover, Plaintiffs never entered into such agreements with Defendants LCF and Group, Inc. ("LCF"), and AKF Inc. d/b/a Fundkite ("Fundkite").

1

Accordingly, Plaintiffs respectfully request that this Court issue an order (i) enjoining the Defendants from withdrawing or attempting to withdraw funds from Plaintiffs' financial accounts; (ii) enjoining the Defendants from freezing Plaintiffs' current and future accounts, assets, and receivables; (iii) enjoining the Defendants from asserting UCC Liens or other purported security interests against Plaintiffs' current and future assets and accounts receivable; (iv) enjoining Defendants from prosecuting any and all legal actions, including court actions and private arbitration actions, against Plaintiffs to enforce the illegal agreements at issue in this matter; and (v) directing Defendants to retract any and all UCC Lien letters sent to third parties regarding or relating to Plaintiffs.

## I.    __INTRODUCTION__

As of the date of this filing, Defendants LCF and Fundkite have stopped hundreds of thousands of dollars owed to Mazzoni Center from reaching the organization, significantly stemming its cash flow and threatening its ability to function.  Defendants have sent out improper UCC lien notices to various business partners who owe Mazzoni Center money to place a stranglehold on the organization by shutting down its critical cash flow.  Defendants' actions have jeopardized Mazzoni Center's ability to meet payroll, buy the necessary supplies to operate its business, meet its monthly obligations, and continue to offer the life-saving medical care, legal services, housing, and other health and wellness services relied on by thousands in and around Philadelphia.  Because the illegal loans are unenforceable, because Mazzoni Center never entered into them, and because the Defendants' actions have threatened to close Mazzoni Center's doors, the Court should grant Plaintiffs' Motion and enjoin Defendants from their bad acts pending resolution of the instant litigation.

## II.    **FACTUAL BACKGROUND**

### A.    **Background and the Parties**

Mazzoni Center is a respected and nationally recognized 501(c)(3) healthcare non-profit that has served the health and wellness needs of the LGBTQIA+ community and other underserved communities in the Philadelphia region and beyond for over forty years. The organization does not turn away patients who cannot afford care and offers critical health and wellness services that include: primary care, behavioral health treatment, HIV and STI community testing and treatment, linkage to HIV treatment and pre-exposure prophylaxis (PrEP) to prevent HIV transmission, housing subsidy services, free legal services, and a food bank for the food insecure.

The organization was recently designated a Federally Qualified Health Center ("FQHC") look-alike, recognizing the quality of the care and services it provides, its charitable mission to provide care regardless of the ability to pay, and the critical need for the services it provides in the Philadelphia region.

The organization offers a number of critical health and wellness services, including primary care, behavioral health treatment, HIV and STI community testing and treatment, linkage to HIV treatment and pre-exposure prophylaxis ("PrEP") to prevent HIV transmission, housing services, free legal services, and a food bank for food insecure community members.  In the period from October 1, 2023 to September 30, 2024, Mazzoni Center conducted over 22,000 medical visits for over 8,000 unique patients, nearly 6,000 behavioral health and individual and group therapy visits, and performed HIV and STI testing for nearly 7,000 individuals.  These services are critical to the city and the region.

As a non-profit, Mazzoni Center relies on grant funding, government reimbursements,

third party billing, and revenue from the federal 340(b) drug program to support the care it offers and to continue operations. Any income earned by the organization is reinvested into its programming and to pay operating expenses such as payroll and employee benefits. The organization has a staff of about 160, approximately two-thirds of which is unionized. The organization covers 90-95% of health insurance premiums for individual staff and offers a retirement plan and other employee benefits. The monthly cost of payroll and benefits alone is over $830,000.00.

As with many non-profit health care institutions across the United States, Mazzoni Center has faced financial difficulties during and in the aftermath of the COVID-19 pandemic and has worked to recover from the fiscal ravages of this difficult period. While there is a favorable long term economic picture for the organization, it has continued to struggle with cash flow issues in 2024 while working to implement some of the benefits of its FQHC look-alike status.

Defendants LCF and Fundkite are part of the merchant cash advance ("MCA") industry, This industry preys upon cash-strapped and struggling small businesses by offering so-called future accounts receivable purchase agreements, also called merchant cash advance agreements. The MCA agreements they offer purport to evade usury laws and other regulation by framing themselves as sales contracts when, in actuality, they function as illegal and usurious loans.

Although for a long while the MCA business model flew under the radar of regulators, courts and government actors have begun to see through the illusory nature of MCA agreements for what they really are – illegal and unenforceable loans.[1] Indeed, earlier this year, the New York Attorney General filed a $1.4 billion lawsuit against MCA lenders after obtaining a

---

[1] https://www.jdsupra.com/topics/merchant-cash-advance-mca/ (Last visited November 4, 2024). https://www.jdsupra.com/legalnews/new-york-state-attorney-general-wins-77-8389935/ (Last visited November 4 2024).

successful $77 million judgment against another group of such lenders.[2]

In addition, a number of courts, including this one, have upheld usury and RICO claims brought by plaintiffs suffering under the yoke of MCA agreements similar to those at issue here. See, e.g. Fleetwood Servs., LLC v. Complete Bus. Sols. Grp., 374 F. Supp. 3d 361 (E.D. Pa. 2019).

### B.    Rachelle Tritinger's Unauthorized Actions

On or about September 10, 2024, Mazzoni Center's now-former Executive Financial Officer, Rachelle Tritinger ("Ms. Tritinger") signed paperwork purporting to enter into a loan transaction with Defendant LCF on behalf of Mazzoni Center (the "LCF Loan").  On September 11, 2024, she signed paperwork purporting to enter into an additional loan transaction with Defendant Fundkite on behalf of Mazzoni Center (the "Fundkite Loan"). As part of the documents Ms. Tritinger signed, she purported to grant a security interest in Mazzoni Center's future receivables with both lenders.

All of these actions were taken without the authority, knowledge, or approval of Plaintiffs and in violation of Mazzoni Center's internal policies. In fact, under these internal policies, Ms. Tritinger did not have authority to enter into agreements that had a value of greater than $10,000.00 without advanced approval of the President and Executive Officer, Sultan Shakir.  In addition, all legal agreements are required to be reviewed by Mazzoni Center's General Counsel before they can be executed on behalf of the organization.

On or about September 12, 2024, Mazzoni Center became aware that Ms. Tritinger had signed loan agreement documents with LCF and Fundkite and that she had submitted paperwork in support of such agreements with false or facially inaccurate representations.  Indeed,

---

[2] https://www.jdsupra.com/legalnews/new-york-attorney-general-brings-1-4-2153020/ (Last visited November 4, 2024).

throughout the application documents and the LCF Loan and Fundkite Loan documents, Ms. Tritinger claimed she was the owner, principal, and/or sole proprietor of Mazzoni Center, a non-profit corporation that has no ownership by its very nature.

### C.     The Illegal LCF and Fundkite Agreements

The LCF Loan purports to be a sales agreement for the purchase of Mazzoni Center's future receivables but is, in actuality, a usurious and illegal loan.  The document provides that, in exchange for $234,570.00 in cash – a purchase price of $250,000.00 minus "origination fees" of $15,430.00 – Mazzoni Center was to pay back LCF $362,500.00 plus a monthly maintenance fee. This was to be done through daily electronic debits of $6,041.67 from the organization's operating account by LCF until the loan was paid off.

The loan contemplates a number of draconian fees and default provisions that make clear absolute payoff was required under its terms.  For example, in the event of a default – defined in pertinent part as a "violat[ion] of any term or covenant in this Agreement" – there is an acceleration clause that provides that 100% of the "Purchased Amount" becomes due as well as a a breach fee of $$2,500.00 and a "liquidated default" fee of 33.33% of whatever balance remains at the time.  Moreover, pursuant to the "Power Of Attorney" provisions of the LCF Loan, LCF had broad powers to direct and control the finances of the debtor and direct payment of the full collateral to itself.  Taking into account the cost of the capital provided in the LCF Loan document, the LCF Loan had an effective interest rate of 55%, not accounting for fees, and approximately 61% with fees included as additional interest.

The Fundkite Loan similarly purports to be in the form of an agreement to purchase Mazzoni Center's future receivables but is, in actuality, a usurious and illegal loan. The document provides that, in exchange for a $479,815.00 cash payment – $500,000.00 minus an

"origination fee" of $20,185.00 – Mazzoni Center was to pay back $690,000.00, remitted in electronic debits by Fundkite in the amount of $24,642.86 weekly from Mazzoni's bank account. The loan, thus, has an effective interest rate of 44% not counting fees, and 48% with their inclusion on top of the principal. As with the LCF Loan, the Fundkite Loan contains a number of harsh default provisions that require absolute payoff along with penalty fees.

Both loans are void under New York's usury laws, which provide that an interest rate above 16% is usurious and voids any agreement that contemplates it; any interest rate above 25% is criminally usurious. See N.Y. Gen. Oblig. L. § 5-501; N.Y. Penal Law § 190.40; see also Adar Bays, LLC v. GeneSYS ID, Inc., 28 F.4th 379, 382 (2d Cir. 2022).

### D. Mazzoni Center's Actions After Discovering Ms. Tritinger's Misdeeds

After Mazzoni Center's discovery of Ms. Tritinger's completion of the LCF Loan and Fundkite Loan paperwork with LCF and Fundkite, it was discovered that both companies had transferred funds into Mazzoni Center's operating account, most of which had already been spent by Ms. Tritinger. Mazzoni Center was able to preserve approximately $70,000.00 of the money transferred into its accounts by Defendants LCF and Fundkite at Ms. Tritinger's direction, which was set aside in a secure account. After further investigation into what had occurred, Mazzoni Center offered to return the principal funds transferred by LCF and Fundkite to them. These offers were refused by both Defendants.

### E. Defendants' Assertion of Legal Actions and Improper Liens Under the Illegal Loan Agreements and Attempts to Place A Stranglehold on the Organization

Defendants LCF and Fundkite both attempted to draw funds out of Mazzoni Center's operating account electronically in attempts to collect on their illegal loans. They also initiated legal actions to enforce their illegal loan agreements against Mazzoni Center and 1348 Bainbridge, against which actions Plaintiffs are actively defending.

7

In addition, and at the crux of this filing, the LCF and Fundkite Defendants have asserted improper UCC liens against Mazzoni to its business partners, effectively freezing the organization's accounts receivable and attempting to place a stranglehold on the non-profit. These business partners to date include, at least:

- The City of Philadelphia, which, as of the date of this filing, has frozen approximately $761.970.57 in funds owed to Mazzoni Center; and

- Stripe, Inc., which has frozen approximately $30,011.09 in funds owed to Mazzoni Center.

Moreover, at least one third-party payer of Mazzoni Center, CIGNA, redirected over $2,000.00 in payments owed to Mazzoni Center to Defendant LCF after LCF asserted its improper UCC Lien to that company.

Defendants have also contacted other payers of Mazzoni Center and have continued to assert their improper UCC liens in attempts to stifle cash flow to Mazzoni Center and collect their unlawful "debt" and enforce the illegal loan agreements into which Mazzoni Center never entered. The funds that are currently being withheld or diverted as a direct result of Defendants' actions and will continue to be withheld from other critical cash sources of the organization are vital to the continuation of Mazzoni Center's ability to perform health and wellness services and to meet payroll, pay employee benefits, meet its obligations, and manage its programming for the regional community. Indeed, these funds are necessary for the organization's very survival.

## III.    LEGAL ARGUMENT

### A.    Legal Standard

A district court properly grants a preliminary injunction where the plaintiff establishes: (1) a likelihood of success on the merits; (2) it will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the non-moving party; and (4) the public interest favors such relief. Miller v. Mitchell, 598 F.3d 139, 147 (3d Cir. 2010) (citing Child Evangelism Fellowship of New Jersey Inc. v. Stafford Twp. Sch. Dist., 386 F.3d 514, 524 (3d Cir. 2004)). The factors for granting an application for a temporary restraining order are the same as those for granting a preliminary injunction. Pileggi v. Aichele, 843 F. Supp. 2d 584, 592 (E.D. Pa. 2012).  Because Plaintiffs satisfy each of the four factors above, the Court should grant their motion for a temporary restraining order and preliminary injunction.

### B.    Plaintiffs Are Likely To Succeed On The Merits.

For the court to issue an injunction, a movant need not prove its entire case. Rather, the movant on a preliminary injunction "need only prove a *prima facie case, not a certainty* that he or she will win." Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001) (citation omitted) (emphasis added). The Third Circuit requires only a "reasonable likelihood" of success on the merits. Saudi Basic Indus. Corp. v. Exxon Corp., 364 F.3d 106, 112 (3d Cir. 2004) (citing Allegheny Energy, Inc. v. DQE, Inc., 171 F.2d 153, 158 (3d Cir. 1999)).

Plaintiffs have filed a Complaint asserting three causes of action against each of the Defendants: Count I asserts claims against the LCF Defendants under RICO: 18 U.S.C. § 1962; Count II asserts RICO conspiracy claims under 18 U.S.C. § 1962(d) against the LCF Defendants; Count III asserts claims against the Fundkite Defendants under RICO: 18 U.S.C. § 1962; Count IV asserts RICO conspiracy claims under 18 U.S.C. § 1962(d) against the Fundkite Defendants; and Count V seeks Declaratory Relief against all Defendants due to the fact that Plaintiffs never

entered into the LCF Loan or Fundkite Loan – *i.e.*, Ms. Tritinger did not act with actual or apparent authority – and the fact that they are illegal loans under state and federal law.

Indeed, the underlying LCF and Fundkite Loans constitute criminally usurious loans. There is a strong likelihood of success on the merits for each of the five causes of action in the Complaint, and therefore a TRO and Preliminary Injunction is mandated to maintain the status quo and to prevent the continued irreparable harm towards the Plaintiffs pending resolution of this litigation. Defendants' actions in seeking to enforce the LCF Loan and Fundkite Loan have already caused irreparable harm to the Mazzoni Center in freezing hundreds of thousands of dollars in its accounts receivable and continue to threaten the ultimate and irreversible destruction of the organization.

Here, Plaintiffs can make out a *prima facie* case for all five claims, even though they only have to show that they are reasonably likely to succeed on **any one** of their claims to obtain injunctive relief. Air Products and Chem., Inc. v. Inter-Chemical LTD, 2003 WL 22917491, *9 (E.D. Pa. Dec. 2, 2003).

**1.** **Plaintiffs have Demonstrated a Likelihood of Success on their RICO Claims Related to Wire Fraud, Defendants' Collection of an Unlawful Debt, and Usury.**

Plaintiffs are likely to succeed on their claims of wire fraud and unlawful debt under RICO, based on the usurious loans Defendants seek to enforce and collect on. In Fleetwood, this Court sustained a RICO claim on motion to dismiss that involving a disguised usurious loan, concluding that wire fraud and the collection of an unlawful debt were both sufficient to support plaintiffs' claims. Fleetwood Servs., LLC v. Complete Bus. Sols. Grp., 374 F. Supp. 3d 361 (E.D. Pa. 2019). In that case, this Court found that a complaint clearly met the applicable standard to establish a RICO wire fraud violation where it alleged:

> (1) a scheme to defraud borrowers and their guarantors by luring them into credit arrangements with illegal interest rates, despite Defendants' knowledge of the illegality of those rates, (2) the use of the wires...to further the scheme, and (3) Defendants engaged in this scheme with the intent to defraud (which may be averred generally).

Id. at 376.

Here, the facts similarly establish multiple counts of wire fraud by Defendants LCF and Fundkite's soliciting and obtaining former employee Rachelle Tritinger's signature on the illegal loans, seeking to collect on the loans through attempted electronic debits from Mazzoni Center's accounts, their assertion of improper UCC Liens to Mazzoni Center's third party payers in their attempts to collect on the illegal loans and, in the case of LCF, diverting payments to itself from Mazzoni Center through such assertion to one of its payers. LCF and Fundkite further committed wire and mail fraud by sending UCC Notices falsely representing that Mazzoni Center was in breach of their usurious loans and directing third party payers to divert payments rightfully owed to Mazzoni Center to themselves instead. As in Fleetwood, Defendants also communicated with Ms. Tritinger by email and telephone in regard to the usurious loans. Defendants also engaged in their scheme of usurious lending and collections with the intent to defraud, *i.e.* trap borrowers such as Ms. Tritinger in usurious loan agreements.

A RICO violation under 18 U.S.C. § 1962(c) can also be established through the collection of an unlawful debt, a theory of liability which requires no demonstration of pattern. See, e.g., Fleetwood, 374 F.Supp. 3d at 376; see also Lateral Recovery, LLC v. Capital Merch. Servs., LLC, 632 F. Supp. 3d 402 (S.D.N.Y. 2022) (sustaining RICO wire fraud and unlawful debt collection claims related to MCA agreement on motion to dismiss). Thus, in attempting to collect and enforce the LCF Loan and Fundkite Loans against Plaintiffs, Defendants further violated RICO.

This is so because the LCF Loan and Fundkite Loan agreements are in fact loans, regardless of their form or framing. The New York Court of Appeals' 2021 decision in <u>Adar Bays</u> enunciated several concepts critical to establishing that the MCA agreements here are, I actuality, loans. First, "[w]hen determining whether a transaction is a loan, substance—not form—controls." <u>Adar Bays, LLC v. GeneSYS ID, Inc.</u>, 37 N.Y.3d 320, 334 (2021). Second, "[u]surious intent is an essential element of usury and where usury does not appear on the face of the [agreement], usury is a question of fact." <u>Id.</u> at 338 (internal citations omitted). And, third, the MCA racket follows an old tradition of masking usurious loan transactions as sales of goods to avoid regulation: "Indeed, a common tool of lenders in the 1800s to avoid enforcement of usury law penalties—civil or criminal—was to disguise the loan as a 'sale of choses in action' exempted from the law." <u>Id.</u> at 342. The <u>Adar</u> court noted the long history of creative but usurious transactions in New York, and courts' duty to sniff them out, stating: "no matter what the disguise, if the court can see that the real transaction was the loan or forbearance of money at usurious interest, ***its plain and imperative duty is to so declare*.**" <u>Id.</u> (citations omitted) (emphasis added).

Thus, a court errs in disregarding allegations that a transaction is intended as a usurious loan merely because the face of the agreement purports to be something else. If the agreement contains provisions that show on the face of the agreement that it functions as an absolutely repayable loan, then a plaintiff carries their burden on that issue as a matter of law. <u>See, e.g.</u>, <u>Lateral Recovery LLC</u>, 632 F. Supp. 3d 402 at 452-53 (citing <u>OriginClear Inc. v. GTR Source, LLC</u>, No. 20-CV-7026-FPG, 2021 U.S. Dist. LEXIS 239013 (W.D.N.Y. Dec. 14, 2021)).

Even if an agreement does not facially have the features of a loan, this does not foreclose a plaintiff from bringing sufficient, plausible allegations of usury. As <u>Adar Bays</u> noted, there is a

tradition of such loans being disguised as legitimate transactions. <u>Adar Bays, LLC</u>, 37 N.Y.3d at 342. And as <u>Adar Bays</u> further noted, the intent question is factual. <u>Id.</u> at 336. If plaintiff has pled sufficient facts to raise a factual question as to the defendants' intent, the face of the written agreement will not preclude inquiry. In such cases, it can still be pled that the agreement is a sham and intended to disguise a loan agreement, as here.

Accordingly, multiple courts have sustained claims that an agreement labeled MCA – or some similar appellation, such as "PSFRA," as in the LCF Loan – is a loan when, in substance, it functions as one. In <u>Lateral Recovery</u>, the court discussed the appropriate analysis and a list of non-exclusive factors thoroughly. <u>Lateral Recovery</u>, 632 F. Supp. 3d. at *452-53. The court noted that an agreement that has a reconciliation provision, an indefinite term, and non-recourse provisions could still be deemed a loan if these provisions were illusory. <u>Id.</u> at 452. It further noted the decision in <u>Davis v. Richmond Capital Grp., LLC</u>, 194 A.D.3d 516, 150 N.Y.S.3d 2, 4 (N.Y. App. Div. 1st Dep't 2021), where the New York appellate division held a complaint sufficiently pled MCA agreements were loans subject to usury laws based on, *inter alia*, the discretionary nature of the reconciliation provisions and provisions authorizing defendants to collect on a personal guaranty in the event of the debtor business's inability to pay or bankruptcy. <u>Id.</u>

A number of other courts, including this one, have looked beyond the MCA label to sustain claims that MCA agreements may be disguised usurious loans. <u>See</u> <u>Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.</u>, 374 F. Supp. 3d 361 (E.D. Pa. 2019) (denying motion to dismiss and permitting RICO and usury claims brought against MCA agreements to go forward); <u>see also</u> <u>Lateral Recovery LLC v. Funderz.Net, LLC</u>, No. 1:22-cv-02170 (JLR), 2024 U.S. Dist. LEXIS 10134 (S.D.N.Y. Jan. 19, 2024) (denying motion for judgment on the pleadings and

upholding civil RICO conspiracy and collection of unlawful debt claims related to MCA agreements); New Y-Capp v. Arch Cap. Funding, LLC, No. 18-cv-3223 (ALC) 2022 U.S. Dist. LEXIS 180309 (S.D. N.Y. Sept. 30, 2022) (finding plaintiffs had pled adequate facts to establish MCA agreements were, in actuality, loans, and upholding RICO claims on motion to dismiss); Haymount Urgent Care PC v. GoFund Advance, LLC, 609 F. Supp. 3d 237 (S.D. N.Y. 2022) (same).

Here, as pled in Plaintiffs' Complaint, the LCF and Fundkite Loans had discretionary and vague reconciliation provisions, acceleration provisions, and security agreements that ensured absolute payoff (and payoff of even greater amounts when taking into account their unlawful penalty and other fee provisions). In other words, the lenders – LCF and Fundkite – bore no market risk. The agreements are, thus, loans and, as such, violate New York's usury laws which provide that an interest rate above 16% is usurious, and an interest rate above 25% is criminally usurious, voiding any agreement that contemplates it. See N.Y. Gen. Oblig. L. § 5-501; see also Adar Bays, LLC v. GeneSYS ID, Inc., 28 F.4th 379, 382 (2d Cir. 2022); Adar Bays, LLC v. GeneSYS ID, Inc., 179 N.E.3d 612 (2021); see also N.Y. Penal Law § 190.40. The effective interest rates in both agreements are more than twice the lawful rate in New York. Accordingly, Plaintiffs have demonstrated a reasonable likelihood of success on their RICO/usurious loan claims.

**2.** **Plaintiffs Have Also Demonstrated a Likelihood of Success on Their Declaratory Judgment Claims.**

Plaintiffs are also likely to succeed on their declaratory judgment claims against Defendants LCF and Fundkite because, first, the agreements are unlawful and unenforceable usurious loans under RICO and New York law and, second, because they did not enter into an agreement with these defendants. For the reasons set forth above, the LCF Loan and Fundkite

Loan are void *ab initio* under New York law, and Defendants' actions in enforcing them violate RICO. <u>See</u> N.Y. Gen. Oblig. L. § 5-501; <u>see also</u> <u>Adar Bays, LLC v. GeneSYS ID, Inc.</u>, 28 F.4th 379, 382 (2d Cir. 2022); <u>Adar Bays, LLC v. GeneSYS ID, Inc.</u>, 179 N.E.3d 612 (2021); <u>see also</u> N.Y. Penal Law § 190.40.

In addition, the LCF Loan and Fundkite Loan agreements are invalid because they were not entered into by Plaintiffs, and Ms. Tritinger did not have actual or apparent authority to bind Plaintiffs in such an extraordinary transaction. "The general rule in New York is that '[o]ne who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority." <u>General Overseas Films, Ltd. v. Robin, International, Inc.</u>, 542 F.Supp. 684, 688 (S.D. N.Y. 1982) (quoting <u>Ford v. Unity Hospital</u>, 299 N.E.2d 659, 664 (1973)). In <u>General Overseas</u>, the court found that an agreement entered into by a company's Vice President and Treasurer to guarantee hundreds of thousands of dollars of another company's debt was not enforceable against the principal. <u>Id.</u> at 688-96. This was so even though the Vice President had been held out publicly as the executive with whom to discuss the company's financial needs and issues, and despite the company's bylaws, which authorized the VP "to sign checks, notes, drafts, bills of exchange and other evidences of indebtedness…". <u>Id.</u> at 689.

In reaching its conclusion that there was no authority, the court noted that a plaintiff "claiming reliance on [an] agent's apparent authority must not fail to heed warning or inconsistent circumstances." <u>Id.</u> at 695 (internal citations omitted). "'The duty of diligence in ascertaining whether an agent is exceeding his authority devolves on those who deal with him, not on his principal.'" <u>Id.</u> (internal citations omitted). Accordingly,

> [a] principal will not be bound by the act of his agent in excess of his actual authority where the facts and circumstances are such as to put the person dealing with the agent upon inquiry as to the power and good faith of the agent.

Id. (quoting 2 N.Y. Jur.2d, Agency, § 74, at 523 (1979), and Angerosa v. White Co., 240 A.D. 425, 432 (4th Dept. 1936)); Scientific Holding Co. v. Plessey, Inc., 510 F.2d 15, 24-25 (2d Cir. 1974).[3]

Here, Ms. Tritinger's actual authority was limited by Mazzoni Center's internal policies, which dictates that any contract with a value of greater than $10,000.00 required the advance approval of the President and Executive Officer. In addition, internal practice required approval from Mazzoni Center's General Counsel prior to entering into an agreement on behalf of the organization. Moreover, Mazzoni Center at no time made any affirmative representations to Defendants LCF or Fundkite that Ms. Tritinger had the authority to act on its behalf.

With respect to her "apparent authority" there was more than enough to put Defendants LCF and Fundkite on notice of something fishy. As an initial matter, Ms. Tritinger characterized herself in various places on the application paperwork with each Defendant as an owner, sole

_____

[3] Although Plaintiffs assert that New York law applies here under Pennsylvania's choice of law rules, the result is the same under Pennsylvania law in regard to the issue of apparent authority. As with New York, Pennsylvania law requires reasonable diligence on the part of a third party when relying on a purported agent's authority. Thus, "[a]n agent has apparent authority if 'the principal, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has granted the agent authority to act.'" Sugartown Pediatrics, LLC v. Merck Sharp & Dohme Corp. (In re Rotavirus Vaccines Antitrust Litig.), 30 F.4th 148, 157 (3d Cir. 2022) (quoting Wisler v. Manor Care of Lancaster PA, LLC, 124 A.3d 317, 323 (Pa. Super. Ct. 2015)). "[A]pparent authority [may] be established with a showing of: (1) limited authority given to the agent by the principal; and (2) conduct of the agent which demonstrates to the third-party the agent's apparent authority to bind the principal." Id. (citing Leidigh v. Reading Plaza Gen., Inc., 431 Pa. Super. 310, 636 A.2d 666, 667-68 (Pa. Super. Ct. 1994)). Third parties dealing with an agent must "***exercise reasonable diligence*** to ascertain the agent's authority." Id. (quoting Bolus v. United Penn Bank, 363 Pa. Super. 247, 525 A.2d 1215, 1222 (Pa. Super. Ct. 1987)) (emphasis added). For the reasons set forth herein – namely Ms. Tritinger's facially inaccurate representations in the application process with Defendants LCF and Fundkite that warranted greater diligence on their parts before transferring hundreds of thousands of dollars into a bank account at her direction – under Pennsylvania law Defendants also cannot rely upon any claim of "apparent authority."

proprietor, 100% owner, or expressed that she held some other variation of ownership of the Mazzoni Center non-profit corporation. As a non-profit entity, this makes absolutely no sense.

In addition, the fact that Ms. Tritinger was not an owner and/or the corporation's non-profit status could easily have been obtained from Mazzoni Center's website or its publicly available corporate filings. Defendants could also have contacted any of Mazzoni Center's Board members or executive staff through Mazzoni Center's website to confirm whether or not Ms. Tritinger had authority to enter into the loans, which entailed extraordinary costs for a small-to-medium sized non-profit with third party companies with whom it had no existing business relationship. Instead, they apparently took Ms. Tritinger's word for it. This was so despite her facially obvious misrepresentations and, thus, Defendants LCF and Fundkite assumed the risk that she did not have the authority she indicated.

Because Ms. Tritinger did not have actual or apparent authority to bind Plaintiffs in the instant "agreements" with Defendants LCF and Fundkite, Plaintiffs also have a high likelihood of success on their request for declaratory relief.

     **C.**     **Plaintiffs Will Suffer Irreparable Harm In The Absence Of Injunctive Relief.**

Plaintiffs will suffer irreparable harm if Defendants are permitted to continue their assertion of improper UCC liens to freeze or misdirect Mazzoni Center's revenue streams and accounts receivable. As of the date of this filing, at least $791,981.66 of Mazzoni Center's assets have been frozen due to the actions of Defendants. Moreover, LCF has succeeded in diverting over $2,000.00 in payments owed to Mazzoni Center to itself in connection with its assertion of the improper UCC Lien. Accordingly, critical revenue is being improperly withheld from Mazzoni Center of the basis of Defendants' bogus UCC liens at a time when cash flow is critical to the organization. Mazzoni Center will also suffer irreparable harm if LCF and Fundkite are

permitted to continue their legal actions to collect on these usurious and illegal loans while this Court adjudicates the parties' rights.

To prove irreparable harm, a moving party "must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." Acierno v. New Castle Cty., 40 F.3d 645, 653 (3d Cir. 1994) (quotation omitted). Risk to the survival of a business, either through substantial loss of business or the potential threat of bankruptcy has been deemed irreparable harm warranting preliminary injunctive relief. See, e.g., Newlife Homecare, Inc. v. Express Scripts, Inc., No. 3:07cv761, 2007 U.S. Dist. LEXIS 33031 at *9 (M.D. Pa. May 4, 2007) (citing Doran v. Salem Inn, Inc., 422 U.S. 922 (1975) (substantial loss of business or potential risk of bankruptcy was enough to support preliminary injunctive relief). Indeed, the Third Circuit has held that, although "a purely economic injury...cannot satisfy the irreparable injury requirement...an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." Minard Run Oil Co. v. United States Forest Serv., 670 F.3d 236, 255 (3d Cir. 2011).

Here, at minimum, Defendants have frozen nearly $800,000.00 of Mazzoni Center's accounts receivable via their assertion of improper UCC liens. Defendant LCF has diverted over $2,000.00 in payments to itself from CIGNA, one of Mazzoni Center's third-party payers. These are only the frozen and diverted receipts Mazzoni Center has been made aware of; no doubt other payers are withholding Plaintiff's income but have not yet notified the organization. Indeed, Mazzoni Center believes Defendants have contacted many other business partners of the organization to assert these improper UCC liens and will continue to freeze additional income streams of the organization with the apparent aim of cutting off all cash flow.

Freezing Mazzoni Center's income has and will have dire existential consequences for

the organization, including not being able to make payroll, an inability to provide care to the thousands of patients and clients who rely on its medical services, behavioral health services, legal services, food from its food bank, housing subsidies to remain in their homes, and other vital, lifesaving care. Should Defendants be permitted to continue their nefarious actions, broadening their attacks on the organization's life's blood, Mazzoni Center faces a true risk of bankruptcy and certainly will not be able to meet its obligations. These facts demonstrate the exact scenario that a Temporary Restraining Order ("TRO") or preliminary injunction seeks to prevent by maintaining the status quo during the pendency of a lawsuit and preventing immediate irreparable harm towards a party. Preserving the status quo permits the parties to continue to exist and maintain their baseline functions while their critical legal rights can be adjudicated by the Court.

Moreover, if Defendants are not restrained, in addition to Mazzoni Center's ultimate destruction, harm will be caused to the general public, *i.e.* the thousands of individuals who rely on the organization for health care, housing support, food, and other health and wellness services.

In short, Mazzoni Center has been victimized by Defendants' criminal usurious conduct and irreparable harm to it will continue unless a TRO and Preliminary Injunction is entered. Mazzoni Center cannot afford to have its current and future receivables frozen or diverted daily by Defendants. As a result of the currently frozen assets, there is a significant risk that Mazzoni Center will be unable to meet payroll and other obligations as soon as November 22, 2024 and continued actions to expand that freeze will no doubt present a risk of bankruptcy. Accordingly, Plaintiffs have demonstrated irreparable harm and injunctive relief should be granted.

**D. Greater Injury Will Result From Denial of Injunctive Relief Than From the Grant of Injunctive Relief.**

Greater injury will be inflicted by the denial of injunctive relief than by granting it. Denying injunctive relief will result in the destruction of Plaintiff's non-profit organization and harm to its staff and the underserved communities that rely on it for their health and well-being. Granting injunctive relief will only restore the status quo as it existed prior to Defendants' unlawful assertion of the UCC liens in this matter until the important issues raised in Plaintiffs' Complaint are fully vetted by the Court.

**E. The Public Interest Favors The Granting of Injunctive Relief.**

The public interest favors granting the injunctive relief Plaintiffs seek here. Mazzoni Center has been a critical health care resource for over 40 years and currently serves thousands of individuals in the region. The loss of this organization would impact the livelihood of its approximately 160 staff members as well as the many thousands who rely on them for their health and well-being. Moreover, where a plaintiff demonstrates "both a likelihood of success on the merits and irreparable injury[,]" as Plaintiffs have done here, it almost always will be the case that the public interest will favor plaintiff. See, e.g., Newlife Home Care, Inc., 2007 U.S. Dist. LEXIS 33031 at *26.

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court issue a temporary restraining order and preliminary injunction: (i) enjoining the Defendants from withdrawing or attempting to withdraw funds from Plaintiffs' financial accounts; (ii) enjoining the Defendants from freezing Plaintiffs' current and future accounts, assets, and receivables; (iii) enjoining the Defendants from asserting UCC Liens or other purported security interests against Plaintiffs' current and future assets and accounts receivable; (iv) enjoining Defendants from

prosecuting any and all legal actions, including court actions and private arbitration actions, against Plaintiffs to enforce the illegal agreements at issue in this matter; and (v) directing Defendants to retract any and all UCC Lien letters sent to third parties regarding or relating to Plaintiffs.

Respectfully submitted,

Dated:  November 5, 2024

/s/  *Geoffrey D. Bruen*
Geoffrey D. Bruen, Esq. (Pa. I.D. No. 205956)
**Executive Legal Officer & General Counsel**
**MAZZONI CENTER**
1348 Bainbridge Street
Philadelphia, PA 19147
(267) 419-9849 (tel)/(215) 563-0664 (fax)
Email:  gbruen@mazzonicenter.org
**Attorney for Plaintiffs**