# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**MAZZONI CENTER** and
**1334-48 BAINBRIDGE STREET LLC**

        Plaintiffs,

     v.

**LCF GROUP, INC., AKF, INC.**
**d/b/a FUNDKITE, ALEKSANDER**
**SHVARTZ, ROBERT KLEIBER,**
**ANDREW PARKER, AND JOHN**
**AND JANE DOES,**

        Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CASE NO. _____

## DECLARATION OF SULTAN SHAKIR

I, SULTAN SHAKIR, hereby declare as follows:

1.      I am the President and Executive Officer of Mazzoni Center, which is a Plaintiff in the above-captioned lawsuit. 1348 Bainbridge Street LLC ("1348 Bainbridge"), which is also a Plaintiff in the above-captioned lawsuit, is a Pennsylvania limited liability company whose sole member is Mazzoni Center.

2.      Mazzoni Center is a respected and nationally recognized 501(c)(3) healthcare non-profit that has served the health and wellness needs of the LGBTQIA+ and other underserved communities in the Philadelphia region and beyond for over forty years.

3.      The organization does not turn away patients who cannot afford care, offering critical health and wellness services that include primary care, behavioral health treatment, HIV and STI community testing and treatment, linkage to HIV treatment and pre-exposure

1

prophylaxis (PrEP) to prevent HIV transmission, housing subsidy services, free legal services, and a food bank for the food insecure in the Philadelphia community.

4.　　The organization was recently designated a Federally Qualified Health Center ("FQHC") look-alike, recognizing the quality of the care and services it provides, its mission to provide care regardless of the ability to pay, and the critical need for the services it provides in the Philadelphia region.

5.　　In the period from October 1, 2023 to September 30, 2024, Mazzoni Center conducted over 22,000 medical visits for over 8,000 unique patients, nearly 6,000 behavioral health and individual and group therapy visits and performed HIV and STI testing for nearly 7,000 individuals.

6.　　As a non-profit, Mazzoni Center relies on grant funding, government reimbursements, third party billing, and revenue from the federal 340(b) drug program to support the care it offers and to continue operations.

7.　　Any income earned by the organization is reinvested into its programming and to pay operating expenses such as payroll, employee benefits, purchasing medical supplies, obtaining any required insurance coverages, and overhead.

8.　　The organization has a staff of about 160, approximately two-thirds of which is unionized. The organization covers 90-95% of health insurance premium costs for individual staff and offers a retirement plan and other benefits. The monthly cost of payroll and benefits alone is over $830,000.00. As with many non-profit health care institutions across the United States, Mazzoni Center faced financial difficulties during and in the aftermath of the COVID-19 pandemic and has worked to recover from the fiscal ravages of this difficult period.

9.　　While there is a favorable long term economic picture for the organization, it has

continued to struggle with cash flow issues in 2024 while working to implement some of the benefits of FQHC look-alike status and other strategies for improving cash flow.

10.     On or about September 10, 2024, Mazzoni Center's now-former Executive Financial Officer, Rachelle Tritinger ("Ms. Tritinger") appears to have signed documents purporting to enter into a loan transaction with Defendant LCF on behalf of Mazzoni Center. She is noted on these documents as an "Owner," "Principal," and "Sole Proprietor" of Mazzoni Center. These actions were taken without the authority, knowledge, or approval of Mazzoni Center or 1348 Bainbridge and were in violation of Mazzoni Center's internal policies. A true and correct copy of the LCF Loan documents are attached hereto as "Exhibit A."

11.     On or about September 11, 2024, Ms. Tritinger appears to have signed paperwork purporting to enter into a loan transaction with Defendant Fundkite on behalf of Mazzoni Center. She is identified in these documents as an "Owner" of Mazzoni Center. These actions were taken without the authority, knowledge, or approval of Mazzoni Center and 1348 Bainbridge and were in violation of Mazzoni Center's internal policies. A true and correct copy of the Fundkite Loan documents are attached hereto as "Exhibit B."

12.     As part of the documents Ms. Tritinger signed with Defendant LCF and Defendant Fundkite, it appears that she purported to grant a security interest in Mazzoni Center's future receivables with both lenders. These actions were taken without the authority, knowledge, or approval of Mazzoni Center and 1348 Bainbridge and were in violation of Mazzoni Center's internal policies.

13.     On or about September 12, 2024, Mazzoni Center became aware that Ms. Tritinger appeared to have signed the LCF and Fundkite loan documents. Mazzoni Center also became aware that she had submitted paperwork as part of the loan applications with false or

clearly inaccurate representations, such as claiming she was the "owner," "majority owner," principal, sole proprietor, and/or had 100% Ownership of Mazzoni Center. A true and correct copy of the pertinent application documents in Mazzoni Center's possession are attached as "Exhibit C."

14.    As a non-profit corporation, Mazzoni Center does not have an owner or any ownership by individuals.

15.    Under Mazzoni Center's internal policies, Ms. Tritinger did not have authority to enter into contracts with a value of greater than $10,000.00 absent my advance approval as President and Executive Officer.

16.    In addition, Mazzoni Center's internal protocols require approval from Mazzoni Center's General Counsel prior to entering into any contractual agreement on behalf of the organization.

17.    After Mazzoni Center's discovery of Ms. Tritinger's completion of the loan paperwork with Defendants LCF and Fundkite, it was discovered that LCF and Fundkite had transferred funds into Mazzoni Center's operating account, most of which had already been spent by Ms. Tritinger.

18.    Mazzoni Center was able to find and preserve approximately $70,000.00 of the money transferred into its accounts by LCF and Fundkite at Ms. Tritinger's direction; this amount was set aside in a secure account.

19.    Mazzoni Center investigated the situation and subsequently offered to return the principal funds transferred by LCF and Fundkite back to them, which offers were refused by both Defendants.

20.    Defendants LCF and Fundkite both attempted to draw funds out of Mazzoni

4

Center's operating account electronically, in attempts to collect on their illegal loans. A true and correct copy of the Notice received from Fundkite after attempting to withdraw money from Mazzoni Center's account is attached hereto as Exhibit D. A true and Correct copy of the Verified Court Complaint filed by LCF against Mazzoni Center and 1348 Bainbridge in the Nassau County Court, in Paragraph 30 of which LCF avers it sought to withdraw money from Mazzoni Center's bank account, is attached hereto as "Exhibit E."

21.    Defendant LCF also initiated legal action to enforce its illegal loan agreement against Mazzoni Center and 1348 Bainbridge. See Exhibit E.

22.    Defendant Fundkite also initiated legal action to enforce its illegal loan agreement against Mazzoni Center and 1348 Bainbridge. A true and correct copy of the Arbitration Demand in that matter is attached hereto as Exhibit F.

23.    LCF and Fundkite have also asserted UCC liens against Mazzoni Center to its business partners in connection with the illegal loans.

24.    As of November 4, 2024, LCF's and Fundkite's assertion of these UCC liens has resulted in the withholding of $791,981.66 in accounts receivable from payers and funders who owe money to Mazzoni Center. Specifically:

a.    On October 17, 2024, the City of Philadelphia notified Mazzoni Center that it was withholding all of the organization's invoice payments due to a lien notice received from LCF. A true and correct copy of the Notice received by Mazzoni Center from the City of Philadelphia is attached hereto as "Exhibit G."

b.    On October 21, 2024, Walgreens notified Mazzoni Center that it had also received a lien notice from Defendant LCF, directing Walgreens to divert funds owed to Mazzoni Center to LCF. A true and correct copy of the UCC Lien Notice

received by Walgreens Co. is attached hereto as "Exhibit H."

    c.   On October 28, 2024,  Stripe, Inc., another business partner of Mazzoni Center, notified the organization that it was withholding funds owed to the organization due to a directive from Defendant LCF to divert payments owed to the organization to Fundkite.  A true and correct copy of the Lien notice received by Stripe from Fundkite is attached hereto as "Exhibit I."

25.     On October 14 and 21, 2024, insurance carrier CIGNA sent notices to Mazzoni Center that it had diverted payments owed to Mazzoni Center to Defendant LCF based on Defendant LCF's directive and UCC lien assertion.  True and correct copies of the notices from CIGNA are attached hereto as Exhibit J.

26.     To date, Defendants' actions in asserting the UCC liens against Mazzoni Center has resulted in the withholding of at least $791,981.66 in funds owed to Mazzoni Center and the diversion to LCF of at least $2,118.68 in third party payments owed to Mazzoni Center.

27.     The amounts being withheld have and will continue to impair Mazzoni Center's ability to operate, pay staff, and provide care to its patients and clients.

28.     I also believe Defendants LCF and Fundkite have asserted UCC Liens to additional payers and funders of Mazzoni Center and will succeed, absent the Court's intervention, in stopping all cash flow to the organization.

29.     The UCC Lien Notices and unauthorized diversion or freezing of Mazzoni Center's receivables have impacted Mazzoni Center's ability to maintain business operations.

30.     Mazzoni Center will not be able to sustain such operations without its incoming receivables for patients it has treated, grant funds that pay for its ongoing programs, and other revenue. Mazzoni Center will also not be able to make payroll or meet its other obligations as

soon as November 22, 2024 as a result and is at risk for filing bankruptcy.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Executed this 5th day of November, 2024 in Philadelphia, Pennsylvania.

Commonwealth of Pennsylvania - Notary Seal
JILL ANN BOYLE - Notary Public
Philadelphia County
My Commission Expires January 21, 2027
Commission Number 1343625

SULTAN SHAKIR

# EXHIBIT A



**AGREEMENT FOR PURCHASE AND SALE OF FUTURE RECEIVABLES (hereinafter "PSFRA", which together with the SELLER AGREEMENT TERMS AND CONDITIONS, the SECURITY AGREEMENT, the PERSONAL GUARANTY(S) OF PERFORMANCE, the POWER OF ATTORNEY and any appendices and addenda hereto and executed in conjunction herewith, shall be collectively referred to as the "Agreement"),** made at the specific insistence and request of __Mazzoni Center DBA Mazzoni Center__ ("Seller") on this __11__ day of ___September___, 20__24__ and made within the State of New York, County of Nassau, by and between The LCF Group, Inc., having an office at 3000 Marcus Avenue, Suite 2W15, Lake Success, New York 11042 (the "Company"), and Seller, having an office at **1348 Bainbridge Street, Philadelphia**, **Pennsylvania** **19147**.

| PURCHASE PRICE | PURCHASED AMOUNT / RTR | PURCHASED PERCENTAGE | TOTAL AMOUNT SELLER WILL RECEIVE++ |
|---|---|---|---|
| $250,000.00 | $362,500.00 | 12.00% | |
| RENEWAL/PAYOFF + | FACTOR RATE | ORIGINATION FEES* | $234,570.00 |
| - | **1.45** | **$15,430.00** | |
| - | | - | |
| COST OF CAPITAL | MONTHLY MAINTENANCE FEE | DAILY REMITTANCE** | |
| **$112,500.00** | **$195** | **$6,041.67** | |

*Origination Fee Schedule:
A. Underwriting Fee:          $ 15,000.00____  to cover Underwriting and related expenses.
B. Account Activation Fee:   $ 395.00____  to cover ACH set up costs, UCC filing fee and various related administrative expenses.
C. Delivery Fee:              $ 35_____  to cover the cost of delivering the Purchase Price, less fees, to Seller via Fedwire.

Additional Fee Schedule:
A. Monthly Maintenance Fee   $195.00        This fee is charged to cover ongoing maintenance and servicing of Seller's account.
B. Default Fee:              $2,500.00       This fee is charged in the event of Seller's default under the Agreement.
C. Stop Payment Fee          $2,500.00       This fee is charged in the event Seller removes Company's ACH debit access.
D. Closed Account Fee        $2,500.00       This fee is charged if Seller closes its designated account without Company's permission.
E. NSF Fee:                  $35.00          This fee is charged each time an ACH transaction is declined for insufficient funds.
F. Bank Change fee           $50.00          This fee is charged each time Seller changes its designated Bank Account.
G. Subordination Fee:        $500.00         This fee is charged to cover administrative costs upon request that we subordinate
                                             our UCC-1.[See Section 1.22(b)]

** Daily Remittance represents a good faith estimate of the monetary value of the purchased percentage of daily receipts based upon historical information provided by Seller and is subject to adjustment to more precisely reflect the actual purchased percentage of daily receipts pursuant to paragraph 1.4 of this Agreement.

+ Renewal/Payoff Amount represents funds paid to satisfy a designated third party.

++ This amount is calculated as the Purchase Price less any Fees set forth in the above Fee Schedule.

**WHEREAS**, Seller intends to assign, and Company intends to purchase, a portion of Seller's future receivables; and

Initials: _RT_

**WHEREAS**, Seller hereby, for the purchase price set forth above (the "Purchase Price") less any Origination Fees set forth above, does sell, demise and assign the Purchased Percentage of Seller's future receivables, future accounts, future contract rights and other future obligations arising from or relating to the future payment of monies received by Seller (collectively "Future Receipts"), as set forth below (the "Purchased Percentage"), to Company, whether the proceeds are paid by Cash, ACH, Check, Credit Card, Debit Card, Bank Card, Charge Card, PayPal, Venmo, Zelle, electronic transfer or any other form of payment in the ordinary course of the Seller's business, for the payment of Seller's sale of goods or services (collectively, the "Purchased Amount" or "RTR") until the Company has received the specified Purchased Amount above; and

**WHEREAS**, Company acknowledges that its recovery of the Purchased Amount is dependent upon Seller's success and that so long as Company receives its Purchased Percentage of Future Sale Proceeds as required hereunder, the amount of time necessary for Company to recover the Purchased Amount is indefinite;

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby declares, covenants, and agrees as follows:

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH WITHIN THIS PSFRA, the SELLER AGREEMENT TERMS AND CONDITIONS, the SECURITY AGREEMENT, the PERSONAL GUARANTY(S) OF PERFORMANCE, the POWER OF ATTORNEY and any appendices and addenda thereto (COLLECTIVELY, THE "Agreement") ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS instrument and it is intended that references to the "Agreement" within this PSFRA, the SELLER AGREEMENT TERMS AND CONDITIONS, the SECURITY AGREEMENT, the PERSONAL GUARANTY(S) OF PERFORMANCE, the POWER OF ATTORNEY and any appendices and addenda thereto are intended to incorporate all terms contained within the aforesaid documents.**

**PURCHASE AND SALE OF FUTURE RECEIVABLES:** Seller hereby sells, assigns and transfers to Company (making Company the absolute owner) in consideration of the Purchase Price specified herein, the Purchased Percentage received by Seller from all of Seller's Future Sale Proceeds until the Purchased Amount has been delivered by Seller to Company.

Seller represents that it is engaged in a commercial enterprise and that this transaction shall only be used for commercial or business purposes, in the ordinary course of business, and not for personal, family, or household purposes. Accordingly, Seller acknowledges that important duties imposed upon Company, and important rights conferred upon a consumer, pursuant to certain federal or state laws, do not apply to this Agreement.

Seller, being duly authorized to do so, hereby agrees to deposit all Future Sale Proceeds into the following Bank Account (or such other Bank Account as may be designated by Seller and approved by the Company prior to the use of such other Bank Account pursuant to the provisions hereof) (the "Designated Bank Account"):

_____        _____

_____

Seller hereby irrevocably authorizes the Purchased Amount to be delivered to Company by Seller's Bank and Seller's Bank is, accordingly, authorized to permit Automated Clearing House ("ACH") debits initiated by Company for the Daily Remittance as specified above, or, in the event of reconciliation relating to such Daily Remittance, such other amounts as may be appropriate, the source of which shall be Seller's deposits, revenues and other receipts and that this authorization shall continue until such time as Company receives the Purchased Amount. Seller hereby authorizes Company to Institute ACH Debit transaction(s) and/or "Reverse Wire" transactions for the Daily Remittance or, in the event of reconciliation relating to such Daily Remittance, such other amounts as may be appropriate from the Seller's Bank Account on a daily basis and will provide Seller with any and all required authorizations and/or access codes to effectuate such ACH Debit. Seller further agrees, as more particularly set forth within the TERMS AND CONDITIONS, to provide to Company any and all monthly bank and Merchant Processing statements upon Company's request. Company is not responsible for any overdrafts or rejected transactions that may result from Company ACH debiting the specified amounts due under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between Company and Seller, upon the violation of any provision contained within Section 1.12 of the SELLER AGREEMENT TERMS AND CONDITIONS, or the occurrence of an Event of Default under any other provision of the SELLER AGREEMENT TERMS AND CONDITIONS, the specified Purchased Percentage shall be increased to 100% and any undelivered Purchased Amount shall become immediately due in its entirety together with any additional liquidated default and collection fees provided for herein or within the SELLER AGREEMENT TERMS AND CONDITIONS, the SECURITY AGREEMENT, the PERSONAL GUARANTY(S) OF

**Initials:** RT

PERFORMANCE, the POWER OF ATTORNEY and any appendices and addenda thereto, and Company shall be entitled to such amounts together with any other legally permissible remedies and relief from the date of such Event of Default.

To the extent set forth herein, each of the parties is obligated upon their execution of the Agreement to all terms of the Agreement, including the Additional Terms set forth within the **SELLER AGREEMENT TERMS AND CONDITIONS, THE SECURITY AGREEMENT, THE PERFORMANCE GUARANTY, THE POWER OF ATTORNEY AND ANY OTHER EXHIBITS AND/OR APPENDICES HERETO.** Each of the undersigned Seller and Owner/Guarantor represents that they are authorized to sign this Agreement for Seller, legally binding said Seller to honor this obligation and that the information provided herein and in all Company documents, forms and interviews is true, accurate and complete in all respects. If any such information is deemed to be materially false or misleading, Seller shall be considered to have material breached all agreements between Seller and Company, and Company shall be entitled to all remedies available under this Agreement and/or applicable law. An investigative or credit report may be obtained in connection with the Agreement.  Seller and each of the performance guarantors signing this Agreement authorize Company, its agents and representatives and any credit reporting agency engaged by Company, at any time now or for so long as Seller and/or Performance Guarantor continue to have any obligations to Company as a consequence of this Agreement or for Company's ability to determine Seller's eligibility to enter into any future agreement with Company to: (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement;

[Remainder of Page Intentionally Left Blank]

Initials: RT

(ii) obtain consumer and business credit reports on the Seller and any of its Owners; and (iii) to contact personal and business references provided by the Seller in the application.

**ANY MISREPRESENTATION MADE BY SELLER OR ANY AGENT OF SELLER IN CONNECTION WITH OR IN THE PROCUREMENT OF THIS AGREEMENT SHALL CONSTITUTE AN IMMEDIATE DEFAULT HEREUNDER.**

**SELLER #1**   *Rachelle Tritinger (Owner 1)*

By:_____
   Signature
   Rachelle Tritinger / Owner
   _____
   Print Name and Title
   _____
   SS#

Phone Number    (412) 477-5240

THE LCF GROUP, INC.

_____
By: Robert Klieber
Title: Chief Operating Officer

**OWNER/GUARANTOR #1**   *Rachelle Tritinger (Owner 1)*

By: _____
   Signature
   Rachelle Tritinger / Owner
   _____
   Print Name and Title

**Initials:** RT

# SELLER AGREEMENT TERMS AND CONDITIONS

**These SELLER AGREEMENT TERMS AND CONDITIONS ("Terms"), which incorporate additional terms to the AGREEMENT FOR PURCHASE AND SALE OF FUTURE RECEIVABLES, the SECURITY AGREEMENT, the PERSONAL GUARANTY(S) OF PERFORMANCE, the POWER OF ATTORNEY and any appendices and addenda hereto and executed in conjunction herewith, (which shall be collectively referred to as the "Agreement") apply to the Agreement and you agree and understand that these SELLER AGREEMENT TERMS AND CONDITIONS apply, regardless of their means of delivery to you.  By entering into the Agreement, you indicate that you have read and accept these SELLER AGREEMENT TERMS AND CONDITIONS, including these applicable Additional Terms and agree to abide by and be bound by all such Terms (as modified from time to time). Please note that we may change these Terms from time to time by delivering such updated Terms via the notice provisions contained within these Terms. We draw your attention to the JURY TRIAL WAIVER; COUNTERCLAIM WAIVER; CLASS ACTION WAIVER; CONSENT TO SERVICE and ARBITRATION PROVISION contained in Section IV below.**

### 1. TERMS OF ENROLLMENT IN PROGRAM

**1.1. Seller Deposit Agreement.** Seller shall take all necessary measures acceptable to Company, with a bank acceptable to Company, to ensure that Company is able to withdraw the Purchased Percentage through Automated Clearing House ("ACH") debits. Seller shall also, prior to funding and as reasonably requested from time-to-time, provide Company and/or its authorized agent with all of the information, documents, authorizations and passwords necessary for verifying Seller's receivables, receipts and deposits into the account. Seller authorizes Company and/or its agent(s) to deduct the amounts purchased by Company as specified herein from settlement amounts which would otherwise be due to Seller from its revenues and to pay such amounts to Company by permitting Company to withdraw the Purchased Percentage(s) by ACH debiting of the Designated Bank Account. The authorization shall be irrevocable without the written consent of Company.

**1.2. Term of Agreement.** This Agreement shall remain in full force and effect until the earlier of: (i) the entire Purchased Amount and any other amounts due to Company are received by Company as per the terms of this Agreement; or (ii) the Seller shall, **not having had a prior event of default hereunder**, cease business operations in good faith; or (iii) Seller shall, **not having had a prior event of default hereunder**, be adjudicated insolvent pursuant to Title 11 of the United States Code or a State Insolvency Law.

**1.3. Future Purchases.** Company reserves the right to rescind the offer to make any purchase payments hereunder in its sole discretion after which time this Agreement will be cancelled without further cost to either Company or Seller.

**1.4. Reconciliation of Specific Daily Remittance.** The Daily Remittance is intended to represent the Purchased Percentage of Seller's daily Receipts. Once every fifteen (15) calendar days, in good faith, Seller or Company may request a reconciliation of the Daily Remittance to more closely reflect the Seller's actual Receipts multiplied by the Purchased Percentage. Any reconciliation request by Seller must be: (i) in writing; (ii) include a complete copy of all documents required at the time of underwriting in the normal course of business including, but not limited to, a copy of Seller's bank statements and any documents evidencing Seller's revenue for the calendar month at issue; and (iii) be sent to Company via electronic mail at TrueUp@thelcfgroup.com (each a "Reconciliation Request"). Any

reconciliation request by Company must be (i) in writing (ii) request a complete copy of all documents required at the time of underwriting in the normal course of business including, but not limited to, a copy of Seller's bank statements and any documents evidencing Seller's revenue for the calendar month at issue and (iii) be sent to Seller via electronic mail at the email address provided by Seller in section 3.3 *infra*. Seller acknowledges and agrees that the documents referenced in clause (ii) above shall be provided to Company within five (5) days of a Reconciliation Request. It is solely the Seller's responsibility to send complete bank statements. Seller agrees to provide Company any reasonable information requested by Company to assist in a Reconciliation Request. Company shall provide a reconciliation within three (3) business days after receiving a Reconciliation Request and all reasonable information requested. The adjusted Daily Remittance will be based on Seller's actual receipts from the 60-day period immediately prior to the date of the Reconciliation Request multiplied by the Purchased Percentage ("Adjusted Daily Remittance"). Following the adjustment of the Daily Remittance, Seller shall remit the Adjusted Daily Remittance until such time as a subsequent reconciliation is requested. It is expressly agreed and understood that a Reconciliation Request will not constitute a basis for suspension of Company's right to deduct the amounts purchased by Company during its pendency and, subject to the Reconciliation Request, any amounts deducted in excess of the Adjusted Daily Remittance shall be credited to Seller's account upon completion of the reconciliation. It is further understood that the mere presentment of a bank statement by Seller, unaccompanied by a written request for reconciliation, shall not give rise to Buyer's obligations under this section 1.4.

Seller and Company acknowledge that the Company has purchased the RTR on a "non-recourse" basis, such that there is no set term wherein Company expects to receive the RTR.   The Company recognizes that the time within which the RTR will be recovered may be indefinite or, in the event of a good faith cessation of Seller's business operations, *see* section 1.2 *supra*, not at all.

**CALCULATION OF DAILY REMITTANCE.** Company calculates a dollar amount to be remitted daily by Seller, which amount shall be a good-faith estimate of the Purchased Percentage of Seller's Future Receipts based upon the financial information supplied to Company by Seller (the "Daily Remittance"). Unless modified pursuant to this section 1.4 (the "Initial Daily Remittance").

**1.5.** Intentionally omitted.

**Initials:** RT

**1.6. Financial Condition.** Seller and Guarantor authorize Company and its agents to investigate their financial history and will provide Company with all financial records as reasonably requested, including, but not limited to, any bank or financial statements, tax returns, merchant processing statements and access to online financial records as Company deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable for release of financial information. Company is authorized to update such information and financial profiles from time to time as it deems appropriate.

**1.7. Transactional History.** Seller authorizes their bank(s), financial institution(s), broker(s) and merchant processor(s) to provide Company with Seller's banking or processing history to determine qualification or continuation in this program.

**1.8. Indemnification**. Seller and Guarantor jointly and severally indemnify and hold harmless any ACH processor utilized by Company, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by ACH Processor resulting from: (a) claims asserted by Company for monies owed to Company from Seller; and (b) actions taken by ACH Processor in reliance upon information or instructions provided by Company.

**1.9. No Liability.** In no event will Company be liable for any claims asserted by Seller under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Seller and Guarantor.

**1.10. Sale of Receipts. SELLER IS SELLING A PORTION OF ITS FUTURE RECEIPTS TO COMPANY AT A DISCOUNT, NOT BORROWING MONEY FROM COMPANY. THERE IS NO INTEREST RATE OR PAYMENT SCHEDULE AND NO TIME PERIOD DURING WHICH THE PURCHASE AMOUNT MUST BE COLLECTED BY COMPANY. THE GOOD-FAITH CESSATION OF BUSINESS OPERATIONS, AN EVENT OF INSOLVENCY (INCLUDING, BUT NOT LIMITED TO, FILING FOR PROTECTION UNDER THE UNITED STATES BANKRUPTCY CODE OR A STATE ASSIGNMENT FOR THE BENEFIT OF CREDITORS ACTION) SHALL NOT – IN AND OF ITSELF - BE DEEMED AN EVENT OF DEFAULT HEREUNDER.** Company is entering into this Agreement knowing the risks that Seller's business may experience a decrease in revenue or cease operations in good faith and Company assumes these risks based on Seller's representations, warranties and covenants in this Agreement, which are designed to give Company a reasonable and fair opportunity to receive the benefit of its bargain. Seller and Company agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price is not intended to be, nor shall it be, construed as a loan from Company to Seller. Seller agrees that the Purchase Price is in exchange for a percentage of Seller's Future Receipts pursuant to this Agreement and equals the fair market and present value of such Receipts. Company has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to Company in respect to the full amount of the Receipts shall be conditioned upon Seller's sale of products and/or services and the payment

therefore by Seller's customers in the manner provided in Section 1.1. It is acknowledged that the Seller shall have a fiduciary responsibility for the safekeeping of the Purchased Percentage, whether or not in Seller's immediate possession or control. Seller shall not employ or permit another to employ such Purchased Percentage in any manner except as provided for herein. Provided Seller shall comply with each of its performance obligations hereunder, Seller shall remain in good standing hereunder.

Notwithstanding any recitation set forth herein, including, but not limited to, a recitation of "Annual Percentage Rate" ("APR") mandated by applicable law or regulation, it is expressly agreed and understood by the Company and Seller that in no event shall the aggregate of all amounts be deemed as interest hereunder. The parties acknowledge that it is intended that Seller does not pay or contract to pay, and that Company does not receive or contract to receive, directly or indirectly, in any manner whatsoever, interest. Nevertheless, In the event a court of competent jurisdiction determines, notwithstanding the intent of the parties to the contrary, that Company has charged or received interest hereunder in excess of the highest rate allowed by applicable law, then the Purchased Amount shall be adjusted automatically by operation of this clause, so that the difference between the Purchased Amount and the Purchase Price shall, if expressed as an interest rate over such term of this Agreement as the ruling court has determined to apply, yield a rate equivalent to the maximum rate permitted by applicable law. Company shall, in such case, promptly refund to Seller any amount received by Company in excess of the maximum lawful rate of interest, it being intended that Seller not pay or contract to pay, and that Company not receive or contract to receive, directly or indirectly, in any manner whatsoever, interest in excess of that which may be paid by Seller under applicable law. For the avoidance of doubt, Seller again acknowledges that Seller is selling a portion of Future Receipts to Company at a discount and not borrowing money from Company. As such, there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Company**.**

**By executing this Agreement, Seller hereby represents and acknowledges that the Initial Daily Remittance, set forth above, accurately represents the Purchased Percentage of Seller's Future Receipts.**

**1.11. Reliance on Terms.** Sections 1.1, 1.8, 1.9 and 2.5 of this Agreement are agreed to for the benefit of Seller, Company and any ACH processor. ACH processors are an intended third-party beneficiary of said provisions and may rely upon their terms for any purpose whatsoever, including, but not limited to, interposing this indemnification as a defense in any legal action.

**1.12. Power of Attorney.** Seller irrevocably appoints Company as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Company under this Agreement, including, without limitation, (i) to obtain and adjust insurance at Company's expense; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (ii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) above; (iii) to cancel, modify, repudiate or terminate any contractor agreement; (iv) to sign Seller's name on any invoice, bill of lading, or assignment

Initials: _RT_

directing customers or account debtors to make payment directly to Company; (v) to file any claims or take any action or institute any proceeding which Company may deem necessary for the collection of any of the undelivered Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount; (vi) to obtain information concerning any deposit account(s) maintained by Seller directly from the financial institution(s) maintaining such account(s) including, but not limited to, balances and account numbers; (viii) to direct the payment of the proceeds of any such deposit account(s) to Company or Company's designee or Company's nominee.

Seller, likewise, irrevocably appoints Company as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Company in the event of a violation by Seller of section 1.13 or the occurrence of an Event of Default under any provision hereof by Seller.

**1.13. EVENTS OF DEFAULT.** The following events shall constitute an event of default and the Company may utilize any and all remedies listed or any other remedy available to it under applicable law or equity, with or without notice, to address such default(s):

(a) Seller takes any action, fails to prevent any action or permits any action which frustrates the Company's use of electronic check, ACH processing or Seller Account "Split" to settle any obligations due pursuant to this Agreement;

(b) Seller takes any action, fails to prevent any action or permits any action which frustrates Company's ability to retrieve its designated percentage of receivables from Seller including, but not limited to, directing its financial institution to dishonor ACH debits originated by Company.  It is expressly agreed and understood that should Company receive an ACH return code of R02, R05, R07, R08, R10, R11, or R29, or such other return code that shall replace any of the foregoing as defined at the time of this Agreement, as a result of any ACH debit initiated pursuant to the Agreement, that such return code shall, in and of itself, constitute an event of deliberate default hereunder;

(c) Seller fails to rectify or provide a replacement Designated Bank Account within three (3) business days of Company receiving an R16 ACH return code;

(d) Seller changes the merchant processor through which its sales are settled to another merchant processor, or permits any event to occur that could cause diversion of any of Seller's sales to another Merchant Processor without seven (7) days advance notice to Company;

(e) Seller voluntarily interrupts the operation of its business in bad faith (e.g., other than good-faith business failure, casualty, state of emergency, natural disasters, acts of God or other good-faith basis which Seller has communicated, within forty-eight (48) hours of its occurrence and in writing, to Company), transfers, moves, sells, disposes, transfers or otherwise conveys its business or assets without: (i) the express prior written consent of Company; and (ii) the written agreement of any purchaser or transferee to the assumption of all of Seller's obligations under this Agreement

pursuant to documentation satisfactory to Company unless any such transfer occurs in conjunction with a good-faith filing pursuant to Title 11 of the United States Code;

(f) Seller takes any action, fails to take any action, or offers any incentive - economic or otherwise – the result of which will be to induce any customer(s) to pay for Seller's products and/or services with any means other than payments, checks, or deposits that are settled through the Designated Bank Account(s);

(g) Seller fails to respond to any communications, including electronic mail communications, initiated by Company concerning any dishonor of any ACH debit initiated by Company for a period exceeding 72 hours or 2 business days, whichever is longer;

(h) Seller shall violate any term or covenant in this Agreement;

(i) Any representation or warranty by Seller in this Agreement or in the underwriting of this Agreement shall prove to have been false or misleading in any material respect when made;

(j) Seller shall have a fiduciary obligation to safeguard Company's Purchased Percentage and insure Company's receipt of same in accordance with the terms of this Agreement;

(k) Seller shall, without notice to Company, transport, move, interrupt, suspend, dissolve, or terminate its business without a good-faith basis;

(l) Seller shall use multiple depository accounts without the Company's prior written consent;

(m) Seller shall change the Designated Bank Account without the Company's prior written consent;

(n) Seller shall default under any of the terms, covenants, and conditions of any other agreement with Company;

(o) Seller or Guarantor shall attempt to repudiate any of its obligations hereunder;

(p) Seller shall utilize its business bank or financial account(s) for non-business-related expenses;

(q) Failure of Seller to comply with its obligations pursuant to paragraph 1.20, *infra*; or

(r) Seller shall fail to provide Company with any requested bank or financial statements within three (3) business days of such request by Company.

**1.14. Remedies.**
**(I)** If any Event of Default occurs, Company may utilize, but is not limited to, all remedies set forth within this section 1.14. All rights, powers and remedies of Company in connection with this Agreement may be exercised at any time by Company after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity, to wit:

(a) proceed to protect and enforce its rights or remedies by Confession of Judgment, Confession of Award or similar process

Initials: _RT_

(as permitted by law), or by suit in equity and/or by action at law or by arbitration proceeding, whether for the specific performance of any covenant, agreement or other provision contained herein, injunction, or to enforce the discharge of Seller's obligations hereunder (including the Personal Guarantee) or any other legal or equitable right or remedy in the amount of the Purchase Amount stated in the Agreement together with all fees due under this Agreement and the attached Security Agreement, including, but not limited to, any collection fees, default fees, costs, and deem such amounts due and payable in full immediately;

(b) immediately liquidate and deem due the full uncollected Purchase Amount plus all fees due under this Agreement, and the attached Security Agreement including, but not limited to, any collection or default fees, and deem such amounts due and payable in full immediately;

(c) enforce the provisions of the Personal Guarantee of Performance against the Guarantor(s). It is expressly agreed and understood that in conjunction with this provision, Company may disclose personal identifying information including, but not limited to, the social security number of any guarantor(s) to third parties with which Company communicates in its exercising of any remedies available to Company;

(d) enforce its security interest in the collateral. It is expressly agreed and understood that in conjunction with this provision, Company may disclose identifying information, including, but not limited to, the FEIN Number or Social Security Number of Seller or any guarantor(s) to third parties with which Company communicates in its exercising of any remedies available to Company;

(e) proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, if Company prevails against Seller, Seller shall be liable for all of Company's associated legal fees, costs, and expenses, including, but not limited to, all reasonable attorney's fees and court costs;

(f) exercise its rights under any assignment of lease without prior notice to Seller. This Agreement shall be deemed Seller's assignment of Seller's lease of Seller's business premises and operations to Company;

(g) debit Seller's depository accounts, wherever situated, by means of ACH debit or facsimile signature on a computer-generated check drawn on Seller's bank account(s) or otherwise for all sums due to Company;

(h) utilize the Power of Attorney accompanying this Agreement to direct the payment of any amounts due to the Company directly from any receivable or deposit account due to the Company;

(i) Seller acknowledges and admits that it has a fiduciary obligation to safeguard and segregate the Future Sales purchased in conjunction with this Agreement. Company shall, therefore, be entitled (in addition to any other remedy to which it may be entitled in law or in equity) to injunctive relief and/or specific performance to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.

**(II)** In addition to any of the aforementioned remedies, Seller shall pay to Company all reasonable costs, including, but not limited to, all reasonable attorney's fees and court costs, associated with: (i) a breach by Seller of the covenants in this Agreement and the enforcement thereof; (ii) the enforcement of Company's remedies set forth within this section 1.14 and with respect to Company's enforcement of those remedies, it is expressly agreed and understood that the Company's collection fees shall be liquidated at the sum of 33.33% of any amounts due to Company and that such liquidated amount shall not be construed as a penalty; and (iii) the defense of any action or proceeding commenced against Company with respect to this Agreement by Seller or any third party. Each of the above additional remedies are intended to be cumulative. In addition to the foregoing, Company shall also be entitled to the following fees, as applicable:

(a) Each time a payment is rejected for insufficient funds an NSF Fee of $35.00 is charged;

(b) On the first instance of any ACH Debit being rejected with a National Automated Clearing House Association ("NACHA") return code of R05, R07, R08, R10, R11, or R29, or such other return code that shall replace any of the foregoing as defined at the time of this Agreement, a "Stop Payment" fee of $2,500.00 is charged ("Stop Payment Fee"). As applicable, a Stop Payment Fee shall be assessed for each Designated Bank Account provided by Seller for which an R05, R07, R08, R10, R11, or R29 code is returned;

(c) On the first occurrence of any event of default, for any reason, a default fee of 10% of any outstanding RTR balance or $2,500.00, whichever is greater, is charged. This is in addition to any other fees set forth within this Agreement.

(d) the foregoing additional remedies contemplated in this subsection (II) are in addition to any other remedies provided for herein and the court costs and collection fees liquidated at the sum of 33.33% set forth within this section 1.14 are in addition to any rights of indemnification that Company may be entitled to within this Agreement.

(e) The parties acknowledge and agree that a breach of this Agreement will damage Company and that by their nature such damage(s) are difficult to ascertain. Accordingly, the parties acknowledge and agree that the various liquidated damages provisions in this section 1.14 are reasonable, not a penalty and solely intended to compensate Company for damages incurred.

**1.15. Required Notifications.** Seller shall give Company written notice within 24 hours of any filing under Title 11 of the United States Code. Seller is required to give Company seven (7) days' written notice prior to the closing of any sale of all or substantially all of the Seller's assets or stock.

**1.16. Publicity.** Seller and each of Seller's owners and all guarantors hereby authorize Company to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.17. D/B/As.** Seller hereby acknowledges and agrees that Company may be using "doing business as" or d/b/a names in connection with various matters relating to the transaction between Company and Seller including but not limited to the

Initials: RT

filing of UCC-1 financing statements.

**1.18. Application of Payments.** Subject to applicable law and generally accepted accounting principles, Company reserves the right to apply payments in any manner Company chooses.

**1.19. Inspection of Collateral and Place of Business; Accounting.** Company or its designated representatives and agents shall have the right, during Seller's normal business hours, and at any other reasonable times and without notice to Seller, to examine Company's bank and merchant processing statements and/or the collateral where located and the interior and exterior of any of Seller's places of business. Any such examination of any of Seller's business may include, among other things, whether Seller: (a) has a place of business that is separate from any personal residence; (b) is open for business; (c) has sufficient inventory to conduct its business; and (d) has one or more point-of-sale terminals to process credit, debit, and/or bank card transactions. When performing an examination, Company or its designated representatives and agents may photograph the interior and exterior of any of Seller's places of business, including any signage and point-of-sale terminals, and may photograph any principal of the Seller. Company or any of its agents shall have the right to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, and/or correspondence that relate to Seller's accounts or other transactions between the parties thereto and the general financial condition of Seller, and Company may remove any of such records temporarily for the purpose of having copies made thereof. Company shall have the right to hire a Certified Public Accountant, licensed in the state where the business is located, to perform analysis of the accounting records for the purpose of determining if the Purchased Percentage of receipts has been made available for remittance to Company. Seller hereby agrees to fully cooperate with such analysis upon the Company's request. In furtherance of the above, Seller agrees to provide current Bank and Merchant Processing account statement(s) upon Company's Request together with real-time access to any and all of Seller's bank, deposit, merchant or other financial account(s) via an online banking aggregation service, including, but not limited to, upSWOT, Decision Logic and Plaid, provided by Company to Seller at the time of underwriting or via the on-line portal of Seller's financial institution(s) (collectively, the "Online Bank Access").  It is agreed and understood that Company shall be entitled, and may at its sole discretion, periodically monitor Seller's financial account(s) whether or not such account(s) were disclosed prior to entering into the Agreement, via Online Bank Access, that the ability to access such information is a material term of consideration under this Agreement and that the withholding or removal of such access shall, upon five (5) days' written notice, constitute a material breach of this Agreement.

**1.20. Overages.** Seller hereby acknowledges and agrees that, in the event of any renewal of the Program, any payment overages shall be applied to its renewal balance unless otherwise requested prior to such renewal.  In the event Seller does not opt to renew its participation in the Program, overages (if any) shall be returned within a reasonable time after completion of the Program and after satisfaction of any and all fees and costs provided herein.

**1.21. Third Party Agents.** Seller hereby acknowledges and agrees that it shall not utilize, retain or otherwise engage any

unlicensed agent ("Agent") to communicate with reference to Seller's obligations under this Agreement without the express written consent of Company, and that in no event shall Company communicate with any such Agent irrespective of any authorizations that may be provided to Company absent such required written consent.  Seller further agrees and understands that it shall be required to disclose any and all fees and contracts, proposed or otherwise, relative to any such Agent, and hereby directs such Agent to disclose any and all fees, contracts and communications between Agent and Seller to Company.

1.22. **Additional Costs.**
(a) Monthly Program Fee.  In addition to the other fees provided for herein, Company shall be entitled, without notice or invoice, to a nonrefundable monthly maintenance fee of $195.00 to be collected via ACH Debit and which shall be due for each month, or portion thereof, during the term of this Agreement. Said fee shall be due and owing upon the first mensiversary of the date of this Agreement and on every mensiversary of the date of this Agreement while Seller maintains a balance due to Company. Each monthly maintenance fee shall be earned upon Company's receipt thereof in consideration of Company's accepting this engagement and servicing the instant transaction as described herein and shall in no way be deemed to represent a diminution of the purchase price set forth herein.  It is hereby agreed and acknowledged that this monthly program fee represents the fair and reasonable cost incurred by the Company in its ongoing servicing.

(b) UCC subordination fee.  In addition to the other fees provided for herein, Company shall be entitled, without notice or invoice, and at Company's sole discretion, to a nonrefundable fee of $500 each time Company subordinates Company's security interest to another party.

(c) Bank Change Fee- $50.00 --- This fee is charged each time when Seller requires a change of bank account to be debited, requiring Company to adjust its system.

**II. REPRESENTATIONS, WARRANTIES AND COVENANTS.** Seller represents warrants and covenants that, as of this date, and, unless expressly stated otherwise during the term of this Agreement:

**2.1. Financial Condition and Financial Information.** Seller's and Guarantor's bank and financial statements, copies of which have been furnished to Company, and future statements which will be furnished to Company hereafter UPON REASONABLE REQUEST of Company are genuine and fairly represent the Average Daily Receipts of Seller at such dates and since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Seller. Seller further represents that it has disclosed any and all Bank and Merchant Processing Accounts maintained by Seller and/or its affiliates to Company. Seller and Guarantor affirmatively represent that they are in compliance and shall remain in compliance and not in default of any contractual obligations.  Seller and Guarantor have a continuing affirmative obligation to inform Company of any material adverse change in their Average Daily Receipts, operation or ownership. Company may request statements at any time during the performance of this Agreement and the Seller and Guarantor shall provide them to Company within three (3)

**Initials:**

business days of such a request. Failure to do so is a material breach of this Agreement.

**2.2. Governmental Approvals.** Seller is in compliance and shall remain in compliance with all laws. Seller represents that it holds all necessary permits, licenses, and authorizations to operate, own and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3. Authorization.** Seller and the person(s) signing this Agreement on behalf of Seller have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4. Insurance.** Company reserves the right to take insurance at Company's expense.

**2.5. Processing and Banking Agreement.** Seller will not change its Merchant Processor, financial institution or bank account(s) or take any other action ("Changes") that could have an adverse effect upon Seller's obligations under this Agreement, including but not limited to, restricting Company's ability to withdraw ACH payments from Seller's account(s), without Company's prior written consent, and shall provide Company with written authorization(s) as necessary, from time to time, to permit Company to ACH debit Seller's account. Notwithstanding any of the foregoing, it is expressly agreed and understood that any such Changes effectuated without Company's prior written consent shall be a material breach of this Agreement.

**2.6. Change of Name or Location.** Seller will not conduct Seller's businesses under any name other than as disclosed to the Processor and Company, nor shall Seller change any of its places of business without Company's prior written consent.

**2.7. No Insolvency.** As of the date of this Agreement, Seller represents that it is operational, operating in the normal course of business, is not insolvent and does not contemplate filing for bankruptcy or foresee any significant change in circumstances that would negatively impact its projected revenues within the foreseeable future. Seller further represents that it has not consulted with a bankruptcy attorney or debt consolidation company within the past six (6) months. Seller also represents that: (a) it has not filed or contemplated filing any petition for bankruptcy protection under Title 11 of the United States Code; (b) it has not filed or contemplated filing an insolvency proceeding (sometimes referred to as an "Assignment of the Benefit of Creditors") pursuant to federal or any state law; and that (c) there is no involuntary petition for bankruptcy protection under Title 11 of the United States Code brought or pending against Seller, nor does Seller anticipate that an involuntary petition will be filed against it.

**NOTWITHSTANDING ANY OF THE FOREGOING WHICH MAY SUGGEST THE CONTRARY, IT IS EXPRESSLY AGREED AND UNDERSTOOD THAT A BANKRUPTCY OR INSOLVENCY FILING BY SELLER SHALL NOT, IN AND OF ITSELF, CONSTITUTE A DEFAULT HEREUNDER.**

**2.8. Working Capital Funding.** Seller shall not enter into any arrangement, agreement or commitment that relates to or involves the Future Receipts or invoices, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Future Receipts or future check sales with any party other than Company without Company's prior written approval.

**2.9. Unencumbered Receipts.** Seller has good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to, the Company's interests. Seller shall disclose to Company any additional funding pursuant to any similar agreement presently in effect.

**2.10. Business Purpose.** Seller represents that it is a valid business presently operating and in good standing under all of its contractual obligations and under the laws of the jurisdictions in which it is organized and/or operates, and Seller is entering into this Agreement for commercial / business purposes and not as a consumer for personal, family or household purposes. Seller further represents that no aspect(s) of its business are presently impaired.

**2.11. Leases.** Seller represents that it is in good standing under any premises lease(s) wherein Seller conducts business ("Leased Premises") and that Seller is entitled to remain in possession of such Leased Premises for a period of at least 360 days from the date of this Agreement.

**2.12. Default Under Other Contracts.** Seller explicitly represents that its execution of and/or performance under this Agreement will not cause or create an event of default by Seller under any contract with another person or entity.

**2.13. Simultaneous Funding.** Seller hereby represents that it has not and shall not receive or request any additional funding pursuant to any similar Agreement with any other entity within 30 days hereof and shall not request or receive any additional funding or enter into any factoring arrangement within 30 days hereof without Company's prior written consent.

**2.14. Good Faith.** Seller and Guarantor(s) hereby affirm that Seller is receiving the Purchase Price and selling Company the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Seller's business. Based upon Seller's and Guarantor's calculations and experience in operating Seller's business, Seller and Guarantor(s) are confident that the Purchase Price paid by Company in exchange for the Purchased Amount of Future Receipts constitutes fair consideration for the present value of such Future Receipts and will be used in a manner that will benefit Seller's current and future business operations.

**III. MISCELLANEOUS**

**3.1. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Company.

**3.2. Assignment.** Company may assign, transfer, or sell its rights to receive the Purchased Amount or delegate its duties

Initials: _RT_

hereunder, either in whole or in part.

**3.3. Notices.** Except as otherwise provided in this Agreement, all notices and other communications hereunder shall be deemed to have been sufficiently given when sent via electronic mail to rtritinger@mazzonicenter.org and legal@thelcfgroup.com and/or when mailed, postage prepaid, via 2-3 day shipping through a nationally recognized courier, including, but not limited to, the USPS, FedEx or UPS, such notices or communications to be addressed as follows:

If to LCF:

THE LCF GROUP, INC.
Attn: Legal Department
3000 Marcus Avenue, Suite 2W15
Lake Success, NY 11042
legal@thelcfgroup.com

If to Obligor(s):

1348 Bainbridge Street,
Philadelphia, Pennsylvania 19147
rtritinger@mazzonicenter.org

or at such other address as the party to whom such notice or demand Is directed may have designated in writing to the other party hereto by notice as provided in this Section 3.3. Each of the parties hereto shall have the right to rely on written notice sent by electronic mail as an original notice given hereunder.  Each of the signatories to this Agreement irrevocably consents to service of process by Certified Mail at the address listed with the Notices provision of this Agreement contained within this paragraph. Each of the signatories to this Agreement agrees that its submission to jurisdiction and consent to service of process by mail is made for the express benefit of each of the other signatories to this Agreement.

**3.4. Waiver of Remedies.** No failure on the part of Company to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**3.5. Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Seller, Company and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the Company's prior written consent which consent may be withheld in Company's sole discretion. Company reserves the rights to assign this Agreement with or without prior written notice to Seller. This Agreement shall be governed by and construed in accordance with the procedural and substantive laws of the State of New York, without regard to any applicable principles of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if Company so elects, be instituted in the state courts located within the State of New York, County of Nassau and/or those federal courts having jurisdiction over the

State of New York, County of Nassau  (the "Acceptable Forums"). Seller agrees that the Acceptable Forums are convenient to it and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Seller further submits to the jurisdiction of the Acceptable Forums over all depository accounts irrespective of their location or whether the subject banking institution deems themselves a separate entity. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Company to transfer such proceeding to an Acceptable Forum.

**3.6. Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**3.7. Severability.** If any of the provisions in this Agreement are found to be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**3.8. Interpretation.** All parties acknowledge that: (i) they understand the seriousness of the provisions of this Agreement, including, but not limited to, that this Agreement constitutes a non-recourse purchase and sale of future receivables, and that this Agreement includes a Jury Trial Waiver, a provision providing for the arbitration of disputes, a waiver on class, collective and/or representative actions, a Security Agreement and Guaranty(s) of performance of Seller's obligations under the Agreement hereon; and (ii) all parties and signatories have had a full opportunity to consult with counsel of their choice in their preferred language or have decided not to avail themselves of that opportunity.  The parties to this Agreement acknowledge that this Agreement is a result of extensive negotiations between the parties and that this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing any instrument to be drafted.

**3.9. Monitoring, Recording and Solicitations.** Seller and Guarantor authorize Company, its affiliates, agents, marketing partners and independent contractors to contact Seller and Guarantor at any telephone number Seller or Guarantor provides to Company or from which Seller or Guarantor places a call to Company or any telephone number where Company believes it may reach Seller or Guarantor, using any means of communication including, but not limited to, calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller or Guarantor incurs charges for receiving such communications. Seller and Guarantor also agree that Company, its affiliates, agents, and independent contractors may use any other medium not prohibited by law including, but not limited to, mail, email, and facsimile to contact Seller or Guarantor. Seller or Guarantor expressly consent to conduct business by electronic means. Seller acknowledges and agrees that Company may monitor and/or record any communications and Seller consents to such monitoring and/or recording by Company. Seller or Guarantor are not required to agree to this section 3.9 in order to enter into this Agreement. If Seller or Guarantor wish to opt out of this section 3.9 or wish to change how Company contacts them for marketing

Initials: RT

purposes, such request shall be made in writing in accordance with the notice provisions of this Agreement.

**IV. JURY TRIAL WAIVER; COUNTERCLAIM WAIVER; CLASS ACTION WAIVER; CONSENT TO SERVICE; ARBITRATION.**

**4.1 JURY TRIAL WAIVER.** The parties hereto waive trial by jury in any court in any suit, action or proceeding on any matter arising in connection with or in any way related to the transactions of which this Agreement is a part or the enforcement hereof. The parties hereto acknowledge that each makes this waiver knowingly, willingly, and voluntarily and without duress, and only after extensive consideration of the ramifications of this waiver with their attorneys.

**4.2 CLASS ACTION WAIVER.** The parties hereto waive any right to assert any claims against the other party as a representative or member in any class, representative or collective action, except where such waiver is prohibited by law as against public policy. To the extent either party is permitted by law or court of law to proceed with a class representative or collective action against the other, the parties hereby agree that: (1) the prevailing party shall not be entitled to recover attorneys' fees or costs associated with pursuing the class or representative action (notwithstanding any other provision in this Agreement); and (2) the party who initiates or participates as a member of the class will not submit a claim or otherwise participate in any recovery secured through the class, collective or representative action.

**4.3.  WAIVER OF COUNTERCLAIMS.**  Seller waives the right to interpose any counterclaim in any court in any suit, action or proceeding on any matter arising in connection with or in any way related to the transactions of which this agreement is a part or the enforcement hereof. Seller acknowledges that it makes this waiver knowingly, willingly, and voluntarily and without duress, and only after extensive consideration of the ramifications of this waiver with their attorneys.

**4.4. ARBITRATION.** Notwithstanding the foregoing, any dispute, claim or controversy arising out of or relating to this Agreement, the Security Agreement or the guaranty(s) herein, or the breach of any of the said Agreement, Security Agreement or the guaranty(s), shall be, at the election of either party, settled by arbitration administered by Mediation and Civil Arbitration, Inc. d/b/a RapidRuling (www.rapidruling.com) in accordance with its Arbitration Rules & Procedures effective at the time a claim is made, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.   An election to arbitration by either party shall be deemed effective by the commencement of an arbitration proceeding with Mediation and Civil Arbitration, Inc. The parties consent to electronic service of process, with service to be made to the following email addresses        rtritinger@mazzonicenter.org        and legal@thelcfgroup.com and/or when mailed, postage prepaid, via 2-3-day shipping through a nationally recognized courier, including, but not limited to, the USPS, FedEx or UPS, such notices or communications to be sent to the addresses provided in section 3.3 hereof.  For the avoidance of doubt, lack of actual receipt or refusal to accept delivery shall not affect the effectiveness of any such notice or communication provided that such notice is properly directed to the above-mentioned email address(es).  The parties agree that, in the event of confirmation

and enforcement, the delinquent party will be responsible for any attorney, court or other fees associated with such action. The parties agree to split all Mediation and Civil Arbitration, Inc. d/b/a RapidRuling fees evenly and the commencing party shall be entitled to any unreimbursed monies paid on behalf of the non-commencing party within any award.

[Remainder of Page Intentionally Left Blank]

**Initials:** _RT_

**Entire Agreement.** Any provision of this Agreement prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement together with the Security Agreement, Personal Guaranty of Performance, Power of Attorney and any schedules or addenda hereto, unless specifically enumerated within a writing subscribed to by all parties hereto, embody the entire agreement between Seller and Company and supersede all prior agreements and understandings, including any representations by Seller's broker to Seller, relating to the subject matter hereof but shall not vitiate, supersede or cancel any concurrent agreement or guaranty presently in effect involving any of the parties hereto unless such concurrent agreement or guaranty presently in effect is specifically referenced in an addendum, appendix or exhibit executed in conjunction with this Agreement.  It is further agreed and understood that Seller is not required to utilize a broker to consummate this transaction, that any broker involved in the procurement of this Agreement is an agent of the Seller and that any fees paid by Seller to its broker is separate and apart from this Agreement. Any words used in this Agreement in the singular, where the context so permits, shall be deemed to include the plural and vice versa. The definitions of words in the singular in this Agreement shall apply to such words when used in the plural where context so permits and vice versa.

**SELLER #1**    *Rachelle Tritinger (Owner 1)*

By:_____
    Signature
    Rachelle Tritinger / Owner
    Print Name and Title

    _____
    SS#

**OWNER/GUARANTOR#1**    *Rachelle Tritinger (Owner 1)*

By:_____
    Signature
    Rachelle Tritinger / Owner
    Print Name and Title

THE LCF GROUP, INC.

_____
By: Robert Klieber
Title: Chief Operating Officer

Initials: _RT_

# GUARANTY - PERSONAL GUARANTY(S) OF PERFORMANCE

**This PERSONAL GUARANTY OF PERFORMANCE is entered into in conjunction with that certain AGREEMENT FOR PURCHASE AND SALE OF FUTURE RECEIVABLES (hereinafter "PSFRA", which together with the SELLER AGREEMENT TERMS AND CONDITIONS, the SECURITY AGREEMENT, the PERSONAL GUARANTY(S) OF PERFORMANCE, the POWER OF ATTORNEY and any appendices and addenda hereto and executed in conjunction herewith, shall be collectively referred to as the "Agreement"),** made at the specific insistence and request of __Mazzoni Center DBA Mazzoni Center__ ("Seller") on this <u>11</u> day of <u>September</u>, <u>2024</u> and made within the State of New York, County of Nassau, by and between The LCF Group, Inc., having an office at 3000 Marcus Avenue, Suite 2W15, Lake Success NY 11042 (the "Company"), and Seller, having an office at <u>1348 Bainbridge Street, Philadelphia</u>, <u>Pennsylvania</u> <u>19147</u>.

Company is buying the Purchased Amount of Future Receipts knowing the risks that Seller's business may slow down or fail, and Company assumes these risks based on Seller's representations, warranties and covenants in the Agreement which are designed to give Company a reasonable and fair opportunity to receive the benefit of its bargain.

Guarantor(s) represent that they (i) will derive a direct or indirect economic benefit from the Agreement; and (ii) are directly or indirectly involved in the business operations of Seller.

Accordingly, as further consideration under the Agreement, the undersigned Guarantor hereby: (i) reaffirms that this Agreement evidences the purchase and sale of Receivables and does not constitute a loan; and (ii) unconditionally guarantees to Company, Seller's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Seller in the Agreement and as each agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations").

Seller and Guarantor acknowledge that this Guaranty is not a personal guaranty of payment, but of performance.

**Scope of Guaranty.** Guarantor's obligations are due at the time of any breach by Seller of any representation, warranty, or covenant made by Seller in the Agreement. In the event Seller fails to perform any of the Guaranteed Obligations, Company may recover from Guarantor(s) for all of Company's losses, damages, and remedies specified in section 1.14 of the Agreement by enforcing its rights under this Guaranty without first seeking to obtain payment from Seller, any other guarantor, or any Collateral, Additional Collateral or Cross- Collateral Company may hold pursuant to the Agreement or any other agreement or guaranty.

In the event that Company must return any amount paid by Seller or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding, including, but not limited to, proceedings under the United States Bankruptcy Code or any state counterpart, Guarantor(s)' obligations under the Agreement and this Guaranty shall include that amount. For the avoidance of doubt, an event of

insolvency (including, but not limited to, filing for protection under the United States Bankruptcy Code or a state assignment for the benefit of creditors action) shall not – in and of itself - be deemed an event of default under the Agreement and/or this Guaranty.

**Guarantor Waivers.** Guarantor hereby expressly waives any requirement that Company notify Guarantor of any of the following events and, as such, Guarantor will not be released from their obligations under the Agreement and this Guaranty if it is not notified of:
  i. Seller's breach of its performance obligations under the Agreement;
  ii. any adverse change in Seller's financial condition or business;
  iii. any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations;
  iv. Company's acceptance of the Agreement; or
  v. any renewal, extension or other modification of the Seller Agreement or Seller's other obligations to Company.

In addition, Company may take any of the following actions without releasing Guarantor from any of its obligations under the Agreement:
  i. renew, extend, or otherwise modify the Agreement or Seller's other obligations to Company;
  ii. release Seller from its obligations to Company;
  iii. sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and
  iv. foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor(s) to obtain reimbursement for payment under the Agreement or this Guaranty. Until the Purchased Amount plus any of Seller's other obligations to Company under the Agreement are satisfied, Guarantor(s) shall not seek reimbursement from Seller or any other guarantor for any amounts paid by it under this Agreement or Guaranty. Guarantor(s) permanently waive and shall not seek to exercise any of the following rights that they may have against Seller, any other guarantor, or any

**Initials:** 

collateral provided by Seller or any other guarantor, for any amounts paid by it, or acts performed by it, under the Agreement or this Guaranty: a) subrogation; b) reimbursement; c) performance; d) indemnification; or e) contribution.

**Guarantor Acknowledgement.** Guarantor(s) acknowledge that they understand the seriousness of the provisions of this Guaranty, including, but not limited to, that the Agreement constitutes a non-recourse purchase and sale of future receivables, and that the Agreement includes a Jury Trial Waiver, a provision providing for the arbitration of disputes, a waiver on class actions, collective and/or representative actions, a Security Agreement and Guaranty(s) of performance of Seller's obligations under the Agreement; and that, prior to entering into the Agreement and this Guaranty, all parties and signatories have had a full opportunity to consult with counsel of their choice in their preferred language or have decided not to avail themselves of that opportunity.  The parties to this agreement acknowledge that the Agreement is a result of extensive negotiations between the parties and that the Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting or causing any instrument to be drafted.

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting Guarantors under this Guaranty are joint and several.

**Jurisdiction and Choice of Law.**  This Guaranty and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the laws of the State of New York. The state courts located In Nassau County, State of New York, and the federal courts within the Eastern District of New York (as applicable) shall have exclusive jurisdiction over all legal proceedings relating to this Guaranty.

**JURY TRIAL WAIVER.** The parties hereto waive trial by jury in any court in any suit, action, or proceeding on any matter arising in connection with or in any way related to the transactions of which the Agreement and/or this Guaranty is a part or the enforcement hereof. The parties hereto acknowledge that each makes this waiver knowingly, willingly, voluntarily, and without duress, and only after extensive consideration of the ramifications of this waiver with their attorneys.

**WAIVER OF COUNTERCLAIMS.**  Seller waives the right to interpose any counterclaim in any court in any suit, action, or proceeding on any matter arising in connection with or in any way related to the transactions of which the Agreement and/or this Guaranty is a part or the enforcement hereof. Seller acknowledges that it makes this waiver knowingly, willingly, voluntarily, and without duress, and only after extensive consideration of the ramifications of this waiver with their attorneys.

**CLASS ACTION WAIVER.** The parties hereto waive any right to

assert any claims against the other party as a representative or member in any class, representative, or collective action, except where such waiver is prohibited by law as against public policy. To the extent either party is permitted by law or court of law to proceed with a class, representative, or collective action against the other, the parties hereby agree that: (1) the prevailing party shall not be entitled to recover attorneys' fees or costs associated with pursuing the class or representative action (notwithstanding any other provision in the Agreement); and (2) the party who initiates or participates as a member of the class will not submit a claim or otherwise participate in any recovery secured through the class or representative action. Seller and Guarantor(s) acknowledge that it makes this waiver knowingly, willingly, voluntarily, and without duress, and only after extensive consideration of the ramifications of this waiver with their attorneys.

**ARBITRATION.** Notwithstanding the foregoing, any dispute, claim, or controversy arising out of or relating to the Agreement, the Security Agreement, the Power of Attorney(s) or any Guaranty(s) related to the foregoing, or the breach of any of the said Agreement, the Security Agreement, the Power of Attorney(s) or any Guaranty(s) shall be, at the election of either party, settled by arbitration administered by Mediation and Civil Arbitration, Inc. d/b/a RapidRuling (www.rapidruling.com) in accordance with its Arbitration Rules & Procedures effective at the time a claim is made, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  An election to arbitrate by either party shall be deemed effective by the commencement of an arbitration proceeding with Mediation and Civil Arbitration, Inc. d/b/a RapidRuling. The parties' consent to electronic service of process, with service to be made to the following email addresses        rtritinger@mazzonicenter.org        and legal@thelcfgroup.com and/or when mailed, postage prepaid, via 2–3-day shipping through a nationally recognized courier, including, but not limited to, the USPS, FedEx or UPS, such notices or communications to be sent to the addresses provided in section 3.3 of the Agreement ("Notices").  The parties agree that, in the event of confirmation and enforcement, the delinquent party will be responsible for any attorney, court, or other fees associated with such action. The parties agree to split all Mediation and Civil Arbitration, Inc. fees evenly and the commencing party shall be entitled to any unreimbursed monies paid on behalf of the non-commencing party within any award.

**Notices.** Except as otherwise provided in the Agreement and/or this Guaranty, all notices and other communications hereunder shall be deemed to have been sufficiently given when sent via electronic    mail    to    rtritinger@mazzonicenter.org    and legal@thelcfgroup.com and/or when mailed, postage prepaid, via 2-3-day shipping through a nationally recognized courier, including, but not limited to, the USPS, FedEx or UPS, such notices or communications to be addressed as follows:

15

**Initials:** RT

- If to LCF:

    THE LCF GROUP, INC.
    Attn: Legal Department
    3000 Marcus Avenue, Suite 2W15
    Lake Success, NY 11042
    legal@thelcfgroup.com

- If to Guarantor(s):

    1348 Bainbridge Street,
    Philadelphia, Pennsylvania 19147
    rtritinger@mazzonicenter.org

or at such other address as the party to whom such notice or demand Is directed may have designated in writing to the other party hereto by notice as provided in this section. Each of the parties hereto shall have the right to rely on written notice sent by electronic mail as an original notice given hereunder. Each of the signatories to this Guaranty irrevocably consents to service of process by Certified Mail at the addresses listed within this section. Each of the signatories to this Guaranty agrees that its submission to jurisdiction and consent to service of process by mail is made for the express benefit of each of the other signatories to this Guaranty of process by Certified Mail at the addresses listed within this section. Each of the signatories to this Guaranty agrees that its submission to jurisdiction and consent to service of process by mail is made for the express benefit of each of the other signatories to this Guaranty.

[Remainder of Page Intentionally Left Blank]

**Initials:**

THE SELLER AGREEMENT TERMS AND CONDITIONS, ALONG WITH ALL DEFINITIONS AND INFORMATION SET FORTH THEREIN ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTY.   CAPITALIZED TERMS NOT DEFINED IN THE SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE SELLER AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

OWNER/GUARANTOR #1        *Rachelle Tritinger (Owner 1)*

By:_____

   Signature
   Rachelle Tritinger / Owner
   _____

   Print Name and Title
   _____

   SS#

THE LCF GROUP, INC.

_____

By: Robert Klieber
Title: Chief Operating Officer

**Initials:**  *RT*

# The LCF Group, Inc. - SECURITY AGREEMENT

Seller's Legal Name ("Seller"): **Mazzoni Center**

D/B/A: **Mazzoni Center**

Federal TAX ID#

Guarantor(s)' Legal Name(s) ("Guarantor(s)"): **1334-48 Bainbridge Street LLC EIN:**

Federal TAX ID#

Personal Guarantor(s)' Name(s) ("Personal Guarantor(s)") **Rachelle Tritinger**

Social Security#              , --,  --,  --

Physical Address: <u>1348 Bainbridge Street</u> City: <u>Philadelphia,</u> State: <u>Pennsylvania</u> Zip: <u>19147</u>

**THIS SECURITY AGREEMENT** is entered into by and between THE LCF GROUP, INC. ("LCF" or "Company"), having an office at 3000 Marcus Avenue, Suite 2W15, Lake Success NY 11042, and the above-listed Seller(s), having a place of business as listed above, any Guarantor(s) listed above ("Guarantor(s)"), having a place of business as listed above, and any Personal Guarantor(s) ("Personal Guarantor(s)"), having a place of business as listed above listed above (the Seller, any Guarantor(s), and any Personal Guarantor(s) shall be collectively referred to as, "Obligor(s)", and Obligors together with LCF shall collectively be referred to as, the "Parties"), as security for, and to guarantee the performance and observance of, all obligations and agreements of any kind of Obligor(s) to LCF, however evidenced, whether now existing or hereafter arising, whether direct or indirect, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, including, without limitation, those which arise under or in connection with any of the agreements now or hereafter in existence (the "Obligations"), the Parties hereto agree that:

1. LCF and Seller have entered into one or more agreements wherein LCF has purchased a certain sum of Future Receipts from Obligor(s). Said agreement(s) may hereafter be supplemented, renewed, modified, and/or augmented by way of further agreements for same, in the event of which the instant agreement shall still be considered in full force and effect (the "Agreement").

2. The Future Receipts sold by Seller to Company pursuant to this Agreement are "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code as in effect in the state in which the Seller is located (the "UCC") and such sale shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Future Receipts free and clear of any liens and encumbrances, from Seller to Company. To the extent the Future Receipts are "accounts" or "payment intangibles" then: (i) the sale of the Future Receipts creates a security interest as defined in the UCC; (ii) this Agreement constitutes a "security agreement" under the UCC; and (iii) Company has all the rights of a secured party under the UCC with respect to such Future Receipts. Seller further agrees that, with or without an Event of Default, Company may notify account debtors, or other persons obligated on the Future Receipts, or holding the Future Receipts, of Seller's sale of the Future Receipts, and may instruct them to make payment or otherwise render performance to or for the benefit of Company.

3. Obligor hereby further grants to LCF a security interest (the "Security Interest") in all of Obligor's shares in the Seller or Guarantor entities, all of Obligor LLC interests in any of the Seller or Guarantor(s) entities, Obligor(s) personal property, tangible and intangible, wherever located, whether now owned or hereafter acquired, including, without limitation, all equipment, Inventory, contract rights, franchise agreements, copyrights, patents, trade names, trademarks, fixtures, permits, licenses, accounts receivable, deposit accounts, lease rights, and payments due from credit card and bank card companies or processors, and to the extent not otherwise included, all proceeds and products of the foregoing, in whatever form including, without limitation, all payments under insurance, whether or not LCF is the loss payee thereof, all proceeds of any governmental taking, and any indemnity, warranty, letter of credit (including the right to draw on such letter of credit), or guaranty payable by reason of any default under, loss of, damage to, or otherwise with respect to, any of the foregoing (collectively, the "Collateral").

4. Obligor(s) will perform all lawful acts which LCF deems necessary or desirable to protect the Security Interest or otherwise to carry out the provisions of this Agreement, including, but not limited to, the execution of Uniform Commercial Code financing, continuation, amendment and termination statements, and similar instruments and the

**Initials:** _RT_

procurement of waivers and disclaimers of interest in the Collateral by the owners of any real estate on which the Collateral is located. Obligor(s) shall furnish LCF, from time to time, upon reasonable request, with financial statements as well as written statements and schedules identifying and describing the Collateral in such detail as LCF may require.

5.    Obligor hereby authorizes LCF to file, without the signature of Obligor, one or more UCC-1 Financing and/or Continuation Statements, and amendments thereto, relating to the Collateral. Obligor irrevocably appoints LCF as its authorized representative (coupled with an interest), with full authority in the place and stead of Obligor and in its name or otherwise, from time to time, in LCF's discretion, to take any action or execute any instrument which LCF may deem necessary and advisable to accomplish the purposes of this Agreement, including, without limitation:

(i)    to obtain and adjust insurance, at LCF's expense, required to be paid to LCF hereunder;

(ii)   to collect moneys due and to become due under or in respect of any of the Collateral;

(iii)  to receive, endorse, and collect any checks, drafts, or other instruments, document, or chattel paper in connection with clause (i) or clause (ii) above;

(iv)   to sign Obligor's name on any invoice or bill of lading relating to any account, on drafts against customers, on schedules and assignment of accounts, on notices of assignments, financing statements, and other public records, on verification of accounts and on notices to customers and account debtors (including notices directing customers and account debtors to make payment directly to LCF); and

(v)    to file any claims or take any action or institute any proceeding on behalf of Obligor which LCF may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of LCF with respect to any of the Collateral.

If Obligor fails to perform under any agreement contained herein, LCF may itself perform, or cause performance of, such agreement, and the costs and expenses incurred by LCF in connection therewith shall be payable by Obligor and shall be fully secured hereby.

The powers conferred upon LCF hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon LCF to exercise any such powers. LCF shall have no duty to Obligor with respect to the Collateral other than the duty to use reasonable care in the safe custody of any of the Collateral in its possession. Without limiting the generality of the foregoing, LCF, although it may do so at its option, shall be under no obligation to Obligor or any other party to take any steps necessary to preserve rights in the Collateral against other parties or any other rights pertaining to the Collateral, including, without limitation, the performance of Obligor's obligations under any agreement.

Anything herein to the contrary notwithstanding, (i) Obligor shall remain liable under any contracts and agreements

relating to the Collateral, to the extent set forth therein, to perform all of Its Obligations thereunder to the same extent as if this Security Agreement had not been executed; and (ii) the exercise by LCF of any of its rights pursuant to the Purchase and Sale of Future Receivables Agreement, this Security Agreement, any Guaranty(s) of performance, any Power of Attorney or LCF's obtaining a judgment shall not release any Obligations under this Security Agreement, any other contracts, or agreements relating to the Collateral.

6.    The Obligor may not sell, assign, or otherwise transfer any interest in all or a portion of the Collateral, outside of the ordinary course of business, without first obtaining LCF's written consent. Should such consent be given, Obligor agrees to account to LCF for the proceeds of any such sale, to hold such proceeds in trust for LCF, and to pay same to LCF to be applied against the Obligations of Obligor to LCF. Obligor authorizes LCF to track the whereabouts of any Collateral. Obligor represents and warrants that:

(i)    all of the Collateral is and shall continue to be located at the address set forth above. In the event Obligor utilizes multiple locations in the ordinary course of business, Collateral shall continue to be located at said locations;

(ii)   none of the Collateral shall be removed from such location, outside of the ordinary course of business, unless LCF receives written notice of such removal, stating the address to which such Collateral will be removed, at least thirty (30) days prior to such removal;

(iii)  Obligor is the lawful owner of the Collateral free from any adverse lien, security Interest, encumbrance, or any other interest whatsoever, and has the sole right to grant a security interest therein and will defend the Collateral against dilution and all claims and demands of all persons;

(iv)   Obligor will keep the Collateral free and clear of all attachments, levies, taxes, liens, security Interests, and encumbrances of every kind and nature;

(v)    Obligor will not, outside of the ordinary course of business, sell, exchange, or otherwise dispose of the Collateral or any of LCF's rights therein or permit any lien or security interest to attach to same (except the lien created by this Agreement), without LCF's prior written consent;

(vi)   Obligor shall execute any written Instruments and do any other acts necessary to effectuate more fully the purposes and provisions of this Agreement, including such instruments as LCF may require to perfect LCF's interest therein in any filing office;

(vii)  Obligor will not permit anything to be done that may impair or lessen the value of any of the Collateral or the security interest granted by this Agreement;

(viii) Obligor will indemnify and hold LCF harmless from all loss, costs, damage, liability or expense, including reasonable attorney's fees, that LCF may sustain or incur to enforce payment, performance or fulfillment of any of the Obligations secured hereby or In the enforcement of this Agreement and the priority thereof  or in the prosecution or

19

**Initials:** RT

defense of any action or proceeding either against LCF or Obligor concerning any matter growing out of or in connection with this Agreement and/or any of the Obligations secured hereby and/or any of the Collateral; and

(ix)    the execution of this Agreement has been duly approved by the undersigned in any manner required by law.

7.    Obligor shall maintain insurance covering the Collateral with financially sound and reputable insurers, satisfactory to LCF against such risks as are customarily insured by a business in the same or similar industry and similarly situated for an amount not less than the full replacement value of such Collateral. All such insurance policies covering property on and after the date the Collateral becomes subject to the Security Interest shall be written so as to be payable in the event of loss to LCF and shall provide for at least 30 days prior written notice to LCF prior to cancellation or modification of each such policy. LCF is hereby appointed as Obligor's irrevocable authorized representative during the term of this Agreement to settle any claims with insurers in the event of loss or damage, and, upon an Event of Default under this Agreement, to cancel, assign, or surrender any insurance policies.

8.    The following shall constitute events of default ("Default") under this Agreement and shall be hereinafter referred to as "Default" or "Defaults":

(i)    Default or breach by Obligor of any Obligation under any agreement between Obligor and LCF;

(ii)    Obligor's failure to comply with any of the terms of this Security Agreement;

(iii)    any material representation, warranty, or other statement of fact given herein or in any writing at any time furnished by or on behalf of Obligor to LCF in connection with this Agreement or otherwise shall be false or misleading in any material respect when given;

(iv)    Any event of default pursuant to the PSFRA entered into in conjunction with the instant Security Agreement;

(v)    Judgment or decree is entered appointing a receiver, trustee, liquidator, or conservator of Obligor or any substantial part of its assets by virtue of an allegation of fraud or dishonesty engaged in by Obligor;

(vi)    a petition under the federal bankruptcy laws or any state insolvency law is filed against Obligor or any guarantor of the Obligations by virtue of an allegation of fraud or dishonesty engaged in by Obligor;

(vii)    judgments aggregating in excess of $25,000 are rendered against Obligor or any attachments, injunctions, or executions are issued against any Collateral having an aggregate value in excess of $25,000; and

(viii)    Obligor sells or transfers its business, in whole or in part without prior written consent of LCF.

9.    Upon any Event of Default, Company may pursue any

remedy available at law (including those available under the provisions of the UCC) or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration or otherwise, to wit:

(i)    In the event of a Default, LCF may, in its discretion, deem all of the Obligations of Obligor immediately due and owing without further notice and without legal process, and immediately take possession of the Collateral in furtherance thereof, sell or otherwise dispose of such Collateral or any part thereof, and pursue any and all further rights and remedies it may have under the law including, without limitation, the rights of a secured party under New York law and/or the Uniform Commercial Code. Obligor shall pay all expenses and reimburse LCF for all expenditures, including reasonable attorneys' fees, collection fees, and legal expenses, in connection with LCF's exercise of any of its rights and remedies under this Agreement;

(ii)    In the event any consent, approval, or authorization of any governmental agency shall be necessary to effectuate any such sale or sales of the Collateral by LCF, Obligor shall execute such instruments as may be required to obtain such consent, approval, or authorization. After deduction of all reasonable costs and expenses of collection, custody, sale, other disposition, delivery, and all other charges (including reasonable attorneys' fees) due against the Collateral, any residue of the proceeds of any such sale or other disposition shall be applied to payment of the Obligations, except as otherwise provided by law or directed by any court of competent jurisdiction thereof. Obligor shall be liable for any deficiency in payment of the Obligations, including all reasonable costs and expenses of collection, custody, sale, other disposition, delivery, and all other charges (including reasonable attorney's fees) secured by the Collateral;

(iii)    Upon the occurrence of a Default and at any time or times thereafter, subject to the provisions of applicable law, LCF may institute proceedings in any court of competent jurisdiction for the appointment of a receiver of the Collateral or of any part thereof or may by instrument in writing appoint any person to be receiver of the Collateral or any part thereof; and any such receiver appointed by instrument in writing shall have the power to:

a.    take possession of the Collateral or any part thereof;

b.    carry on the business of Obligor;

c.    borrow money on the security of the Collateral required for the maintenance, preservation, or protection of the Collateral or any part thereof or for the carrying on of the business of Obligor; and

d.    sell, lease, or otherwise dispose of the whole or any part of the Collateral at public auction, by public tender, or by private sale, either for cash or upon credit, at such time and upon such terms and conditions as the receiver may determine; provided that any such receiver shall be deemed the agent of Obligor and LCF shall not be in any way responsible for any misconduct or negligence of any such receiver.

20

**Initials:** RT

10.  Obligor shall be liable for, and Company may charge and collect all costs and expenses, including, but not limited to, attorney's fees provided for within this Agreement, which may be incurred by Company in protecting, preserving, and enforcing Company's security interest and rights.

11.  Obligor(s) each agree not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral, the Additional Collateral, or the Cross-Collateral, as applicable without prior written consent of LCF and further represent that their execution of and/or performance contemplated under this Agreement will not cause or create an event of default by Obligor(s) under any contract with another person or entity.

12.  Company shall have the right to cure Obligor's default in the payment of rent on the following terms. In the event Obligor is served with papers in an action against Obligor for nonpayment of rent or for summary eviction, Company may execute its rights and remedies hereunder and, to the extent permissible by law, deem this document to act as an Assignment of Lease from Obligor to LCF. Obligor also agrees that Company may enter into an agreement with Obligor's landlord giving Company the right: (a) to enter Obligor's premises and take possession of the furnishings, fixtures, and equipment therein for the purpose of protecting and preserving same; and (b) to assign Obligor's lease to another qualified operator capable of operating a business comparable to Obligor's at such premises.

13.  In the event Obligor shall have defaulted upon its obligations under the Agreement prior to a bankruptcy filing under Chapters 7, 11, or 13 of the Federal Bankruptcy Code, in consideration of the advances made by LCF to Obligor under the Purchase and Sale of Future Receivables Agreement and other good and valuable consideration, Obligor hereby consents to modification of the automatic stay set forth in 11 U.S.C. §362 to allow LCF to immediately take possession of the Collateral, sell same, and apply the sale proceeds to the payment of the Obligations. Obligor understands that LCF is making such advances in reliance upon Obligor's agreement to such modification of the automatic stay.

14.  In the event Obligor shall have defaulted upon its obligations under the Agreement prior to a bankruptcy filing under Chapters 7, 11, or 13 of the Federal Bankruptcy Code, in consideration of the advances made by LCF to Obligor under the Purchase and Sale of Future Receivables Agreement and other good and valuable consideration, Obligor shall reimburse LCF for all of LCF's reasonable cost and expenses (including, without limitation, reasonable legal fees and expenses including, but not limited to, any liquidated legal fees provided for within the Agreement) in connection with or arising out of this Agreement or any Default, enforcement or collection proceeding resulting therefrom, including, without limitation, all manner of participation in: (a) bankruptcy, insolvency, receivership, foreclosure, winding up, or liquidation proceedings of the Obligor, (b) judicial or regulatory proceedings in connection with the collection of the Obligations, and (c) workout, restructuring, and other negotiations or proceedings (whether or not any transaction contemplated thereby is consummated) in connection with the collection of the Obligations.

15.  To the extent permitted by law, Obligor hereby waives demand for payment, notice of dishonor or protest, and all other notices of any kind in connection with the Obligations except notices required hereby, by law or by any other agreement between Obligor and LCF.  LCF may release, exchange, or modify any Collateral or security which It may from time to time hold and may release, surrender, or modify the liability of any third party without giving notice hereunder to Obligor. Such modifications, changes, renewals, releases, or other actions shall in no way affect any of the Obligations or Obligor's other obligations hereunder.

16.  Obligor will pay, indemnify, and hold harmless LCF from and against all costs and expenses (including taxes, if any) arising out of or incurred in connection with any transfer of Collateral into or out of the name of LCF.

17.  Obligor(s) each agree to execute any documents or take any action in connection with this Agreement as LCF deems necessary to perfect or maintain LCF's priority security interest in the Collateral, together with any Additional Collateral and Cross-Collateral as the case may be, including the execution of any account control agreements. Seller and Guarantor each hereby authorize Company to file any financing statements deemed necessary by Company to perfect or maintain Company's security interest, which financing statement may contain notification that Seller and Guarantor have granted a negative pledge to Company with respect to the Collateral, the Additional Collateral and the Cross-Collateral, and that any subsequent lien or may be tortiously interfering with Company's rights.

18.  Except as otherwise provided in this Agreement, all notices and other communications hereunder shall be deemed to have been sufficiently given when sent via electronic mail to rtritinger@mazzonicenter.org and  legal@thelcfgroup.com and/or when mailed, postage prepaid, by certified or registered mail, return receipt requested, and the sender shall have received such return receipt, or sent by trackable courier service, such notices or communications to be addressed as follows:

•  If to LCF:

THE LCF GROUP, INC.
Attn: Legal Department
3000 Marcus Avenue, Suite 2W15
Lake Success, NY 11042
legal@thelcfgroup.com

•  If to Obligor(s):

1348 Bainbridge Street,
Philadelphia, Pennsylvania 19147
rtritinger@mazzonicenter.org

or at such other address as the party to whom such notice or demand Is directed may have designated in writing to the other party hereto by notice as provided in this section 18. Each of the parties hereto shall have the right to rely on written notice sent by electronic mail as an original notice given hereunder. Each of the signatories to this Agreement

**Initials:** RT

irrevocably consents to service of process by Certified Mail at the address listed within this section. Each of the signatories to this Agreement agrees that its submission to jurisdiction and consent to service of process by mail is made for the express benefit of each of the other signatories to this Agreement.

19. No course of dealing between Obligor(s) and LCF, nor any delay in exercising, on the part of LCF, any right, power, or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies hereunder are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law or in equity, including, without limitation, the rights and remedies of a secured party under the Uniform Commercial Code. It is understood and agreed that all understandings and agreements heretofore had between the parties, if any, with respect to the subject matter hereof, are merged into this Security Agreement, which alone fully and completely expresses their agreement with respect thereto.

20. This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the laws of the State of New York. The state courts located In Nassau County, State of New York, and the federal courts of the Eastern District of New York, shall have exclusive jurisdiction over all legal proceedings relating to this Agreement.

21. This Agreement shall be binding upon, and inure to, the benefit of the parties hereto and their respective successors and assigns, including any other holder(s) of any obligations, provided, however, that Obligor(s) shall have no rights of assignment without the prior written consent of LCF. This Agreement may be executed in one or more counterparts, each of which shall together constitute the same agreement. The invalidity or unenforceability of any provision hereof shall in no way affect the validly or enforceability of any other provision hereof. No modification, recission, waiver, release, or amendment of this Security Agreement shall be made except by a written agreement executed by Obliger and LCF. A copy of this Agreement may be accepted as an original.

22. USE OF IDENTIFYING INFORMATION. It is expressly agreed and understood that in conjunction with this provision, Company may disclose identifying information including, but not limited to, the FEIN Number or Social Security Number of Seller or any Guarantor(s) to third parties with which Company communicates in its exercising of any remedies available to Company.

23. JURY TRIAL WAIVER. The parties hereto waive trial by jury in any court in any suit, action, or proceeding on any matter arising in connection with or in any way related to the transactions of which this Agreement is a part or the enforcement hereof. The parties hereto acknowledge that each makes this waiver knowingly, willingly, voluntarily, and without duress, and only after extensive consideration of the ramifications of this waiver with their attorneys.

24. CLASS ACTION WAIVER. The parties hereto waive any right

to assert any claims against the other party as a representative or member in any class, representative, or collective action, except where such waiver is prohibited by law as against public policy. To the extent either party is permitted by law or court of law to proceed with a class, representative, or collective action against the other, the parties hereby agree that: (1) the prevailing party shall not be entitled to recover attorneys' fees or costs associated with pursuing the class or representative action (notwithstanding any other provision in this Agreement); and (2) the party who initiates or participates as a member of the class will not submit a claim or otherwise participate in any recovery secured through the class or representative action. The parties hereto acknowledge that each makes this waiver knowingly, willingly, voluntarily, and without duress, and only after extensive consideration of the ramifications of this waiver with their attorneys.

25. WAIVER OF COUNTERCLAIMS. Seller waives the right to interpose any counterclaim in any court in any suit, action, or proceeding on any matter arising in connection with or in any way related to the transactions of which this Agreement is a part or the enforcement hereof. Seller acknowledges that it makes this waiver knowingly, willingly, voluntarily, and without duress, and only after extensive consideration of the ramifications of this waiver with their attorneys.

26. ARBITRATION. Notwithstanding the foregoing, any dispute, claim, or controversy arising out of or relating to this Agreement, the Security Agreement or the guaranty(s) herein, or the breach of any of the said Agreement, Security Agreement or the guaranty(s), shall be, at the election of either party, settled by arbitration administered by Mediation and Civil Arbitration, Inc. d/b/a RapidRuling (www.rapidruling.com) in accordance with its Arbitration Rules & Procedures effective at the time a claim is made, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. An election to arbitrate by either party shall be deemed effective by the commencement of an arbitration proceeding with Mediation and Civil Arbitration, Inc. d/b/a RapidRuling. The parties' consent to electronic service of process, with service to be made to the following email addresses rrtitinger@mazzonicenter.org and legal@thelcfgroup.com and/or when mailed, postage prepaid, via 2-3-day shipping through a nationally recognized courier, including, but not limited to, the USPS, FedEx or UPS, such notices or communications to be sent to the addresses provided in section 18 hereof. The parties agree that, in the event of confirmation and enforcement,

[Remainder of Page Intentionally Left Blank]

**Initials:** RT

the delinquent party will be responsible for any attorney, court, or other fees associated with such action. The parties agree to split all Mediation and Civil Arbitration, Inc. d/b/a RapidRuling fees evenly and the commencing party shall be entitled to any unreimbursed monies paid on behalf of the non-commencing party within any award.

SELLER #1    *Rachelle Tritinger (Owner 1)*

By: _____
    Signature
    Rachelle Tritinger / Owner
    _____
    Print Name and Title
    _____
    SS#

OWNER/GUARANTOR #1    *Rachelle Tritinger (Owner 1)*

By: _____
    Signature
    Rachelle Tritinger / Owner
    _____
    Print Name and Title

THE LCF GROUP, INC.

*Robert Klieber*

_____
By: Robert Klieber
Title: Chief Operating Officer

Initials: *RT*

# P O W E R   O F   A T T O R N E Y

**KNOWN ALL BY THESE PRESENTS** that I, Rachelle Tritinger, principal and/or sole proprietor of Mazzoni Center, doing business as Mazzoni Center, at 1348 Bainbridge Street, Philadelphia, Pennsylvania 19147 (hereinafter 'Mazzoni Center'), does hereby appoint THE LCF GROUP, INC., (hereinafter, '"LCF") as my true and lawful attorney in fact:

1. To have full power and authority to direct any Merchant Processor being used by Mazzoni Center to make payments to LCF as contemplated under the Agreement dated September 11, 2024 (the "Agreement") between Mazzoni Center and LCF;

2. To have full power and authority to direct any Merchant Processor being used by Mazzoni Center to direct the entirety of Mazzoni Center's credit card receivables to LCF in order to satisfy amounts due to LCF under the Agreement;

3. To have full power and authority to direct Bank of America - Bank and any and all other Banks in which Mazzoni Center or Rachelle Tritinger holds an account to direct payment(s) to LCF as contemplated under the ACH/ADF Authorization Agreement between Mazzoni Center and LCF;

4. To communicate with Bank of America - Bank and any and all other Banks to obtain information regarding the business accounts of Mazzoni Center, including without limitation, obtaining balances, account numbers, and copies of all statements and/or banking transactions;

5. To enter into, make, sign, execute, endorse, accept, and deliver any and all documents, agreements, contracts, or other writings, or to perform any other act, deed, matter, or thing to effectuate the intent of the Agreement dated September 11, 2024 between Mazzoni Center and LCF;

6. To obtain and adjust insurance at LCF's expense;

7. To withdraw any monies held on account with any debt settlement companies;

8. To receive, endorse, negotiate, and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection any amounts due to LCF as contemplated under the Agreement dated September 11, 2024 (the "Agreement") between Mazzoni Center and LCF;

9. To cancel, modify, repudiate, or terminate any agreement(s) with any vendor, consultant, or service provider of Mazzoni Center;

10. To sign Mazzoni Center 's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to LCF;

11. To file any claims or take any action or institute any proceeding which Company may deem necessary for the collection of any of the undelivered Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount;

12. To create and negotiate a check or draft in Seller's name utilizing any account information on file in satisfaction of Seller's obligations to Company, Company's designee, or Company's nominee; and

13. To institute a wire transfer of funds from Seller's deposit account(s) to Company, Company's designee, or Company's nominee.

**Initials:** _RT_

I HAVE RECEIVED A COPY OF THIS POWER OF ATTORNEY AND I DO HEREBY STATE AND DECLARE THAT THIS POWER OF ATTORNEY SHALL NOT BE AFFECTED BY MY SUBSEQUENT DISABILITY OR INCOMPETENCE; AND FURTHER, I DO HEREBY RATIFY AND CONFIRM ALL WHATSOEVER MY SAID ATTORNEY SHALL DO OR CAUSE TO BE DONE BY VIRTUE OF THIS POWER OF ATTORNEY.

**This Power of Attorney shall be used only upon Seller's violation of any of the terms of the Agreement dated September 11, 2024 between Mazzoni Center and LCF.**

**IN WITNESS WHEREOF,** the said Mazzoni Center has caused this instrument to be signed, sealed and acknowledged by its duly authorized qualified officer, Rachelle Tritinger this <u>11</u> day of <u>September,</u> **2024**.

**KNOW ALL BY THESE PRESENTS:**

SELLER #1     *Rachelle Tritinger (Owner 1)*

By:_____

Signature

Rachelle Tritinger / Owner_____

Print Name and Title

_____

SS#

Mazzoni Center_____

Company

THE LCF GROUP, INC.

_____

By: Robert Klieber

Title: Chief Operating Officer

**Initials:** RT



**AUTHORIZATION AGREEMENT FOR DIRECT DEPOSITS (ACH CREDITS) AND DIRECT PAYMENTS (ACH DEBITS)**
**This Authorization Agreement for Direct Deposits (ACH Credits) and Direct Payments ("Daily ACH Authorization") is part of (and incorporated by reference into) the Merchant Agreement (the "Agreement").**
**DEFINITIONS:**

**Company:  THE LCF GROUP, INC.**
**Merchant:  Mazzoni Center**
              **(Merchant's Legal Name)**

**Merchant Agreement:  Merchant Agreement Between Company and Merchant Dated September 11 ,2024**

**DESIGNATED CHECKING ACCOUNT INFORMATION**
Bank Name:                                Bank Telephone Number:
Merchant Tax ID:
Routing Number:              Account Number:

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.  By signing below Merchant attests that the Designated Checking Account was established for business purposes and not for personal, family or household purposes.

**DISBURSMENT OF PURCHASE PRICE.** By signing below, Merchant authorizes Company to disburse the Purchase Price less any applicable fees set forth in the Agreement upon Advance approval by initiating an ACH credit to the bank account described below (or a substitute bank account Merchant later identifies and is acceptable to Company) (the "Account").
**COLLECTION OF FUNDS ARISING FROM FUTURE RECEIPTS.**  By signing below, Merchant authorizes Company to collect the funds that Company is entitled to receive under the Agreement by initiating ACH debits to the Account as follows:
For an amount up to **$6,041.67**   (or) Percentage of each banking deposit **12.00%** together with a nonrefundable monthly maintenance fee of $195.00 pursuant to section 1.22 of the terms and conditions of this PSFRA
**On the following days:**  Each business day.  On the business day immediately following any business day(s) on which Merchant's bank was not open or was not able to process ACH transactions, the Company will debit the Designated Bank Account for an amount equal to the sum of (i) the Daily Payment amount due on that business day plus (ii) the Daily Payment amount(s) due on the proceeding business day(s) when the Bank was not open or could not process ACH transactions.
**MISCELLANEOUS.** Merchant understands that Merchant is responsible for ensuring that funds arising from Future Receipts remain in the Account each day until Company debits the amount that the Agreement authorizes Company to debit from the Account for that day. Company is not responsible for any overdrafts or rejected transactions that may result from the Company debiting any of Merchant's accounts. The ACH authorizations provided for in this agreement will remain in effect until Company has received written notification from Merchant of its termination in such time and in such manner as to afford Company and Merchant's depository bank a reasonable opportunity to act on it. Company is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Agreement. The origination of ACH transactions to Merchant's accounts, including, but not limited to, the Account, must comply with the provisions of U.S. law and NACHA Rules.

**MERCHANT SIGNATURE**

Merchants Legal Name: Mazzoni Center

Signature:  _Rachelle Tritinger (Owner 1 )_   Title:  Executive Financial Officer
                                                              _____

Date:  9/11/2024
         _____

**Initials:** _RT_



**Advance Repurchase Addendum**

Re: The Purchase and Sale of Future Receivables Agreement ("PSFRA") between The LCF Group, Inc. ("company") and Mazzoni Center (seller) dated September 11, 2024 wherein Company purchased $362,500.00 of Seller's future receivables for $250,000.00.

Company agrees to accept an Accelerated Repurchase Amount pursuant to the below schedule provided that Seller remains in full compliance with all obligations pursuant to the PSFRA and provided that there has been no event of default by Seller up to and including the date of the Accelerated Repurchase:

| Pay within X Calendar Days | Discounted Repurchase Amount |
|---|---|
| 30.00 | $337,500.00 |
| 60.00 | $350,000.00 |

Seller shall not be entitled to any Accelerated Repurchase if same is paid to Company by any third-party on behalf of Seller.

Executed and agreed on this **11** day of **September, 2024,**

| **Seller** | **Guarantor** | **The LCF Group, Inc.** |
|---|---|---|

*Rachelle Tritinger (Owner)*  *Rachelle Tritinger (Owner)*

X_____  X_____  X_____

Print Name:  Rachelle Tritinger          Print Name:

**Initials:** RT

**DocuSign**

## Certificate Of Completion

Envelope Id: 25ECFEAC339D4068A0FC5C6C711960A3
Subject: Mazzoni Center DBA Mazzoni Center - Strategic Funding Group - SFG - Contract
ClientId: 8d51b80a-a211-48d0-a935-9241993ee83e
Source Envelope:
Document Pages: 27
Certificate Pages: 5
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 11
Initials: 27

Status: Completed

Envelope Originator:
Underwriting
3000 Marcus Ave Ste 2W15
New York, NY  10001
underwriting@thelcfgroup.com
IP Address: 52.247.86.22

## Record Tracking

Status: Original
          9/11/2024 8:43:13 AM

Holder: Underwriting
          underwriting@thelcfgroup.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Rachelle Tritinger (Owner 1 )<br>rtritinger@mazzonicenter.org<br>Executive Financial Officer<br>Security Level:<br>.None<br>ID: d0e93010-b7f9-440c-a2bd-6fd09648410c<br>9/11/2024 9:24:43 AM | *Rachelle Tritinger (Owner 1 )*<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 50.201.139.106 | Sent: 9/11/2024 8:43:15 AM<br>Viewed: 9/11/2024 9:24:56 AM<br>Signed: 9/11/2024 9:26:24 AM<br>Focused View |
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 9/11/2024 9:24:55 AM<br>   ID: 9f5d733c-90fb-4a8f-9e9c-d808d1447a81 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| amadera@thelcfgroup.com<br>amadera@thelcfgroup.com<br>Security Level: Email, Account Authentication<br>(None) | **COPIED** | Sent: 9/11/2024 9:26:26 AM |
| **Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | | |
| ashivhare@thelcfgroup.com<br>ashivhare@thelcfgroup.com<br>Security Level: Email, Account Authentication<br>(None) | **COPIED** | Sent: 9/11/2024 9:26:27 AM |
| **Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | | |
| tjameer@thelcfgroup.com<br>tjameer@thelcfgroup.com<br>Security Level: Email, Account Authentication<br>(None) | **COPIED** | Sent: 9/11/2024 9:26:27 AM |
| **Electronic Record and Signature Disclosure:** | | |

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Not Offered via DocuSign | | |
| underwriting@thelcfgroup.com<br>underwriting@thelcfgroup.com<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 9/11/2024 9:26:26 AM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |
| vyadav@thelcfgroup.com<br>vyadav@thelcfgroup.com<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 9/11/2024 9:26:27 AM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/11/2024 8:43:15 AM |
| Certified Delivered | Security Checked | 9/11/2024 9:24:56 AM |
| Signing Complete | Security Checked | 9/11/2024 9:26:24 AM |
| Completed | Security Checked | 9/11/2024 9:26:27 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 2/14/2024 10:11:53 AM
Parties agreed to: Rachelle Tritinger (Owner 1 )

Case 2:24-cv-05921-KSM    Document 2-3    Filed 11/05/24    Page 38 of 129

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, The LCF Group (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact The LCF Group:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: hiriarte@thelcfgroup.com

**To advise The LCF Group of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at hiriarte@thelcfgroup.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from The LCF Group**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to hiriarte@thelcfgroup.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with The LCF Group**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to hiriarte@thelcfgroup.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify The LCF Group as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by The LCF Group during the course of your relationship with The LCF Group.

# EXHIBIT B



**REVENUE PURCHASE AGREEMENT**
**PURCHASE AND SALE OF FUTURE RECEIPTS (the "Agreement")**

Dated SEPTEMBER 11, 2024, Between AKF Inc, DBA FundKite, located at 88 Pine Street, 24th Floor, New York NY 10005 hereafter known as ("BUYER"), the ("SELLER") listed below and each guarantor identified below (each a "Guarantor")

("THE SELLER")
MERCHANT INFORMATION

SELLER's Legal Name:  **MAZZONI CENTER**  DBA: **MAZZONI CENTER / MAZZONI CENTER OUR HEALTH. OUR LIVES. OUR COMMUNITY.**

Physical Address:  **1348 BAINBRIDGE ST, PHILADELPHIA, PA 19147**

Mailing Address: **1348 BAINBRIDGE ST, PHILADELPHIA, PA 19147**

Primary Telephone:  **1-267-389-3431**  Business Website:  **https://www.mazzonicenter.org/**

Type of Entity:  **Corporation**  State of Incorporation: **PA**

Tax Id Number: ███████████  Date Business Started:  **07/20/1981**

Name of Primary Authorized Signer:  **RACHELLE DENISE TRITINGER**  Position or Title: **CFO**

Email for Owner:  **rtritinger@mazzonicenter.org**

Purchase Price: **$500,000.00**
(The agreed upon Purchase Price for the Receipts sold by SELLER to BUYER)

Fees Deducted:  **$20,185.00**
(See Appendix A for breakdown of fees)

Disbursement Amount:  **$479,815.00**
(The dollar amount BUYER will pay to SELLER after deducting the Fees Deducted)

Purchased Amount:  **$690,000.00**
(The dollar value of the Receipts being sold and remitted to BUYER from SELLER)

Remittance Percentage:  **9%**
(The percentage of Receipts SELLER agrees to remit to BUYER  **each week**.

Initial Estimated Remittance Amount (Weekly): **$24,642.86**
(The dollar amount to be  debited  **each week**.  from the SELLER's bank account as described below, subject to reconciliation)

Reconciliation Frequency: **Monthly**
*Reconciliation may result in an adjustment to the Initial Estimated Remittance Amount.

Designated Bank Account (the "Designated Account")

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

Name of Bank: _____    ABA Transit/Routing #: _____    Checking Account # ████████

Upon the terms and subject to the conditions set forth in this Agreement,  DBA MAZZONI CENTER / MAZZONI CENTER OUR HEALTH. OUR LIVES. OUR COMMUNITY.  hereby sells, assigns and transfers to AKF Inc. DBA Fundkite ("FUNDKITE" and "BUYER") in consideration for the funds provided (the "PURCHASE PRICE"), all of SELLER's future sales, accounts, contract rights and other obligations and entitlements arising from or relating to the payment of monies from SELLER's customers and/or third-party payers and the proceeds thereof including, but not limited to all payments made by cash, check, electronic transfer or other form of monetary payment in the course of the Seller's business (the "Receipts"), in the amount specified above (the "Purchased Amount") to be remitted by the percentage of Receipts specified above (the "Remittance Percentage") until the Purchased Amount has been remitted by SELLER to BUYER. (SELLER, BUYER and each Guarantor shall collectively be referred hereinafter to as the "PARTIES").

SELLER shall remit the Remittance Percentage of Receipts to BUYER, until such time as BUYER receives full remittance of the Purchased Amount and any outstanding fees in accordance with Appendix A hereto. SELLER hereby authorizes BUYER to ACH Debit the initial estimated and adjusted remittance amounts from the Designated Account stated above (each a "Remittance Date") and will provide BUYER with access codes and monthly bank statements thereto. BUYER is not responsible for any overdrafts or rejected transactions that may result from BUYER ACH debiting the specified remittances under the terms of this Agreement.

BUYER has calculated the Initial Estimated Remittance Amount based on SELLER'S actual Receipts prior to the date of this Agreement, determined by BUYER based on a review of Banking Records provided by SELLER. SELLER acknowledges and agrees that the Initial Estimated Remittance Amount is an accurate estimate of the Remittance Percentage of SELLER's actual Receipts prior to the date of this Agreement.

A list of all fees applicable under this Agreement is outlined in Appendix A. SELLER agrees to pay all fees as described therein.

# I. TERMS OF ENROLLMENT IN PROGRAM

1.1 SELLER Deposit Account. SELLER shall deposit all Receipts into the Designated Account with a bank acceptable to BUYER. SELLER authorizes BUYER and/or its agent to withdraw the Remittance Percentage or Initial Estimated/Adjusted Remittance Amount from the Designated Account. The authorization shall be irrevocable without the written consent of the BUYER. For the duration of this Agreement, SELLER shall have the use and enjoyment of Receipts above the Remittance Percentage to be remitted to BUYER. Additionally, the Remittance Percentage of Receipts are to be held in trust in the Designated Account for the benefit of BUYER and SELLER shall have no legal or equitable interest in said Receipts.

1.2 Non-Recourse Sale of Future Receipts (THIS IS NOT A LOAN). SELLER is selling a portion of Receipts to BUYER at a discount, not borrowing money from BUYER. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by BUYER. BUYER is taking the risk that Receipts may be remitted more slowly than BUYER may have anticipated or projected because SELLER's business has slowed down, or the full Purchased Amount may never be remitted because SELLER's business filed a Chapter 7 liquidation or otherwise ceased operations in the ordinary course of business. BUYER is buying the Purchased Amount of Receipts knowing the risks that SELLER's business, despite SELLER's reasonable efforts, may slow down or fail, and BUYER assumes these risks based on SELLER's representations, warranties, and covenants in this Agreement that are designed to give BUYER a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, SELLER transfers to BUYER full and complete ownership of the Purchased Amount of Receipts and BUYER retains no legal or equitable interest therein. SELLER will treat the Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns. BUYER is entitled to audit SELLER's accounting records upon reasonable notice in order to verify compliance. SELLER waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

arbitration in which SELLER asserts that this transaction is anything other than a purchase and sale of future Receipts.

1.3 Reconciliation (IMPORTANT PROTECTION FOR SELLER). SELLER acknowledges and agrees that the Initial Estimated Remittance Amount is an accurate estimate of the Remittance Percentage of SELLER's actual Receipts prior to the date of this Agreement.  SELLER has the right to obtain reconciliations to ensure that the Remittance Amount continues to be an accurate estimate of the Remittance Percentage of SELLER's actual Receipts over the course of this Agreement.

a) Periodic Reconciliation. BUYER shall perform periodic reconciliations according to the agreed Reconciliation Frequency.

b) SELLER May Obtain Additional Reconciliations. SELLER may obtain additional reconciliations between any periodic reconciliations by sending a written request by email to customerservice@fundkite.com.

c) Banking Records.  SELLER agrees to provide Banking Records requested by BUYER to complete each reconciliation.  As used in this Agreement, "Banking Records" means bank statements, accounts receivable reports, credit card receipts, view-only access to SELLER's business bank accounts, and other business or banking records reasonably likely to provide evidence of SELLER's actual Receipts for the applicable reconciliation period.  BUYER will calculate SELLER's actual Receipts based solely upon a review of the requested Banking Records. BUYER is not obligated to complete any reconciliation for which requested Banking Records are unavailable or not provided.

d) Adjusting the Remittance Amount.  No later than three (3) business days following BUYER's receipt of the requested Banking Records, BUYER shall adjust the Remittance Amount so that subsequent withdrawals from the Designated Account are equal to the Remittance Percentage of the actual Receipts collected by SELLER during the reconciliation period, as reasonably determined by BUYER .

e) Failure to Provide Reconciliation Information.  If SELLER fails to provide requested Banking Records within seven (7) calendar days after written notice from BUYER, BUYER may adjust the Remittance Amount to the Initial Estimated Remittance Amount.

1.4 Processing Trial and BUYER'S Acceptance of Agreement. Prior to paying the Disbursement Amount to SELLER, BUYER shall have the right to instruct the credit/debit card processor used by SELLER for conducting its business to conduct a processing trial (a "Processing Trial") to determine whether settlement amounts of Receipts will be processed, reported and paid as contemplated under this Agreement. SELLER agrees that BUYER will make its final decision, in its sole and absolute discretion and with or without regard for the results of the Processing Trial, whether to purchase the Purchased Amount of Receipts after completing the Processing Trial or opting not to conduct a Processing Trial, and any underwriting conducted by BUYER. If BUYER elects to purchase the Purchased Amount of Receipts, BUYER will pay the Disbursement Amount to SELLER, and SELLER's obligations hereunder to remit the Purchased Amount shall commence immediately. The obligation of BUYER under this Agreement will not be effective unless and until BUYER has completed its review of the SELLER and has accepted this Agreement by delivering the Disbursement Amount.

1.5 Financial Condition. SELLER authorizes BUYER and its agents to investigate their financial responsibility and history, and will provide to BUYER any financial or bank statements, tax returns, credit card statements and accounts receivable reports, and view-only access to any business bank account maintained by SELLER, as BUYER deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. BUYER is authorized to require Seller to provide updated information and financial profiles from time to time as it deems appropriate.

1.6 Transactional History. SELLER authorizes BUYER to obtain SELLER's banking records, payment processing transaction records and records of activity with any online seller or marketplace to verify information provided by SELLER in connection with the performance of this program.

1.7 Indemnification. SELLER indemnifies and hold harmless BUYER, Processor, any and each of SELLER's, and any

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

Account Debtors, their officers, directors, attorneys, assigns, agents and shareholders against all loses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred, resulting from (a) all claims asserted by BUYER and its agents for amounts owed to BUYER from SELLER and (b) actions taken by Processor, SELLER's Banks and Account Debtors in reliance upon any information or instructions provided by BUYER and (c) litigation with SELLER and Guarantor(s). SELLER agrees to indemnify and hold harmless BUYER its officers, directors, attorneys, assigns, agents and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney's fees) that they may have of any kind arising out of or related to the Agreement and enforcement of BUYER's remedies thereunder.

1.8 No Liability. In no event will BUYER and its agents, attorneys, assigns or affiliates be liable for any claims asserted by SELLER or Guarantor(s) under any legal theory for lost profits, lost revenue, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is knowingly and voluntarily waived by SELLER or Guarantor(s). In the event these claims are nonetheless raised, SELLER and Guarantor(s) will be jointly liable for all of BUYER's attorney's fees and expenses resulting therefrom.

1.9 Reliance on Terms. Notwithstanding the fact that Processor, SELLER's bank, Guarantor(s)'s bank and Account Debtors, and their affiliates, are not parties to this Agreement, Sections 1.1, 1.2, 1.3, 1.4, 1.5 1.6, 1.7, 1.8, 1.9, 1.10, 1.13, 1.14, 2.3, 2.5, 2.6, and 2.7 of this Agreement are also for the benefit of BUYER, SELLER's bank and Guarantor(s)'s bank, Account Debtors and Processor, and each of their respective officers, directors, attorneys, assigns, agents and shareholders, and these parties may rely upon these terms and raise them as a defense in any action.

1.10 Disclosure of Information. SELLER, Guarantor(s) and each person signing this Agreement on behalf of SELLER and/or as Owner or Guarantor(s), in respect of himself or herself personally authorizes BUYER to disclose information concerning SELLER, Guarantor(s)'s and each Owner's credit standing (including credit bureau reports that BUYER obtains) and business conduct to agents, affiliate subsidiaries, and credit reporting bureaus. SELLER and each Owner and Guarantor(s) hereby waive to the maximum extent permitted by law any claim for damages against BUYER or any of its affiliates relating to any (i) investigation undertaken by or on behalf of BUYER as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

1.11 D/B/A's. SELLER, Guarantor(s), and each Owner acknowledges that BUYER may be using "doing business as" or "d/b/a" names or authorized agents in connection with various matters relating to the transaction between BUYER and SELLER, including the filing of UCC-1 financing statements and other notices or filing.

1.12 Bank Holidays and Other Bank Closures. BUYER will debit the Initial Estimated/Adjusted Remittance Amount only on each weekday on which SELLER's bank is open and able to process ACH transactions.

1.13 ACH Authorization. If an ACH transaction is rejected by SELLER's financial institution for any reason other than a stop payment order placed by SELLER with its financial institution, including without limitation insufficient funds, SELLER agrees that BUYER may resubmit up to two times any ACH transaction that is dishonored. SELLER's bank may charge SELLER fees for unsuccessful ACH entries. SELLER agrees that BUYER has no liability to SELLER for such fees. In the event BUYER makes an error in processing any payment or credit, SELLER authorizes BUYER to initiate ACH entries to or from the Designated Account or bank account to correct the error. SELLER acknowledges that the origination of ACH entries to and from the Designated Account or bank account must comply with applicable law and applicable network rules. SELLER agrees to be bound by the Rules and Operating Guidelines of NACHA. SELLER will not dispute any ACH transaction initiated pursuant to this Authorization, provided the transaction corresponds to the terms of this Authorization. SELLER requests the financial institution that holds the Designated Account and bank account to honor all ACH entries initiated in accordance with this Authorization.

# II. REPRESENTATIONS, WARRANTIES, AND COVENANTS

SELLER represents, warrants and covenants that as of this date and, unless expressly stated otherwise, during the

course of this Agreement:

2.1 Accounts Receivables and Financial Information. SELLER's accounts receivables and payable reports, bank and financial statements, copies of which have been furnished to BUYER, and future statements which will be furnished hereafter at the discretion of BUYER, fairly represent the performance and financial condition of SELLER at the dates the statements are provided. All performance and financial information provided to BUYER by SELLER and any Guarantor(s) is truthful, complete and accurate as of the date of this Agreement. BUYER may request Banking Records at any time during the performance of this Agreement and the SELLER shall provide them to BUYER within five business days. SELLER's failure to do so is a material breach of this Agreement.

2.2 Government Approvals. SELLER is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own operate and lease its properties and to conduct the business in which it is presently engaged.

2.3 Authorization. SELLER, and the persons(s) signing this Agreement on behalf of SELLER and Guarantor(s), have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4 No Diversion of Receipts. SELLER must deposit all Receipts into the Designated Account on a daily basis and must instruct SELLER'S credit card processor to deposit all Receipts of Seller into the Designated Account on a daily basis. SELLER agrees not to (i) change the Designated Account, (ii) add an additional business bank account into which SELLER deposits Receipts without the express written consent of BUYER, (iii) revoke BUYER'S authorization to debit the Designated Account, (iv) close the Designated Account without the express written consent of BUYER or, (v) take any other action with the intent to interfere with BUYER'S right to collect the purchased Receipts.

2.5 Change of Name, Location or Type of Business. SELLER will not conduct SELLER's business, or any similar business, under any name other than as disclosed to the Processor and BUYER or change the type of business it operates or any of its places of business without prior written consent from BUYER. Such change made without the prior written consent of BUYER shall be a material breach of this Agreement.

2.6 Estoppel Certificate. SELLER will at any time, and from time to time, upon at least one (1) day's prior notice from BUYER to SELLER execute, acknowledge and deliver to BUYER and/or to any other person, firm or corporation specified to BUYER a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, the same is in full force and effect as modified and stating the modifications) and stating the dates on which the Purchased Amount or any portion thereof has been remitted.

2.7 No Bankruptcy or Assignment. As of the date of this Agreement, SELLER does not contemplate and has not filed any petition for bankruptcy protection or assignment for the benefit of creditors, and there has been no involuntary petition or receivership brought or pending against SELLER. SELLER further warrants that as of the date of this Agreement, SELLER does not anticipate filing any such bankruptcy petition and has no knowledge of or reason to believe any creditor has any cause to file an involuntary petition or receivership as against SELLER.

2.8 Working Capital Funding. At any time either contemporaneous with or after the execution of this Agreement, SELLER shall not, unless permitted in writing by BUYER, enter into any arrangement, agreement, or a loan that relates to or encumbers Seller's Receipts or future revenue with any party other than BUYER.

2.9 Unencumbered Receipts. SELLER warrants that, unless otherwise disclosed in writing to BUYER prior to the date of this Agreement, SELLER has good, complete and marketable title to all of its Receipts free and clear of any and all liabilities, liens, claims, changes, restriction, conditions, options, rights, mortgages, security, interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of BUYER. SELLER shall not voluntarily transfer or sell all or substantially all of its assets, shares and/or membership interests without prior written consent of BUYER.

2.10 Business Purposes. SELLER is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and SELLER is entering into this Agreement for business purposes and not for consumer,

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

personal, family or household purposes.

2.11 Defaults Under Other Contracts. SELLER's execution of and/or performance under this Agreement will not cause or create an event of default by SELLER under any contract with another person or entity.

2.12 Bank Account. SELLER represents and warrants that (i) any bank account disclosed by SELLER (including but not limited to the Designated Account) provided to BUYER is SELLER's bank account; (ii) the person executing this Authorization on behalf of SELLER is an authorized signer on the bank account and has the power and authority to authorize BUYER to initiate ACH transactions to and from the bank account; and (iii) the bank account is a legitimate, open, and active bank account used solely for business purposes and not for personal, family or household purposes.

# III. REMEDIES FOR SELLER'S BREACH OF THIS AGREEMENT

3.1 Remedies. If SELLER violates any term or covenant in this Agreement or if any representation or warranty by SELLER in this Agreement proves to have been incorrect, false or misleading in any material respect when made, BUYER may proceed to protect and enforce its rights including, but not limited to, the following:

a) The Remittance Percentage shall equal 100%. The full unremitted Purchased Amount plus all fees and charges (including legal fees) assessed under this Agreement will become due and payable in full immediately.

b) BUYER may enforce the provisions of the Guaranty of Performance against each Guarantor.

c) SELLER shall pay to BUYER all reasonable costs associated with SELLER'S breach, including a Breach Administration Fee, as set forth and defined in the Appendix A. Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which BUYER shall recover judgment against SELLER, SELLER shall be liable for all of BUYER's costs, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of BUYER under this provision shall be limited as provided in the arbitration provision set forth below.

d) BUYER may debit depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on any of SELLER'S bank accounts for all sums due to BUYER.

3.2 Remedies Are Cumulative, Subject to Arbitration. Subject to Arbitration as provided in Section 4.14 of this Agreement, all rights, powers, and remedies of BUYER in connection with this Agreement may be exercised at any time by BUYER after the occurrence of a breach, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.3 Required Notifications. SELLER is required to give BUYER three (3) days prior written notice of intent to change the Designated Account with updated account information attached to the notice. SELLER is required to give BUYER ten (10) days' written notice of the intent to sell, assign or transfer all or substantially all of the SELLER's assets or stock and shall provide BUYER in writing the name, address, phone number, email address and facsimile number of the proposed assignee, transferee or BUYER's legal representative or owner.

3.4 Security Interest. The Parties agree and understand this purchase and sale transaction is governed by Article 9 of the Uniform Commercial Code (the "UCC") and BUYER has a security interest in the Receipts purchased. The Receipts purchased are Accounts and General Intangibles pursuant to UCC Article 9, and BUYER has a security interest in all (a) SELLER's present and future Accounts, and General Intangibles, as such terms are defined in the UCC, now owned or hereafter owned or acquired by SELLER; and (b) all proceeds, as that term is defined in Article 9 of the UCC (a and b collectively, the "Collateral"). The security interests created by this transaction and evidenced by this Agreement shall secure all of the BUYER's entitlements under this or any other agreement now existing or later entered into between SELLER and BUYER or an affiliate of BUYER. SELLER authorizes BUYER to file one or more UCC-1 forms consistent with the UCC in order to give notice that the Purchased Amount of Future Receipts is the sole property of BUYER. BUYER may

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

notify Account Debtors and/or other persons obligated on the Receipts or Accounts, of SELLER's sale of the Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of BUYER. SELLER authorizes BUYER to debit the Designated Account and all other business bank accounts of SELLER for all costs incurred by BUYER associated with the filing, amendment or termination of any UCC filings.

3.5 Negative Pledge. SELLER agrees not to create, incur, or assume, directly or indirectly, any lien on or with respect to any of the Collateral (as defined in section 3.4 above), as applicable.

# IV. MISCELLANEOUS.

4.1 Modifications. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by BUYER.

4.2 Assignment. BUYER may assign, transfer or sell its right to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part. The Parties have entered into this Agreement in the State of New York and the Parties further agree that BUYER is the absolute owner of Receipts in consideration of the funds provided. Fundkite may act as the lead purchaser for itself and other co-investors making FUNDKITE on behalf of itself and all co-investors collectively "FUNDKITE" and "BUYER".

4.3 Notices. All notices as required by Section 3.3 hereunder shall be delivered by certified mail; return receipt requested to the respective Parties to this Agreement at the addresses set forth in this Agreement and shall become effective only upon receipt. All other notices, requests, consent, demands, and other communications may be made in writing sent by regular mail and/or electronic mail to SELLER at rtritinger@mazzonicenter.org  and to BUYER at customerservice@fundkite.com.

4.4 Waiver of Remedies. No failure on the part of BUYER to exercise and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any other right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. Subject to Arbitration, as provided in section 4.14 of this Agreement, the remedies provided hereunder are cumulative and not exclusive to any remedies provided by law or equity.

4.5 Phone Recordings and Contact. SELLER and each Guarantor(s) agree that any call between them and BUYER and its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, SELLER and Guarantor(s) acknowledge and agree that: (i) they have an established business relationship with BUYER, its managers, employees and agents (collectively, the "BUYER Parties") and that SELLER and Guarantor(s) may be contacted by any of the BUYER Parties from time-to-time regarding SELLER's performance of its obligations under this Agreement or regarding other business transactions; (ii) they will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of the BUYER Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to SELLER and Guarantor(s)'s office, or its owners, managers, officers, or employees.

4.6 Binding Effect. This Agreement shall be binding upon and inure to the benefit of SELLER, BUYER, and their respective successors and assigns, except that SELLER shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of BUYER which consent may be withheld in BUYER's sole discretion. BUYER reserves the right to assign this Agreement with or without prior written notice to SELLER.

4.7 Governing Law, Venue, and Jurisdiction. Except as set forth in the Arbitration section, this Agreement shall be governed by or constructed in accordance with the laws of the state of New York, without regard to any applicable principles of conflicts of law. Any suit, action, or proceeding arising out of any disputes between the SELLER, Guarantor(s) and the BUYER, its affiliates agents, attorneys and assigns herein, or arising out of the Agreement hereunder, or the interpretation, performance or breach hereof, shall if BUYER so elects, be instituted in any court sitting in New York State, (the "Acceptable Forums"). SELLER and each Guarantor(s) agree that the Acceptable Forums

are convenient to it/them and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, SELLER and each Guarantor(s) waive any right to oppose any motion or application made by BUYER to transfer and/or dismiss such proceeding.

4.8 Survival of Representation, etc. All representations, warranties and covenants herein shall survive the full execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

4.9 Severability. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions of this Agreement.

4.10 Entire Agreement. This Agreement and any Guaranty embody the entire agreement between SELLER and BUYER and Guarantor(s) and supersede all prior agreements and understanding relating to the subject matter hereof.

4.11 JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART, OR THE ENFORCEMENT THEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH PARTY AGREES TO THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

4.12 CLASS ACTION WAIVER. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.13 SERVICE OF PROCESS. SELLER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES PERSONAL SERVICE OF LEGAL PROCESS AND ANY OBJECTION TO THE ABSENCE OF PERSONAL SERVICE OF PROCESS AND HEREBY AGREES TO ACCEPT SERVICE OF LEGAL PROCESS BY (I) ELECTRONIC MAIL SENT TO SELLER'S EMAIL ADDRESS PROVIDED TO BUYER BY SELLER ("LAST KNOWN EMAIL ADDRESS OF SELLER"), (II) UNITED STATES POSTAL SERVICES FIRST CLASS OR CERTIFIED MAIL SENT TO SELLER'S MAILING ADDRESS PROVIDED TO BUYER BY SELLER ("LAST KNOWN ADDRESS OF SELLER"), OR (III) BY ANY OTHER MEANS PERMITTED BY NEW YORK LAW. SELLER UNDERSTANDS AND AGREES THAT AN ACTION, LAWSUIT, OR CONTROVERSY MAY BE TAKEN UP AND CONSIDERED BY A COURT WITHOUT ANY FURTHER NOTICE. SERVICE OF PROCESS SHALL BE EFFECTIVE UPON SENDING / MAILING OF SERVICE OF PROCESS BY BUYER ("SERVICE DATE"). SELLER SHALL NOTIFY BUYER OF ANY CHANGE TO ITS LAST KNOWN EMAIL ADDRESS OR ITS LAST KNOWN ADDRESS FOR SERVICE. UNLESS BUYER IS NOTIFIED OF A CHANGE, BUYER'S LAST KNOWN EMAIL ADDRESS OR ITS LAST KNOWN ADDRESS SHALL BE PRESUMED TO BE ACCURATE AND VALID FOR THE PURPOSES OF SERVICE OF PROCESS AND NOTICES. THIS PROVISION SHALL SUPERSEDE ANY NOTICE REQUIREMENTS IN THE CONTRACT WITH RESPECT TO SERVICE OF PROCESS. SELLER WILL HAVE THIRTY (30) CALENDAR DAYS FROM THE SERVICE DATE OF THE SERVICE OF PROCESS HEREUNDER IN WHICH TO RESPOND. FURTHERMORE, SELLER EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT.

4.14 ARBITRATION. IF BUYER, SELLER OR ANY GUARANTOR(S) REQUESTS, THE OTHER PARTIES AGREE TO

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR(S) SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR(S) DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR(S) MAY COMMENCE AN ARBITRATION PROCEEDING WITH MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING ("RAPID") OR, IN CASE RAPID IS UNAVAILABLE AS ARBITRATOR AT THE TIME WHEN THE INTENT TO ARBITRATE ARISES, THE PARTIES HERETO MAY COMMENCE AN ARBITRATION PROCEEDING WITH JAMS, FORMERLY KNOWN AS JUDICIAL ARBITRATION AND MEDIATION SERVICES, INC. ("JAMS"), OR, ALTERNATIVELY, THE PARTY INTENDING TO ARBITRATE A DISPUTE BETWEEN THE PARTIES HERETO MAY SEEK COURT'S APPOINTMENT OF AN ARBITRATOR TO ARBITRATE A DISPUTE BETWEEN THE PARTIES HERETO. BUYER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR(S) FOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND THE GUARANTOR(S) MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR(S) OR THE RELIEF SOUGHT BY SELLER OR THE GUARANTOR(S) IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY RAPID OR JAMS RULES. SELLER AND THE GUARANTOR(S) AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR(S) MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR(S) AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. ANY ARBITRATION DECISION RENDERED PURSUANT TO THIS ARBITRATION AGREEMENT MAY BE ENFORCED IN ANY COURT WITH JURISDICTION. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

4.15 RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S)(S) MAY OPT OUT OF THIS ARBITRATION CLAUSE. TO OPT OUT OF THIS ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR(S) MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR(S) DOES NOT WANT THIS ARBITRATION CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR(S) MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT:

ARBITRATION OPT OUT,
FundKite, 88 Pine St, 24th Floor New York NY 10005.

4.16 Facsimile Acceptance. Facsimile signatures shall be deemed acceptable for all purposes.

4.17 Electronic Signatures. Electronic (digital) signatures and "DocuSign" signatures shall be deemed acceptable for all purposes.

4.18 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement. Electronic signatures complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to time, or other applicable law will be deemed original signatures for purposes of this Agreement. Transmission by telecopy, electronic mail or other transmission method of an executed counterpart of this Agreement will constitute due

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

and sufficient delivery of such counterpart.

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

THE "TERMS OF ENROLLMENT IN PROGRAM", APPENDIX "A" AND "GUARANTY OF PERFORMANCE" ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.

Agreement of SELLER: By signing below SELLER agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the preceding and following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes, and SELLER will use all funds received from BUYER to operate or grow its business.

**SELLER: MAZZONI CENTER**

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
**09-11-2024 2:06 pm**

Agreed to by: Signature

it's **CFO**  (Title)

Agreement of Each Owner Guarantor(s) and Affiliated Business Guarantor(s): Each Owner, Guarantor and Affiliated Business Guarantor signing below agrees to the terms of this Agreement, including those terms and conditions on the preceding and following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes, and SELLER will use all funds received from BUYER to operate or grow its business.

**Sign as Owner:**

Print Name: RACHELLE DENISE TRITINGER

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
**09-11-2024 2:04 pm**

Signature

**Individual Guarantors**
**Guarantor**

Print Name: **RACHELLE DENISE TRITINGER**

Social Security Number: ▮▮▮▮▮▮

Driver's License: ▮▮▮▮▮▮ State Issued: **Pennsylvania**

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
**09-11-2024 2:04 pm**

Signature

# Affiliated Business Guarantors

**Guarantor:** 1334-48 BAIN BRIDGE STREET LLC

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
**09-11-2024 2:05 pm**

by Signature

**Address:** 1348 BAINBRIDGE STREET, PHILADELPHIA, PA 19147
**Tax Id#:** - **State of Incorporation:** Pennsylvania

---

**Guarantor:** MAZZONI CENTER D/B/A Mazzoni Center - Washington West

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
**09-11-2024 2:05 pm**

by Signature

**Address:** 1201 Locust St, Philadelphia, PA 19107
**Tax Id#:**              **State of Incorporation:** Pennsylvania

---

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

# GUARANTY OF PERFORMANCE

A. BUYER has purchased Future Receipts of SELLER, pursuant to that REVENUE PURCHASE AGREEMENT Purchase and Sale of Future Receipts (the "Agreement") dated, incorporated herein.

B. The undersigned Guarantor(s) hereby are parties to the Agreement and each agrees to irrevocably, absolutely and unconditionally guarantee to BUYER, SELLER's prompt and complete performance of the following "Guaranteed Obligations":

> 1. SELLER'S obligation to deposit all Receipts into the Designated Account on a daily basis and instruct SELLER'S credit card processor to deposit all Receipts of SELLER into the Designated Account on a daily basis.

> 2. SELLER'S obligation not to (i) change the Designated Account, (ii) add an additional business bank account, (iii) revoke BUYER's authorization to debit the Designated Account, (iv) close the Designated Account without the express written consent of BUYER or, (v) take any other action with the intent to interfere with BUYER's right to collect the purchased Receipts.

> 3. SELLER's obligation not to enter into any arrangement, agreement, or a loan that relates to or encumbers SELLER'S Receipts of future revenue with any party other than BYUER, unless permitted in writing by BUYER;

> 4. SELLER's representations, covenants and warranties shall be truthful, accurate and complete and shall not be misleading in any material respect when made;

> 5. SELLER's obligation to provide Banking Records to BUYER in accordance with the Agreement;

> 6. SELLER's obligation to not voluntarily transfer or sell all or substantially all of its assets, shares and/or membership interests without prior written consent of BUYER;

<u>Indemnification.</u> Guarantor indemnifies and hold harmless BUYER against all loses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred, resulting from SELLER's failure to perform any of the Guaranteed Obligations.

<u>Guarantor(s) Waivers.</u> In the event that the SELLER fails to perform any of the Guaranteed Obligations, BUYER may enforce its rights under this Guaranty against any and all Guarantor(s) without first seeking to obtain performance from SELLER or any other Guarantor(s). BUYER is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Guaranty if it is not notified of: (i) SELLER's default, or failure to perform any obligations under the Agreement; (ii) BUYER's acceptance of the Agreement or this Guaranty; and (iii) any renewal, extension or other modification of the Agreement or SELLER'S other obligations to BUYER. In addition, BUYER may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Guaranty: (i) renew, extend or otherwise modify the Agreement or SELLER's other obligations to BUYER; and (ii) release SELLER from its obligations to BUYER. Until SELLER's obligations to BUYER under the Agreement are satisfied in full, Guarantor(s) shall not seek reimbursement from SELLER or any other Guarantor(s) for any amounts paid by it under this Guaranty.

Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against the SELLER, any other Guarantor(s), or any collateral provided by SELLER or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this agreement: (i) subrogation; (ii)reimbursement; (iii)performance; (iv) indemnification; or (v) contribution. In the event that BUYER must return any amount paid by or on behalf of SELLER or any other Guarantor(s) including but not limited to, a proceeding filed under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this agreement shall include any such amounts.

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

Acknowledgment of Purchase. Guarantor(s) acknowledges and agrees that the Purchase Price paid by BUYER to SELLER in exchange for the Purchased Amount of Receipts is a purchase of the Purchased Amount of Receipts and is not intended to be treated as a loan or financial accommodation from BUYER to SELLER. Guarantor(s) specifically acknowledges that BUYER is not a lender, bank or credit card processor, and that BUYER has not offered any loans to SELLER. Guarantor(s) acknowledges the Receipts Purchase Price paid to SELLER is good and valuable consideration for the sale of the Purchased Amount of Receipts.

Joint and Several Liability. The obligations hereunder of the persons or entities constituting Guarantor(s) under this Agreement are joint and several.

JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT THEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH PARTY AGREES TO THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

CLASS ACTION WAIVER. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

ARBITRATION. IF BUYER, SELLER OR ANY GUARANTOR(S) REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR(S) SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR(S) DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR(S) MAY COMMENCE AN ARBITRATION PROCEEDING WITH MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING ("RAPID") OR, IN CASE RAPID IS UNAVAILABLE AS ARBITRATOR AT THE TIME WHEN THE INTENT TO ARBITRATE ARISES, THE PARTIES HERETO MAY COMMENCE AN ARBITRATION PROCEEDING WITH JAMS, FORMERLY KNOWN AS JUDICIAL ARBITRATION AND MEDIATION SERVICES, INC. ("JAMS"), OR, ALTERNATIVELY, THE PARTY INTENDING TO ARBITRATE A DISPUTE BETWEEN THE PARTIES HERETO MAY SEEK COURT'S APPOINTMENT OF AN ARBITRATOR TO ARBITRATE A DISPUTE BETWEEN THE PARTIES HERETO. BUYER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR(S) FOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND THE GUARANTOR(S) MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR(S) OR THE RELIEF SOUGHT BY SELLER OR THE GUARANTOR(S) IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY RAPID OR JAMS RULES. SELLER AND THE GUARANTOR(S) AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR(S) MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR(S) AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. ANY ARBITRATION DECISION RENDERED PURSUANT TO THIS ARBITRATION AGREEMENT MAY BE ENFORCED IN ANY COURT WITH JURISDICTION. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THIS ARBITRATION CLAUSE. TO OPT OUT OF THIS ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR(S) MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR(S) DOES NOT WANT THIS CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR(S) MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN FOURTEEN 14 DAYS AFTER THE DATE OF THIS AGREEMENT:

ARBITRATION OPT OUT,
FundKite, 88 Pine Street, 24th Floor Street New York NY 10005.

SERVICE OF PROCESS. EACH GUARANTOR(S) HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES PERSONAL SERVICE OF LEGAL PROCESS AND ANY OBJECTION TO THE ABSENCE OF PERSONAL SERVICE OF PROCESS AND HEREBY AGREES TO ACCEPT SERVICE OF LEGAL PROCESS BY (I) ELECTRONIC MAIL SENT TO GUARANTOR'S EMAIL ADDRESS PROVIDED TO BUYER BY GUARANTOR ("LAST KNOWN EMAIL ADDRESS OF GUARANTOR"), (II) UNITED STATES POSTAL SERVICES CERTIFIED MAIL SENT TO GUARANTOR'S MAILING ADDRESS PROVIDED TO BUYER BY GUARANTOR ("LAST KNOWN ADDRESS OF GUARANTOR"), OR (III) BY ANY OTHER MEANS PERMITTED BY NEW YORK LAW. GUARANTOR UNDERSTANDS AND AGREES THAT AN ACTION, LAWSUIT, OR CONTROVERSY MAY BE TAKEN UP AND CONSIDERED BY A COURT WITHOUT ANY FURTHER NOTICE. SERVICE OF PROCESS SHALL BE EFFECTIVE UPON SENDING / MAILING OF SERVICE OF PROCESS BY BUYER ("SERVICE DATE"). GUARANTOR SHALL NOTIFY BUYER OF ANY CHANGE TO ITS LAST KNOWN EMAIL ADDRESS OR ITS LAST KNOWN ADDRESS FOR SERVICE. UNLESS BUYER IS NOTIFIED OF A CHANGE, BUYER'S LAST KNOWN EMAIL ADDRESS OR ITS LAST KNOWN ADDRESS SHALL BE PRESUMED TO BE ACCURATE AND VALID FOR THE PURPOSES OF SERVICE OF PROCESS AND NOTICES. THIS PROVISION SHALL SUPERSEDE ANY NOTICE REQUIREMENTS IN THE CONTRACT WITH RESPECT TO SERVICE OF PROCESS. EACH GUARANTOR(S) WILL HAVE THIRTY (30) CALENDAR DAYS FROM THE SERVICE DATE OF THE SERVICE OF PROCESS HEREUNDER IN WHICH TO RESPOND. FURTHERMORE, EACH GUARANTOR(S) EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT.

Guarantor(s) Acknowledgement. Guarantor(s) acknowledges that: (i) He/She understands the seriousness of provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "REVENUE PURCHASE AGREEMENT PURCHASE AND SALE OF FUTURE RECEIPTS" AND "TERMS OF ENROLLMENT IN PROGRAM" ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS PERFORMANCE GUARANTY.**

### Individual Guarantors
**Guarantor**

Print Name: **RACHELLE DENISE TRITINGER**

Social Security Number: ██████████

Driver's License: ██████████ State Issued: **Pennsylvania**

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
**09-11-2024 2:05 pm**

Signature

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

# Affiliated Business Guarantors

**Guarantor:** 1334-48 BAIN BRIDGE STREET LLC

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
**09-11-2024 2:05 pm**


by Signature

**Address:** 1348 BAINBRIDGE STREET, PHILADELPHIA, PA 19147
**Tax Id#:** - **State of Incorporation:** Pennsylvania

---

**Guarantor:** MAZZONI CENTER D/B/A Mazzoni Center - Washington West

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
**09-11-2024 2:05 pm**


by Signature

**Address:** 1201 Locust St, Philadelphia, PA 19107
**Tax Id#:**                **State of Incorporation:** Pennsylvania

---

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224



# APPENDIX A: THE FEE STRUCTURE

A. <u>Service Fees</u>

- <u>Origination FEE</u> - $20,185.00 The Origination Fee is deducted from the Purchase Price.

B. <u>NSF Fee</u>  - $35.00.  The NSF Fee is due each time the BUYER'S debit ACH of the Account is rejected for insufficient funds. And will be debited from the SELLER'S account on the next available business day or added to the balance.

C. <u>Rejected ACH Fee</u>- $100.00.  The Rejected ACH Fee is due if SELLER directs the bank to reject BUYER'S debit ACH, and will be debited from the SELLER'S account on the next available business day or added to the balance.

D.  <u>Breach Administration Fee</u> -If SELLER violates any term or covenant in this Agreement, and such breach is not cured within and five  (5) calendar days of its first occurrence, SELLER shall pay the BUYER the amount of 25% of the total amount of Purchased Amount outstanding.

The Breach Administration Fee is intended to compensate the BUYER for the additional administrative costs associated with SELLER'S failure to comply with the terms of the Agreement. This amount will be added to the total amount to be remitted by SELLER effectively providing an additional discount to the BUYER. The parties agree that this fee is a good faith estimate of the damages caused by the breach of the Agreement in addition to BUYER'S other remedies specified in this Agreement, including the increased resources required to be expended by the BUYER to respond to the breach, as well as other damages and expenses caused by the breach.

**Agreement of Seller**
**MAZZONI CENTER**

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
**09-11-2024 2:05 pm**

Agreed to by: Signature                                                                              it's **CFO**  (Title)

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224



# AUTHORIZATION AGREEMENT
# FOR AUTOMATED CLEARING HOUSE TRANSACTIONS

MAZZONI CENTER ("SELLER") hereby authorizes AKF Inc, DBA FundKite ("FUNDER") to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other payments due to Funder from Seller under the terms of that Revenue Purchase Agreement (the "Agreement") dated SEPTEMBER 11, 2024 entered into between Seller and FUNDER, as it may be amended, supplemented or replaced from time to time.  Seller also authorizes FUNDER to initiate additional entries (debits and credits) to correct any erroneous transfers.  In addition, SELLER violates any term or covenant in this Agreement, Seller authorizes FUNDER to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to FUNDER from Seller under the terms of the Agreement. Seller agrees to be bound by the Rules and Operating Guidelines of NACHA and represents and warrants that the designated account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes.  Seller authorizes FUNDER to contact Seller's financial institution to obtain available funds information and/or to verify any information Seller has provided about the designated checking account and to correct any missing, erroneous or out-of-date information.  Seller understands and agrees that any revocation or attempted revocation of this Authorization will constitute an event of default under the Agreement. In the event that Seller closes the designated checking account, or the designated checking account has insufficient funds for any ACH transaction under this Authorization, Seller authorizes FUNDER to contact Seller's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller's financial institution, and to initiate ACH transactions under this Authorization to such additional account(s).

**Transfer Funds To/From:**
Name of Bank:
ABA Transit/Routing
Checking Account #:█████████

This authorization is to remain in full force and effect until all amounts due to Buyer under the Agreement have been paid in full, in such time and in such manner as to afford Buyer a reasonable opportunity to act on it.

**Seller Information:**
Seller's Name: **MAZZONI CENTER**
Contract ID: **70234927**
Merchant's Tax ID: █████████
Print Name: **RACHELLE DENISE TRITINGER**
Signature of Authorized Representative:

Signed by: Rachelle Tritinger
*Rachelle Tritinger*
09-11-2024 2:05 pm

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

# EXHIBIT C

# fundkite.

## Business Funding Application

**COMPANY NAME**
Mazzoni Center

**FEDERAL TAX ID**

**BUSINESS ADDRESS**
1348 Bainbridge St

**CITY**
Philadelphia

**STATE**
Pennsylvania

**ZIP CODE**
19147

**DATE BUSINESS STARTED**
04/01/1982

**STATE OF INCORPORATION**
Pennsylvania

**TYPE OF ENTITY**
Corporation

**FIRST NAME**
Rachelle

**LAST NAME**
Tritinger

**TITLE**
Executive

**OWNER SSN**

**DATE OF BIRTH**

**OWNERSHIP %**
100

**OWNER HOME ADDRESS**

**CITY**

**STATE**
Pennsylvania

**ZIP CODE** REDACTED

**SIGNATURE**

**TYPE YOUR NAME**
Rachelle Tritinger

**DATE**
09/09/2024

*By signing above, each of the above listed business applicant and principal owner (individually and collectively, you) authorize Fundkite (FundKite) and each of its representatives, successors, assigns and designees that may be involved with or acquire purchases of future receivables including Sales Based Financing transactions (recipients) to obtain consumer or personal and business reports and other information about you, including credit card processor statements and bank statements, from one or more consumer reporting agencies, such as TransUnion, Experian, and Equifax, and from other credit bureaus, banks, creditors and other third parties (1) to review the transaction you have applied for, including to authenticate your identity, verify information in your application, make underwriting decisions, and for related purposes, and (2) if your application results in your entering into any transaction with any of the recipients, to service, monitor, collect and enforce the transaction. You also authorize Fundkite, as agent for the recipients, to transmit this application form, along with any of the foregoing information obtained in connection with this application, to any or all of the recipients for the foregoing purposes. You also consent to the release, by any creditor or financial institution, of any information relating to any of you, to Fundkite, as agent on behalf of the recipients, and to each of the recipients, on its own behalf.

Consent to telephone calls: you expressly consent to receiving marketing and other calls and messages, to landline, wireless or similar devices, including auto-dialed and prerecorded message calls, and sms messages (including text messages) from recipients, at telephone numbers that you have provided. Message and data rates may apply.

Each signer acknowledges that Fundkite and/or recipients may rely on the statements and information set forth in this application and that such statements and information may be incorporated by reference in any agreement any of the undersigned may enter into with Fundkite and/or recipients. Each of the undersigned hereby agrees to notify Fundkite and/or recipients promptly of any change in any such statement or information. Each signer has read and understands the terms of this application, including any addendum, and represents and warrants that the information contained herein is true and correct.

I, principal owner(s) of the business applicant, authorize Fundkite and/or recipients to obtain my consumer report, including my credit score, and other information, for the purpose of obtaining a working capital for the business applicant.

ver:FB-IP: 68.162.70.34



## Congratulations, On Your Preliminary Offer!

Dear MAZZONI CENTER,

This preliminary offer ("Preliminary Offer," or "PO") is based on an initial review and is not a guaranty or commitment that FundKite will consummate a transaction. Complete contracts and documentation described herein must be provided for underwriting review before FundKite will enter into a transaction. Any misrepresentation in the application submitted to FundKite or material adverse change may void this Preliminary Offer, which is subject to change or cancellation if the requested transaction no longer meets applicable requirements. Please take your time to go over the below details and complete your documents.

| PROPOSED FUNDING DETAILS | | |
|---|---|---|
| **ITEM** | **TERM** | **DESCRIPTION** |
| **Purchase Price** | $500,000.00 | The "Purchase Price" is the amount Fundkite (the "Buyer") would remit to your business(es) (collectively, the "Seller") in exchange for the Purchased Amount of receivables, as further reduced by Closing Costs below (if any). |
| **Purchased Amount** | $690,000.00 | The "Purchased Amount" is the total future receivables purchased by Buyer from Seller. |
| **Disbursement Amount** | $479,815.00 | The "Disbursement Amount" is the difference between the Purchase Price of receivables reduced by any Closing Costs, including a Prior Balance, which will be remitted to your business bank account from the Purchase Price. |
| **Specified Percentage** | 9 % | Agreed-upon percentage (i.e. portion) of Seller's future business revenue to be remitted to Buyer until the Purchased Amount is received. |
| **Manner, frequency, and amount of remittances** | | Buyer will collect the Purchased Amount by debiting your business bank account in periodic remittances or "installments" that will occur Weekly. The initial Remittance Amount will be $24,642.86, which is based upon 9% of your estimated revenue from documentation submitted, and representations, by Seller. For details on your right to Adjustment of the initial Remittance Amount, see Section 1.3 of your contract. |
| **Structure of Financing** | | Revenue-based financing in the form of a purchase-and-sale of future business receivables. |
| **Seller's Pledge of Security** | | In order to ensure Seller's prompt and complete remittance of the Purchased Amount, Seller shall grant Buyer a security interest in Seller's accounts-receivables. |
| **Guaranty of Performance** | | Owner(s) of Seller(s) personal guarantee(s) of performance (not payment) of Seller's obligations under the proposed financing. |
| **Costs or Discounts Associated with Prepayment** | | As the pace of remittance is based upon the revenue flow of your business, there is no additional cost or fees accrued based solely on remittance pace (i.e. amount of time required to satisfy the Purchased Amount), whether slower or faster than anticipated based upon documentation and representations made by your business in the application process. The contract does not provide a discount for rapid remittance of the Purchased Amount. For information on our Exceptional Delivery Options, e-mail us at customerservice@fundkite.com. |

AKF Inc DBA FundKite © 2024 All Rights Reserved v09012024

| CLOSING COSTS | | |
|---|---|---|
| **Origination Fee** | $20,185.00 | Buyer's charge for origination fee. |
| **Prior Balance(s)** | To Be Determined | Seller's prior balance(s) due to Buyer and/or a third-party(s), which would be deducted from the Purchase Price and remitted/applied to satisfy Seller's obligations. |

**CREDIT AUTHORIZATION TO FUNDKITE AND RELATED ENTITIES**

This Preliminary Offer is for informational purposes, and is intended to highlight some of the material terms and conditions of the proposed Sale of Future Receipts Agreement (the "Agreement"), an offer being extended by Buyer, notwithstanding any alternative description of a product that may have been communicated to the Seller. Among other things, Seller and Seller's Owner(s) affirm and acknowledge that the Agreement requires that (i) the Owner will personally guaranty performance by the Seller under the Agreement, (ii) the Purchased Amount will be reduced by Closing Costs; (iii) the Seller may be subject to certain default fees/damages during the course of the Agreement, should an Event of Default occur; and (iv) to the extent the Specified Percentage is remitted via Remittance Amount payments, those Remittance Amounts will be through an automated ACH debit of the Seller's bank account. This preliminary offer is not a contract and is not binding on either Buyer and/or Seller(s).

Test Deal Participation Email (hereinafter "you" "your" and "yours") understand that by signing this notice, you are providing "written instructions" under the Fair Credit Reporting Act to AKF Inc. dba FundKite ("FundKite"), thereby authorizing FundKite to obtain information from your personal consumer credit report and business credit profile and/or other information from TransUnion, Experian, Equifax, Thompson Reuters Clear and/or LexisNexis. You hereby authorize FundKite to obtain such information to confirm your identity to avoid fraudulent transactions in your name, determine prequalification for a commercial transaction or any other lawful purpose covered under the Fair Credit Reporting Act.

Principal Owner:

Print Name: RACHELLE DENISE  TRITINGER

Signed by: **Rachelle Tritinger (Executive Financial Officer)**

*Rachelle Tritinger*

09-10-2024 2:08 pm

**Signature:**



## Funding Checkout

By checking by next to each statement below, you are verifying the statement is true, complete and accurate. If the statement below is not true, complete and accurate, please contact FundKite Underwriting at (212)-952-0001 or by email underwriting@fundkite.com

My name is RACHELLE DENISE TRITINGER and I am a majority owner of MAZZONI CENTER.

MAZZONI CENTER is open and operating without any restrictions.

My average gross sales for the last four months are $1,130,871.65 per month.

I have read and understand the Revenue Purchase Agreement and I agree to all the terms and conditions therein.

I understand this is NOT a loan and there is no interest rate, no fixed payment and no maturity date associated with the sale of my Receipts.

I have agreed to sell $690,000.00 of my Receipts to FundKite in exchange for the Purchase Price of $500,000.00 and I will remit to FundKite each week on Wednesday 9% of my sales until the Full Purchased Amount has been paid.

I will not sell additional receipts without FundKite's prior written consent. Any sale of my Receipts without prior written consent of FundKite is a material breach of the agreement.

I am not in or contemplating business or personal bankruptcy.

I have not taken any additional funding in the last 48 hours and have disclosed all prior funding agreements to FundKite.

I have disclosed any and all pending or entered judgments, liens or settlements as against the business or individual owner, entered into or negotiated within the past 2 years.

I will continue to provide FundKite with ongoing electronic access to the Designated Account and provide bank statements, credit card receipts and batching reports for reconciliation or upon request.

I have agreed to pay a service fee in the amount of $20,185.00 and as a result my net disbursement (Deposit to my Account) will be $479,815.00 on day of funding.    I understand that Fundkite has relied upon the truthfulness, accuracy and completeness of all the information I have provided to Fundkite and any misrepresentation of facts, omission of facts or misleading information is a material breach of the Agreement.

I am not currently planning to relocate the business within the next 12 months. If I decide to relocate the business within the next 12 months I will notify FundKite prior to the move.

AKF Inc DBA FundKite © 2023 All Rights Reserved



## Reconciliations, Here's How it Works

We reconcile your sales to ensure you are remitting

payments that are reflective of your actual sales and not more.



**We review your sales deposits**



**We calculate what the remittance amount is.**



**You get notifications with our reconciliation result**



**Payment is debited from your account the next day.**

## PAYMENT STRUCTURE

- ● Example of daily revenue

- ○ 10% of your daily sales receievd *(example only, actual percentage is specifed in contract)*



AKF Inc DBA FundKite © 2023 All Rights Reserved

# Reconciliation Frequency



**Weekly**, each Tuesday we calculate your total Sales deposits for the previous 7 days, and debit the account the on the next business day.



**Monthly**, By the 12th of the month we calculate your total sales for the previous month and adjust your debits to reflect the remittance percentage going forward until next reconciliation.

Important - Your Reconciliation Frequency is Monthly Unless you select the option below

Weekly Reconciliation

AKF Inc DBA FundKite © 2023 All Rights Reserved



**Schedule 1 to Revenue Purchase Agreement**

As defined in the Merchant Agreement Dated SEPTEMBER 11, 2024 , to which this Schedule is appended and made part thereof, "FUNDER" encompasses the lead purchaser and any and all co-investors. The co-investors specifically include each of the corporate persons named below:

| |
|---|
| FundKite SPV LLC |
| Fundkite SPV LLC Series 10/19/23 |
| Fundkite SPV LLC Series 10/31/23 |
| Fundkite SPV LLC Series 12/08/23 |
| Fundkite SPV LLC Series 02/23/24 |
| Fundkite SPV LLC Series 04/04/24 |
| 1025MMT LLC |
| American Direct Funding LLC |
| Calitalist B2B Investment LLC |
| DeRider Funding Capital LLC |
| Moonbonk LLC |
| LOUD Dividend Growth FUND I MCA LLC |
| LOUD Private Growth I LLC |
| Pinkdome Corporation |

Nothing in this Schedule in any way modifies the obligation of Merchant to deal exclusively with the FundKite as the sole and exclusive party with authority to act on behalf of itself and any and all co-investors as FUNDER.

By signing below, Merchant acknowledges that each of the above-named co-investors may enforce any and all terms of the Merchant Agreement against Merchant acting jointly, as a collective body, or severally, in their respective individual capacity.

**Acknowledgment of Merchant:** Name Of Merchant: MAZZONI CENTER

**Agreed to by:** Print Name: RACHELLE DENISE TRITINGER It's CFO (Title)

Signed by: **Rachelle Tritinger (Executive Financial Officer)**

**09-11-2024 2:03 pm**

AKF Inc DBA FundKite © 2023 All Rights Reserved

EXHIBIT D



09-23-2024

***VIA EMAIL: rtritinger@mazzonicenter.org rtritinger@mazzonicenter.org***
MAZZONI CENTER DBA MAZZONI CENTER / MAZZONI CENTER OUR HEALTH. OUR LIVES. OUR COMMUNITY.
Atten: RACHELLE DENISE TRITINGER
1348 BAINBRIDGE ST,
PHILADELPHIA, PA 19147

RE:    Notice of Event of Breach Under Revenue Purchase Agreement ("Agreement") with AKF, Inc. d/b/a FundKite ("FundKite") dated SEPTEMBER 11, 2024

## <u>URGENT IMMEDIATE RESPONSE REQUIRED</u>

Dear RACHELLE DENISE TRITINGER,

I am writing to advise you that FundKite received notice that its scheduled ACH debit of Receipts from the business bank account of MAZZONI CENTER ("Merchant") Merchant's Designated Account was blocked.

FundKite's inability to successfully debit the Merchant's Designated Account due to any "block" placed on its debits by or at your behest constitutes a breach of the Revenue Purchase Agreement (the "Agreement") between Merchant and FundKite. See Agreement, Section 2. When Merchant breaches the Agreement, 100% of the uncollected Receipts that were purchased by FundKite become immediately due and FundKite becomes entitled to a breach administration fee equal to 25% of the amount of uncollected Receipts. See Agreement, Section 3.1 (d)  and Appendix A (D).

Please contact FundKite before 3PM EST MONDAY SEPTEMBER 23RD, 2024 to discuss curing Merchant's breach of the Agreement. The failure to contact FundKite upon receipt of this notice regarding this matter will result in the breach administration fee being incurred and FundKite may take legal action to enforce its rights and remedies under the Agreement, including initiating a lawsuit against the Merchant and all Guarantors, for breaching the Agreement.

The foregoing is without prejudice to FundKite's rights and nothing contained herein shall be deemed a waiver of any such rights, all of which are hereby expressly reserved.


Sincerely,


Yesenia Rodriguez
Recovery and Litigation
Email: yesenia.r@fundkite.com
Direct Line: 1-929-445-5600

---

[1]  Capitalized terms not otherwise defined herein have the meaning given to them in the Agreement.

**Contract: #** 70234927                         AKF Inc DBA FundKite © 2022 All Rights Reserved

EXHIBIT E

FILED: NASSAU COUNTY CLERK 09/23/2024 02:50 PM
NYSCEF DOC. NO. 1

INDEX NO. 616825/2024

RECEIVED NYSCEF: 09/23/2024

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-------------------------------------------------------------------X

THE LCF GROUP, INC.,

                            Plaintiff,

      -against-

MAZZONI CENTER d/b/a MAZZONI CENTER,
1334-48 BAINBRIDGE STREET LLC,
and RACHELLE TRITINGER,

                         Defendants.

-------------------------------------------------------------------X

Index No.

**SUMMONS**

**PLAINTIFF'S ADDRESS**:
3000 Marcus Ave, Suite 2W15
Lake Success, NY 11042

Date Purchased:

To the above-named defendants:

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer on the plaintiff's attorneys within twenty (20) days after service of this summons, exclusive of the day of service (or within thirty (30) days after service is complete if this summons is not personally delivered to you within the State of New York). If you fail to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

    Plaintiff designates Nassau County as the place of trial, as plaintiff's principal place of business is located within the State of New York, County of Nassau. Venue is also proper in Nassau County based upon the consent to jurisdiction contained within the subject agreement entered into by and between the parties hereto.

Defendants' Address(es):

- Mazzoni Center d/b/a Mazzoni Center – 1348 Bainbridge Street, Philadelphia, Pennsylvania 19147

- Rachelle Tritinger – 1348 Bainbridge Street, Philadelphia, Pennsylvania 19147

- 1334-48 Bainbridge Street LLC – 1348 Bainbridge Street, Philadelphia, Pennsylvania 19147

Dated: Lake Success, New York
       September 23, 2024

       **THE FELDMAN LAW FIRM, P.C.**

       By: Adam J. Feldman, Esq.
       *Attorneys for Plaintiff*, c/o The LCF Group, Inc.
       3000 Marcus Ave, Suite 2W15, Lake Success, NY 11042
       212-244-4422 / ajf@feldmanlegal.com

FILED: NASSAU COUNTY CLERK 09/23/2024 02:50 PM    INDEX NO. 616825/2024
NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 09/23/2024

SUPREME COURT OF THE STATE OF NEW YORK                 Index No.
COUNTY OF NASSAU
-------------------------------------------------------------------X    **VERIFIED COMPLAINT**
THE LCF GROUP, INC.,

                              Plaintiff,

          -against-

MAZZONI CENTER d/b/a MAZZONI CENTER,
1334-48 BAINBRIDGE STREET LLC,
and RACHELLE TRITINGER,
                              Defendants.          Date Purchased:
-------------------------------------------------------------------X

  Plaintiff The LCF Group, Inc. ("LCF"), by its attorneys, The Feldman Law Firm, P.C., as

and for its verified complaint against defendants MAZZONI CENTER d/b/a MAZZONI

CENTER, 1334-48 BAINBRIDGE STREET LLC, and RACHELLE TRITINGER, alleges as

follows:

### PARTIES

1.  LCF is a corporation formed and existing under the laws of The State of New York, which

maintains its principal place of business at 3000 Marcus Ave, Suite 2W15, Lake Success, New

York 11042.

2.  Upon information and belief, defendant Mazzoni Center d/b/a Mazzoni Center

("Merchant") is a business entity formed under the laws of one of the States of the United States,

which maintains its principal place of business at 1348 Bainbridge Street, Philadelphia,

Pennsylvania 19147.

3.  Upon information and belief, defendant Rachelle Tritinger ("TRITINGER" or

"Guarantor") is an individual residing and domiciled at 1348 Bainbridge Street, Philadelphia,

Pennsylvania 19147.

FILED: NASSAU COUNTY CLERK 09/23/2024 02:50 PM
NYSCEF DOC. NO. 1

INDEX NO. 616825/2024
RECEIVED NYSCEF: 09/23/2024

4.      Upon information and belief, Defendant 1334-48 Bainbridge Street LLC ("14BS"), is a business entity organized and operating under the laws of one of the States of the United States and which maintains its principal place of business at 1348 Bainbridge Street, Philadelphia, Pennsylvania 19147.

5.      Hereinafter, 14BS and TRITINGER shall collectively be referred to as "Guarantors", unless the allegations are inapplicable to both.

6.      Hereinafter, MERCHANT, 14BS and TRITINGER shall be collectively referred to as "Defendants".

## JURISDICTION AND VENUE

7.      This Court has personal jurisdiction over Defendants and subject matter jurisdiction over this action based upon the consent to jurisdiction contained in Section 3.5 of the subject purchase and sale of future receivables agreement, which was entered into by and between the parties on September 11, 2024 (the "Agreement").

8.      Venue is proper under CPLR § 503(a), as LCF maintains its principal place of business in the State of New York, County of Nassau.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A.  The Merchant Case Advance Industry

9.      The Merchant Cash Advance ("MCA") industry – part of the larger "Fintech" sector – is an important source of funds for small businesses throughout the United States.  Fintech leverages technological advancements to expand the availability of capital to businesses previously shut out from conventional banking products after the financial crisis of 2008.

10.     Accordingly, businesses that might otherwise be foreclosed from traditional sources of capital have increasingly turned to the MCA industry as a means of expanding and supporting their

FILED: NASSAU COUNTY CLERK 09/23/2024 02:50 PM

NYSCEF DOC. NO. 1

INDEX NO. 616825/2024

RECEIVED NYSCEF: 09/23/2024

businesses.  MCA is not a recourse product – rather, a merchant sells a percentage of its future receivables at a discounted present value.  The MCA funder typically recovers the percentage of receivables it purchases from a small business through regular ACH debits from a small business' bank account, which, initially, is estimated as a percentage of average revenues prior to the funding.

11.    The dollar amount tied to such percentage is adjustable upon a merchant's request, and a reduction in a merchant's revenues directly correlates to a reduction in remittances.  As a result, the length of time for the MCA funder to receive its percentage of future sales is indefinite.  For example, assuming a purchased percentage of 15% of daily sales, if a merchant's daily revenues were averaging $100.00, the MCA funder would be entitled to receive $15.00 ($100.00 x 0.15 = $15.00). If those revenues were to drop to $10.00, the MCA funder would be entitled to receive $1.50 ($10.00 x 0.15 = $1.50).

12.    To safeguard against remittances in excess of the agreed upon percentage of daily sales, LCF's standard purchase and sale of future receivables agreement ("PSFRA"), like the subject Agreement here, contains a reconciliation provision, which invites a merchant to document its monthly sales in order to ensure that monthly remittances to LCF do not exceed 12.00% of revenues, and remittances in excess of the purchased percentage are returned to the merchant.

13.    Moreover, a cessation of business operations, bankruptcy, or other insolvency does not constitute an event of default under LCF's standard PSFRA.  Instead, LCF's form PSFRA clearly provides, that so long as a merchant complies with the contract's notification requirements, LCF's recovery of purchased receivables from said merchant can extend indefinitely and, in the event of a cessation of business operations, may never occur at all.

**B.  *The Agreement***

FILED: NASSAU COUNTY CLERK 09/23/2024 02:50 PM

NYSCEF DOC. NO. 1

INDEX NO. 616825/2024

RECEIVED NYSCEF: 09/23/2024

14.     On September 11, 2024 , LCF and Merchant entered into the Agreement, whereby Merchant sold LCF $362,500.00 ("Purchased Amount") of Merchant's accounts, contract rights, and other obligations arising from or relating to the payment of monies from Merchant's customers and other third party payors ("Receivables") for the sum of $250,000.00 (less certain scheduled and agreed-upon fees) ("Purchase Price"), to be paid by the Merchant to LCF from 12.00% of Merchant's daily revenue.

15.     The Agreement provides that LCF will receive the Purchased Amount of Merchant's future receivables via a daily ACH debit of 12.00% of Merchant's daily receipts and estimated that amount as a true and accurate estimate of the purchased percentage of sales based upon Defendants' representations to LCF.

16.     Paragraph 1.10 of the Agreement provides for the "Sale of Receipts".  This provision clearly specifies that no interest rate, payment schedule, or time period is applicable to the Agreement and that a bankruptcy filing or cessation of the Merchant's business would not constitute an event of default.

17.     Paragraph 1.10 of the Agreement further elaborates that the contemplated transaction is not a lending transaction and that the Merchant is not borrowing money.  Rather, the contract specifies that a portion of the Merchant's future receivables is being purchased.

18.     Pursuant to paragraph 1.4 of the Agreement, Defendants were entitled to request a monthly reconciliation to ensure that the Merchant's monthly remittances did not exceed 12.00% of its revenues.

19.     Defendants have not sought to reconcile any remittances made or due to LCF.

20.     As contemplated under paragraph 1.13 of the Agreement, a Merchant defaults, *inter alia*, by:

FILED: NASSAU COUNTY CLERK 09/23/2024 02:50 PM
INDEX NO. 616825/2024
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 09/23/2024

    a.   blocking LCF's access to the designated bank account (the "Designated Account") from which Merchant agreed to permit LCF to withdraw the purchased Receivables;

    b.   failing to respond to communications initiated by LCF concerning any dishonor of any ACH debit initiated by LCF for a period exceeding 72 hours;

    c.   failing to provide LCF with any requested bank or financial statements within three business days of such a request, and/or;

    d.   depositing Receivables into a bank account other than the Designated Account.

21.    Notably, non-payment is not defined as an event of default.

22.    Accordingly, so long as Merchant complied with the terms of performance under the Agreement, LCF would not be entitled to any remedy.

23.    Defendants, prior to Merchant's default, failed to utilize the various safeguards and guardrails available to them under the Agreement.

### C.  The Guaranty

24.    By virtue of a personal guaranty of performance executed by TRITINGER on or about September 11, 2024 (the "Personal Performance Guaranty"), TRITINGER is Merchant's personal performance guarantor and, as a result of the Merchant's default in performance under the Agreement, is personally liable for the obligations Merchant owed to LCF.

25.    Under the aforesaid Personal Performance Guaranty, TRITINGER guarantied the performance of Merchant to LCF without reservation or defense.

26.    Plaintiff proceeds against 14BS by virtue of "Cross-Corporate" guaranty executed by it to the benefit of Plaintiff on or about September 11, 2024, which warranted that 14BS would pay any amounts owed to Plaintiff by MERCHANT without reservation or defense.

FILED: NASSAU COUNTY CLERK 09/23/2024 02:50 PM        INDEX NO. 616825/2024

NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 09/23/2024

## AS AND FOR A FIRST CAUSE OF ACTION

27.    Merchant agreed that in the event of its default under the Agreement, the full uncollected Purchased Amount plus all fees due under the Agreement would become immediately due and payable in full to LCF less payments on account.

28.    LCF paid Merchant the Purchase Price, as provided in the Agreement and applicable fee schedules therein, and has fully performed its obligations to Defendants under the Agreement.

29.    Merchant, despite continuing to operate, breached the Agreement by defaulting on its performance obligations, representations, and warranties to LCF.

30.    On or about September 12, 2024, Merchant breached its obligations under the Agreement by frustrating LCF's access to draw upon its Specified Percentage of receivables by the merchant revoking ACH debit authorization in contention of its contractual obligations (R29)[1] Additionally, Merchant failed to meet its obligations under Section 1.13 of the Agreement.

31.    As a result, LCF has not received the full Purchased Amount of Receivables from Merchant.

32.    Merchant was credited with $0.00 via payments and/or the application of unexpended funds to its balance and therefore owes LCF $362,500.00 of the Purchased Amount under the Agreement.

33.    Merchant also owes LCF $5,035.00 for default and nonsufficient funds fees ("NSF") pursuant to the Agreement.

34.    By reason of the foregoing, LCF has been damaged by Merchant's breach of the Agreement in the sum of $367,535.00 with interest thereon from September 12, 2024.

---

[1] See Generally https://www.actumprocessing.com/understanding-ach-return-codes/

FILED: NASSAU COUNTY CLERK 09/23/2024 02:50 PM    INDEX NO. 616825/2024
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 09/23/2024

35.    LCF is entitled to judgment in the amount of $367,535.00 with interest thereon from September 12, 2024, together with such other and further relief as this Court deems just and proper.

## AS AND FOR A SECOND CAUSE OF ACTION

36.    LCF repeats and realleges each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

37.    Under Paragraph 1.14 of the Agreement, Merchant agreed to pay LCF's reasonable attorneys' fees in the event of default. The parties agreed that reasonable attorneys' fees would be liquidated as 33.33% of the Purchased Amount balance outstanding upon the occurrence of an event of default.

38.    Accordingly, pursuant to the Agreement, Merchant owes LCF $120,821.25 as liquidated damages and not as a penalty.

39.    LCF is entitled to judgment against Merchant in the amount of $120,821.25, together with such other and further relief as this Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION

40.    LCF repeats and realleges each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

41.    Guarantors executed guarantees of performance of all the representations, warranties, and covenants made by Merchant under the Agreement.

42.    By reason of those guarantees, Guarantors are obligated to LCF in the sum of $367,535.00.

## AS AND FOR A FOURTH CAUSE OF ACTION

43.    LCF repeats and realleges each and every allegation set forth in the preceding paragraphs as if set forth fully herein.

FILED: NASSAU COUNTY CLERK 09/23/2024 02:50 PM     INDEX NO. 616825/2024
NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 09/23/2024

44.     By reason of the guarantees, Guarantors are obligated to pay LCF's reasonable attorneys' fees. The parties agreed that reasonable attorneys' fees would be liquidated as 33.33% of the Purchased Amount balance outstanding upon the occurrence of an event of default by Merchant.

45.     Accordingly, Guarantors owe LCF $120,821.25 as liquidated damages and not as a penalty.

46.     LCF is entitled to judgment against Guarantors in the amount of $120,821.25, together with such other and further relief as this Court deems just and proper.

        **WHEREFORE,** LCF demands judgment in the amount of:

1)     $367,535.00 against Merchant upon the first cause of action;

2)     $120,821.25 against Merchant upon the second cause of action;

3)     $367,535.00 against Guarantors upon the third cause of action;

4)     $120,821.25 against Guarantors upon the fourth cause of action; and

5)     Statutory interest from September 12, 2024, costs, and disbursements upon all causes of action, together with such other and further relief as this Court deems just and proper.


Dated: Lake Success, New York
        September 23, 2024


                                        **THE FELDMAN LAW FIRM, P.C.**


                                        By: Adam J. Feldman, Esq.
                                        *Attorneys for Plaintiff*, c/o The LCF Group, Inc.
                                        3000 Marcus Ave, Suite 2W15, Lake Success, NY 11042
                                        212-244-4422 / ajf@feldmanlegal.com

FILED: NASSAU COUNTY CLERK 09/23/2024 02:50 PM    INDEX NO. 616825/2024
NYSCEF DOC. NO. 1                                             RECEIVED NYSCEF: 09/23/2024

SUPREME COURT OF THE STATE OF NEW YORK                Index No.
COUNTY OF NASSAU
-------------------------------------------------------------------X    **VERIFICATION**
THE LCF GROUP, INC.,

                                    Plaintiff,

    -against-

MAZZONI CENTER d/b/a MAZZONI CENTER,
1334-48 BAINBRIDGE STREET LLC,
and RACHELLE TRITINGER,

                                    Defendants.
-------------------------------------------------------------------X

STATE OF NEW YORK    }
                      } ss:
COUNTY OF NASSAU    }

    **ROBERT KLEIBER**, being duly sworn, deposes, and says:

    I am the Chief Operating Officer and Chief Financial Officer for the plaintiff in this action,

The LCF Group, Inc., and I have read the within Verified Complaint and know the contents thereof

to be true to my own knowledge, with the exception of those matters therein stated to be alleged

upon information and belief, and as to those matters, I believe them to be true.


So sworn before me on
September 23, 2024



_____                          _____
Notary Public                                        Robert Kleiber

┌─────────────────────────────────────┐
│  Adam Jason Feldman, Notary Public   │
│        State of New York             │
│          No. 02FE6001199             │
│      Qualified in Nassau County      │
│   Commission Expires 01/05/2026      │
└─────────────────────────────────────┘

FILED: NASSAU COUNTY CLERK 09/23/2024 02:50 PM    INDEX NO. 616825/2024

NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 09/23/2024

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
----------------------------------------------------------------------x
THE LCF GROUP, INC.,

                      Plaintiff,

                                                 Index No.

      -against-

MAZZONI CENTER d/b/a MAZZONI CENTER,
1334-48 BAINBRIDGE STREET LLC,
and RACHELLE TRITINGER,

                    Defendants.
----------------------------------------------------------------------x

## NOTICE OF ELECTRONIC FILING
### (Consensual Case)
(Uniform Rule § 202.5-b)

**You have received this Notice because:**

    1)  The Plaintiff/Petitioner, whose name is listed above, has filed this case using the New York State Courts E-filing system ("NYSCEF"), and

    2)  You are a Defendant/Respondent (a party) in this case.

- **If you are represented by an attorney:**
  Give this Notice to your attorney.   (<u>Attorneys</u>: see "Information for Attorneys" pg.2).

- **If you are not represented by an attorney:**
  **You will be served with all documents in paper and you must serve and file your documents in paper, unless you choose to participate in e-filing.**

  **If you choose to participate in e-filing, you <u>must</u> have access to a computer and a scanner or other devise to convert documents into electronic format, a connection to the internet, and an e-mail address to receive service of documents.**

  The **benefits of participating in e-filing** include:
  - serving and filing your documents electronically
  - free access to view and print your e-filed documents
  - limiting your number of trips to the courthouse
  - paying any court fees on-line (credit card needed)

**To register for e-filing or for more information about how e-filing works:**
- visit: <u>www.nycourts.gov/efile-unrepresented</u> or

FILED: NASSAU COUNTY CLERK 09/23/2024 02:50 PM    INDEX NO. 616825/2024
NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 09/23/2024

- contact the Clerk's Office or Help Center at the court where the case was filed. Court contact information can be found at www.nycourts.gov

To find legal information to help you represent yourself visit www.nycourthelp.gov

### Information for Attorneys

An attorney representing a party who is served with this notice must either consent or decline to electronic filing and service through NYSCEF for this case.

Attorneys registered with NYSCEF may record their consent electronically in the manner provided at the NYSCEF site. Attorneys not registered with NYSCEF but intending to participate in e-filing must first create a NYSCEF account and obtain a user ID and password prior to recording their consent by going to www.nycourts.gov/efile

Attorneys declining to consent must file with the court and serve on all parties of record a declination of consent.

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov).

Dated: September 23, 2024

Adam J. Feldman
  Name

The Feldman Law Firm, P.C.
  Firm Name

3000 Marcus Ave #2W15
Lake Success, NY 11042
Address

212.244.4422
Phone

ajf@feldmanlegal.com
E-Mail

To: Mazzoni Center d/b/a Mazzoni Center
    1348 Bainbridge Street, Philadelphia, Pennsylvania 19147

    Rachelle Tritinger
    1348 Bainbridge Street, Philadelphia, Pennsylvania 19147

    1334-48 Bainbridge Street LLC
    1348 Bainbridge Street, Philadelphia, Pennsylvania 19147

# EXHIBIT F

# **Rapid**Ruling

# ARBITRATION DEMAND

You are hereby notified that a copy of the agreement and this demand, along with all supporting documentation, are being filed with RapidRuling with a request that it commence administration of arbitration pursuant to its Commercial Arbitration Rules located at http://www.rapidruling.com (the "Rules"). You have fourteen (14) days to submit an answer, and in case of your failure to answer, an award may be entered against you for the relief demanded by claimant.

**All responsive documents must be submitted to Rapid Ruling at http://efile.rapidruling.com pursuant to the Rules.**

## RESPONDENT INFORMATION     |   Please attach continuation pages if additional space is needed.

| NAME | Mazzoni Center d/b/a Mazzoni Center / Mazzoni Center Out Health. Our Lives. Our Community |
|---|---|

| STREET ADDRESS | 1348 Bainbridge Street |
|---|---|

| CITY | Philadelphia | STATE | PA | ZIP | 19147 |
|---|---|---|---|---|---|

| PHONE | 267-389-3431 | FAX | | EMAIL | NPChrysanthem@MDWCG.com |
|---|---|---|---|---|---|

The Claimant named below, a party to an arbitration agreement which provides arbitration under the Rules of RapidRuling (or Mediation and Civil Arbitration, Inc.), hereby demands arbitration.

| BRIEF DESCRIPTION OF DISPUTE: | The Claimant  and Respondent entered into a Revenue Purchase Agreement on September 11, 2024, which the respondent breached on September 19, 2024. See |
|---|---|

| AMOUNT OF CLAIM | USD$ 862,500.00 |
|---|---|

OTHER RELIEF SOUGHT

- ☑ Attorney's Fees
- ☑ Arbitration Costs
- ☐ Other
- ☑ Interest
- ☐ Punitive/Exemplary

## CLAIMANT INFORMATION     |   Please attach continuation pages if additional space is needed.

| NAME | AKF, Inc d/b/a Fundkite | NAME OF REPRESENTATIVE | Oleg A. Mestechkin |
|---|---|---|---|

| STREET ADDRESS | 88 Pine Street, Suite 2430 | FIRM NAME | Mestechkin Law Group P.C. |
|---|---|---|---|

| CITY | New York | ZIP | 10005 | STREET ADDRESS | 2218 Ocean Avenue |
|---|---|---|---|---|---|

| STATE | NY | CITY | Brooklyn | ZIP | 11229 |
|---|---|---|---|---|---|

| PHONE | | FAX | | STATE | NY |
|---|---|---|---|---|---|

| EMAIL | om@lawmlg.com | PHONE | 2122561113 | FAX | 6463652069 |
|---|---|---|---|---|---|

| SIGNATURE | *[signature]* | EMAIL | om@lawmlg.com |
|---|---|---|---|

**NOTICE PURSUANT TO NEW YORK'S CIVIL PRACTICE LAW AND RULES § 7503(c): unless the party served applies to stay the arbitration within twenty (20) days after service the party served shall thereafter be precluded from objecting that a valid agreement was not made or has not been complied with and from asserting in Court the bar of a limitation of time.**

© 2022, Mediation and Civil Arbitration, Inc. d/b/a RapidRuling, All Rights Reserved.

# EXHIBIT G

Kathleen A. Brady, MD, MSCE (she/her/hers)
Director/Medical Director
Division of HIV Health
Philadelphia Department of Public Health

Philadelphia, PA 19107
E-mail:
Phone:
Fax:
https://phillykeeponloving.com/

---

**From:** Kathleen A Brady
**Sent:** Thursday, October 17, 2024 12:22 PM
**To:** Sultan Shakir          @mazzonicenter.org>
**Subject:** FW: Mazzoni Center

Hi Sultan,
I received this email from PDPH Chief of Staff yesterday. Can you tell me what's going on? I've been told to hold all of your invoices for payment. Should we set up a call to discuss?

Kathleen

Kathleen A. Brady, MD, MSCE (she/her/hers)
Director/Medical Director
Division of HIV Health
Philadelphia Department of Public Health

Philadelphia, PA 19107
E-mail:
Phone:
Fax:
https://phillykeeponloving.com/

---

**From:** Sara Enes
**Sent:** Tuesday, October 15, 2024 2:44 PM
**To:** Kathleen A Brady                    @phila.gov>; Naomi Mirowitz <                    @phila.gov>
**Subject:** Mazzoni Center

Hi Kathleen and Naomi,

I received an email late on Friday afternoon from the Law department regarding the Mazzoni Center. The City received a lien notice from one of Mazzoni's funders, indicating that Mazzoni has defaulted on their loan. This lien exposes the city to liability, and we have been instructed by law not to make any payments to Mazzoni until law determines liability and to whom we should be making payments. I have already asked Bill Marks not to process payments. Please instruct your staff to do the same.

Please also reach out to Mazzoni and see if they can provide information about where they are headed financially. I am happy to discuss further or relay any questions to law, or schedule a call for all of us to discuss.

Thanks,
Sara

**Sara Enes Thorpe, MBA, MSW** (she/her)
Chief of Staff
Philadelphia Department of Public Health

Philadelphia, PA 19107

# EXHIBIT H



The LCF Group
Legal Department
3000 Marcus Ave, Suite 2W15
Lake Success, NY 11042

**URGENT | ACTION REQUIRED**

September 18, 2024
Walgreen Co.
Attn; Legal Department
200 Wilmot Rd. MS #2002
Deerfield, IL 60015
Via First-Class Mail

Re: Mazzoni Center DBA Mazzoni Center AND 1334-48 Bainbridge Street LLC AND
Rachelle Tritinger
EIN:
Amount Due: $367,535.00

Sir or Madam:

Please be advised that The LCF Group, Inc. f/k/a Last Chance Funding Inc. ("LCF") is a secured creditor with respect to the accounts receivable of **Mazzoni Center DBA Mazzoni Center AND Rachelle Tritinger** ("Debtor"). LCF and Debtor have a contractual agreement ("Agreement") whereby LCF has a perfected security interest in and is the assignee of among other things your account obligations, Debtor's cash and collateral and, indeed, all of Debtor's other assets. LCF is contractually entitled to receive any and all such obligations based upon Debtor's default of its obligations to LCF. Copies of our UCC Financing Statement reflecting the indebtedness of Debtors to LCF is included herewith. Indeed, pursuant to UCC §9-315, LCF has a perfected security interest upon the proceeds of its collateral even if they currently reside in a deposit account. As the deposits within the Debtor's accounts are identifiable cash proceeds of LCF's collateral (eg Debtor's receivables), LCF's security interest is not time limited.

LCF understands that Walgreen Co. may have a business relationship with Debtor by which Walgreen Co. may, from time to time, owe funds to Debtor. If Walgreen Co. has such a relationship with Debtor, pursuant to Article 9 of the Uniform Commercial Code (§§9-406, 9-607), LCF hereby demands that you direct all monies that you now owe or hereafter come to owe Debtor to LCF at the following address[1]:

The LCF Group, Inc. FBO **Mazzoni Center DBA Mazzoni Center AND 1334-48 Bainbridge Street LLC**
3000 Marcus Avenue, Suite 2W15
Lake Success, NY 11042

This obligation will not be discharged unless and until all funds in your possession due to Debtor have been paid directly to LCF. Action(s) inconsistent with this obligation may subject you to liability to LCF for damages, including but not limited to amounts inappropriately paid to Debtor.

Please confirm, in writing, your confirmation that all amounts owed or to be owed will be held immediately upon receipt of this lien notice. If you have any questions or concerns about this demand, please do not hesitate to contact me at 332-233-8550 or email us at UCC@TheLCFGroup.com.
Sincerely,

Gustavo Rodriguez
Paralegal
The LCF Group, Inc.

---

[1] ACH / Wire instructions & W-9 are available upon request.

 332.233.8550       UCC@thelcfgroup.com       212.244.4769



20240911217419

**COMMONWEALTH OF PENNSYLVANIA**
*Department of State*
*Bureau of Corporations and Charitable Organizations*
PO Box 8721
Harrisburg, Pennsylvania 17105-8721
**UCC1 FINANCING STATEMENT**
Fee: $84

| Pennsylvania Department of State |
| --- |
| **-FILED-** |
| File #: 20240911217419 |
| Date Filed: 9/11/2024 |

B0736-3751 09/11/2024 12:48 PM Received by Pennsylvania Department of State

| Submitter contact information | |
| --- | --- |
| Contact Name | CORPORATION SERVICE COMPANY |
| Phone Number | 1-800-858-5294 |
| Email Address | SPRFiling@cscglobal.com |

| Submitter information | |
| --- | --- |
| Name | CORPORATION SERVICE COMPANY |
| Address | 801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62703 |

**Debtors**

| DEBTOR'S NAME | MAILING ADDRESS |
| --- | --- |
| MAZZONI CENTER | 1348 BAINBRIDGE STREET<br>PHILADELPHIA, PA 19147 |
| 1334-48 BAINBRIDGE STREET LLC | 1348 BAINBRIDGE STREET<br>PHILADELPHIA, PA 19147 |
| RACHELLE TRITINGER | 1348 BAINBRIDGE STREET<br>PHILADELPHIA, PA 19147 |

**Secured Parties**

| SECURED PARTY'S NAME | MAILING ADDRESS | Assignor |
| --- | --- | --- |
| THE LCF GROUP, INC. | 3000 MARCUS AVENUE, SUITE 2W15<br>LAKE SUCCESS, NY 11042 | ☐ |

**Collateral**

All Assets now owned or hereafter acquired and wherever located, including but not limited to, the following subcategories of assets: a. Accounts, including but not limited to, credit card receivables; b. Chattel Paper; c. Inventory; d. Equipment; e. Instruments, including but not limited to, Promissory Notes; f. Investment Property; g. Documents; h. Deposit Accounts; i. Letter of Credit Rights; j. General Intangibles; k. Supporting Obligations; and l. Proceeds and Products of the foregoing. Notice Pursuant to an agreement between Debtor and Secured Party, Debtor has agreed not to further encumber the collateral described herein, the further encumbering of which may constitute the tortious interference with the Secured Party's right by such encumbrancer in the event that any entity is granted a security interest in the Debtor's accounts, chattel paper or general intangibles contrary to the above, the Secured Party asserts a claim to any proceeds thereof received by such entity.

| Designations | |
| --- | --- |
| Select the designation which describes this financing statement | Not Applicable |
| Select an additional designation which describes this financing statement | Not Applicable |

| Alternative Designations | |
| --- | --- |
| Select the alternative designation which describes this financing statement | Not Applicable |

| Optional Submitter Reference Data | 2924 18272 |
| --- | --- |

# The LCF Group, Inc. - SECURITY AGREEMENT

Seller's Legal Name ("Seller"): **Mazzoni Center**

D/B/A: **Mazzoni Center**

Federal TAX ID#

Guarantor(s)' Legal Name(s) ("Guarantor(s)"): **1334-48 Bainbridge Street LLC EIN:**

Federal TAX ID# :

Personal Guarantor(s)' Name(s) ("Personal Guarantor(s)") **Rachelle Tritinger**


Physical Address: 1348 Bainbridge Street City: Philadelphia, State: Pennsylvania Zip: 19147

**THIS SECURITY AGREEMENT** is entered into by and between THE LCF GROUP, INC. ("LCF" or "Company"), having an office at 3000 Marcus Avenue, Suite 2W15, Lake Success NY 11042, and the above-listed Seller(s), having a place of business as listed above, any Guarantor(s) listed above ("Guarantor(s)"), having a place of business as listed above, and any Personal Guarantor(s) ("Personal Guarantor(s)"), having a place of business as listed above listed above (the Seller, any Guarantor(s), and any Personal Guarantor(s) shall be collectively referred to as, "Obligor(s)", and Obligors together with LCF shall collectively be referred to as, the "Parties"), as security for, and to guarantee the performance and observance of, all obligations and agreements of any kind of Obligor(s) to LCF, however evidenced, whether now existing or hereafter arising, whether direct or indirect, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, including, without limitation, those which arise under or in connection with any of the agreements now or hereafter in existence (the "Obligations"), the Parties hereto agree that:

1. LCF and Seller have entered into one or more agreements wherein LCF has purchased a certain sum of Future Receipts from Obligor(s). Said agreement(s) may hereafter be supplemented, renewed, modified, and/or augmented by way of further agreements for same, in the event of which the instant agreement shall still be considered in full force and effect (the "Agreement").

2. The Future Receipts sold by Seller to Company pursuant to this Agreement are "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code as in effect in the state in which the Seller is located (the "UCC") and such sale shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Future Receipts free and clear of any liens and encumbrances, from Seller to Company. To the extent the Future Receipts are "accounts" or "payment intangibles" then: (i) the sale of the Future Receipts creates a security interest as defined in the UCC; (ii) this Agreement constitutes a "security agreement" under the UCC; and (iii) Company has all the rights of a secured party under the UCC with respect to such Future Receipts. Seller further agrees that, with or without an Event of Default, Company may notify account debtors, or other persons obligated on the Future Receipts, or holding the Future Receipts, of Seller's sale of the Future Receipts, and may instruct them to make payment or otherwise render performance to or for the benefit of Company.

3. Obligor hereby further grants to LCF a security interest (the "Security Interest") in all of Obligor's shares in the Seller or Guarantor entities, all of Obligor LLC interests in any of the Seller or Guarantor(s) entities, Obligor(s) personal property, tangible and intangible, wherever located, whether now owned or hereafter acquired, including, without limitation, all equipment, Inventory, contract rights, franchise agreements, copyrights, patents, trade names, trademarks, fixtures, permits, licenses, accounts receivable, deposit accounts, lease rights, and payments due from credit card and bank card companies or processors, and to the extent not otherwise included, all proceeds and products of the foregoing, in whatever form including, without limitation, all payments under insurance, whether or not LCF is the loss payee thereof, all proceeds of any governmental taking, and any indemnity, warranty, letter of credit (including the right to draw on such letter of credit), or guaranty payable by reason of any default under, loss of, damage to, or otherwise with respect to, any of the foregoing (collectively, the "Collateral").

4. Obligor(s) will perform all lawful acts which LCF deems necessary or desirable to protect the Security Interest or otherwise to carry out the provisions of this Agreement, including, but not limited to, the execution of Uniform Commercial Code financing, continuation, amendment and termination statements, and similar instruments and the

**Initials:** RT

Docusign Envelope ID: 25ECFEAC-339D-4068-A0FC-5C6C711960A3

procurement of waivers and disclaimers of interest in the Collateral by the owners of any real estate on which the Collateral is located. Obligor(s) shall furnish LCF, from time to time, upon reasonable request, with financial statements as well as written statements and schedules identifying and describing the Collateral in such detail as LCF may require.

5.  Obligor hereby authorizes LCF to file, without the signature of Obligor, one or more UCC-1 Financing and/or Continuation Statements, and amendments thereto, relating to the Collateral. Obligor irrevocably appoints LCF as its authorized representative (coupled with an interest), with full authority in the place and stead of Obligor and in its name or otherwise, from time to time, in LCF's discretion, to take any action or execute any instrument which LCF may deem necessary and advisable to accomplish the purposes of this Agreement, including, without limitation:

(i)  to obtain and adjust insurance, at LCF's expense, required to be paid to LCF hereunder;

(ii)  to collect moneys due and to become due under or in respect of any of the Collateral;

(iii)  to receive, endorse, and collect any checks, drafts, or other instruments, document, or chattel paper in connection with clause (i) or clause (ii) above;

(iv)  to sign Obligor's name on any invoice or bill of lading relating to any account, on drafts against customers, on schedules and assignment of accounts, on notices of assignments, financing statements, and other public records, on verification of accounts and on notices to customers and account debtors (including notices directing customers and account debtors to make payment directly to LCF); and

(v)  to file any claims or take any action or institute any proceeding on behalf of Obligor which LCF may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of LCF with respect to any of the Collateral.

If Obligor fails to perform under any agreement contained herein, LCF may itself perform, or cause performance of, such agreement, and the costs and expenses incurred by LCF in connection therewith shall be payable by Obligor and shall be fully secured hereby.

The powers conferred upon LCF hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon LCF to exercise any such powers. LCF shall have no duty to Obligor with respect to the Collateral other than the duty to use reasonable care in the safe custody of any of the Collateral in its possession. Without limiting the generality of the foregoing, LCF, although it may do so at its option, shall be under no obligation to Obligor or any other party to take any steps necessary to preserve rights in the Collateral against other parties or any other rights pertaining to the Collateral, including, without limitation, the performance of Obligor's obligations under any agreement.

Anything herein to the contrary notwithstanding, (i) Obligor shall remain liable under any contracts and agreements relating to the Collateral, to the extent set forth therein, to perform all of Its Obligations thereunder to the same extent as if this Security Agreement had not been executed; and (ii) the exercise by LCF of any of its rights pursuant to the Purchase and Sale of Future Receivables Agreement, this Security Agreement, any Guaranty(s) of performance, any Power of Attorney or LCF's obtaining a judgment shall not release any Obligations under this Security Agreement, any other contracts, or agreements relating to the Collateral.

6.  The Obligor may not sell, assign, or otherwise transfer any interest in all or a portion of the Collateral, outside of the ordinary course of business, without first obtaining LCF's written consent. Should such consent be given, Obligor agrees to account to LCF for the proceeds of any such sale, to hold such proceeds in trust for LCF, and to pay same to LCF to be applied against the Obligations of Obligor to LCF. Obligor authorizes LCF to track the whereabouts of any Collateral. Obligor represents and warrants that:

(i)  all of the Collateral is and shall continue to be located at the address set forth above. In the event Obligor utilizes multiple locations in the ordinary course of business, Collateral shall continue to be located at said locations;

(ii)  none of the Collateral shall be removed from such location, outside of the ordinary course of business, unless LCF receives written notice of such removal, stating the address to which such Collateral will be removed, at least thirty (30) days prior to such removal;

(iii)  Obligor is the lawful owner of the Collateral free from any adverse lien, security Interest, encumbrance, or any other interest whatsoever, and has the sole right to grant a security interest therein and will defend the Collateral against dilution and all claims and demands of all persons;

(iv)  Obligor will keep the Collateral free and clear of all attachments, levies, taxes, liens, security Interests, and encumbrances of every kind and nature;

(v)  Obligor will not, outside of the ordinary course of business, sell, exchange, or otherwise dispose of the Collateral or any of LCF's rights therein or permit any lien or security interest to attach to same (except the lien created by this Agreement), without LCF's prior written consent;

(vi)  Obligor shall execute any written Instruments and do any other acts necessary to effectuate more fully the purposes and provisions of this Agreement, including such instruments as LCF may require to perfect LCF's interest therein in any filing office;

(vii)  Obligor will not permit anything to be done that may impair or lessen the value of any of the Collateral or the security interest granted by this Agreement;

(viii)  Obligor will indemnify and hold LCF harmless from all loss, costs, damage, liability or expense, including reasonable attorney's fees, that LCF may sustain or incur to enforce payment, performance or fulfillment of any of the Obligations secured hereby or In the enforcement of this Agreement and the priority thereof or in the prosecution or

**Initials:** RT

Docusign Envelope ID: 25ECFEAC-339D-4068-A0FC-5C6C711960A3

defense of any action or proceeding either against LCF or Obligor concerning any matter growing out of or in connection with this Agreement and/or any of the Obligations secured hereby and/or any of the Collateral; and

(ix) the execution of this Agreement has been duly approved by the undersigned in any manner required by law.

7. Obligor shall maintain insurance covering the Collateral with financially sound and reputable insurers, satisfactory to LCF against such risks as are customarily insured by a business in the same or similar industry and similarly situated for an amount not less than the full replacement value of such Collateral. All such insurance policies covering property on and after the date the Collateral becomes subject to the Security Interest shall be written so as to be payable in the event of loss to LCF and shall provide for at least 30 days prior written notice to LCF prior to cancellation or modification of each such policy. LCF is hereby appointed as Obligor's irrevocable authorized representative during the term of this Agreement to settle any claims with insurers in the event of loss or damage, and, upon an Event of Default under this Agreement, to cancel, assign, or surrender any insurance policies.

8. The following shall constitute events of default ("Default") under this Agreement and shall be hereinafter referred to as "Default" or "Defaults":

(i) Default or breach by Obligor of any Obligation under any agreement between Obligor and LCF;

(ii) Obligor's failure to comply with any of the terms of this Security Agreement;

(iii) any material representation, warranty, or other statement of fact given herein or in any writing at any time furnished by or on behalf of Obligor to LCF in connection with this Agreement or otherwise shall be false or misleading in any material respect when given;

(iv) Any event of default pursuant to the PSFRA entered into in conjunction with the instant Security Agreement;

(v) Judgment or decree is entered appointing a receiver, trustee, liquidator, or conservator of Obligor or any substantial part of its assets by virtue of an allegation of fraud or dishonesty engaged in by Obligor;

(vi) a petition under the federal bankruptcy laws or any state insolvency law is filed against Obligor or any guarantor of the Obligations by virtue of an allegation of fraud or dishonesty engaged in by Obligor;

(vii) judgments aggregating in excess of $25,000 are rendered against Obligor or any attachments, injunctions, or executions are issued against any Collateral having an aggregate value in excess of $25,000; and

(viii) Obligor sells or transfers its business, in whole or in part without prior written consent of LCF.

9. Upon any Event of Default, Company may pursue any

remedy available at law (including those available under the provisions of the UCC) or in equity to collect, enforce, or satisfy any obligations then owing, whether by acceleration or otherwise, to wit:

(i) In the event of a Default, LCF may, in its discretion, deem all of the Obligations of Obligor immediately due and owing without further notice and without legal process, and immediately take possession of the Collateral in furtherance thereof, sell or otherwise dispose of such Collateral or any part thereof, and pursue any and all further rights and remedies it may have under the law including, without limitation, the rights of a secured party under New York law and/or the Uniform Commercial Code. Obligor shall pay all expenses and reimburse LCF for all expenditures, including reasonable attorneys' fees, collection fees, and legal expenses, in connection with LCF's exercise of any of its rights and remedies under this Agreement;

(ii) In the event any consent, approval, or authorization of any governmental agency shall be necessary to effectuate any such sale or sales of the Collateral by LCF, Obligor shall execute such instruments as may be required to obtain such consent, approval, or authorization. After deduction of all reasonable costs and expenses of collection, custody, sale, other disposition, delivery, and all other charges (including reasonable attorneys' fees) due against the Collateral, any residue of the proceeds of any such sale or other disposition shall be applied to payment of the Obligations, except as otherwise provided by law or directed by any court of competent jurisdiction thereof. Obligor shall be liable for any deficiency in payment of the Obligations, including all reasonable costs and expenses of collection, custody, sale, other disposition, delivery, and all other charges (including reasonable attorney's fees) secured by the Collateral;

(iii) Upon the occurrence of a Default and at any time or times thereafter, subject to the provisions of applicable law, LCF may institute proceedings in any court of competent jurisdiction for the appointment of a receiver of the Collateral or of any part thereof or may by instrument in writing appoint any person to be receiver of the Collateral or any part thereof; and any such receiver appointed by instrument in writing shall have the power to:

a.   take possession of the Collateral or any part thereof;

b.   carry on the business of Obligor;

c.   borrow money on the security of the Collateral required for the maintenance, preservation, or protection of the Collateral or any part thereof or for the carrying on of the business of Obligor; and

d.   sell, lease, or otherwise dispose of the whole or any part of the Collateral at public auction, by public tender, or by private sale, either for cash or upon credit, at such time and upon such terms and conditions as the receiver may determine; provided that any such receiver shall be deemed the agent of Obligor and LCF shall not be in any way responsible for any misconduct or negligence of any such receiver.

**Initials:** RT

10. Obligor shall be liable for, and Company may charge and collect all costs and expenses, including, but not limited to, attorney's fees provided for within this Agreement, which may be incurred by Company in protecting, preserving, and enforcing Company's security interest and rights.

11. Obligor(s) each agree not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral, the Additional Collateral, or the Cross-Collateral, as applicable without prior written consent of LCF and further represent that their execution of and/or performance contemplated under this Agreement will not cause or create an event of default by Obligor(s) under any contract with another person or entity.

12. Company shall have the right to cure Obligor's default in the payment of rent on the following terms. In the event Obligor is served with papers in an action against Obligor for nonpayment of rent or for summary eviction, Company may execute its rights and remedies hereunder and, to the extent permissible by law, deem this document to act as an Assignment of Lease from Obligor to LCF. Obligor also agrees that Company may enter into an agreement with Obligor's landlord giving Company the right: (a) to enter Obligor's premises and take possession of the furnishings, fixtures, and equipment therein for the purpose of protecting and preserving same; and (b) to assign Obligor's lease to another qualified operator capable of operating a business comparable to Obligor's at such premises.

13. In the event Obligor shall have defaulted upon its obligations under the Agreement prior to a bankruptcy filing under Chapters 7, 11, or 13 of the Federal Bankruptcy Code, in consideration of the advances made by LCF to Obligor under the Purchase and Sale of Future Receivables Agreement and other good and valuable consideration, Obligor hereby consents to modification of the automatic stay set forth in 11 U.S.C. §362 to allow LCF to immediately take possession of the Collateral, sell same, and apply the sale proceeds to the payment of the Obligations. Obligor understands that LCF is making such advances in reliance upon Obligor's agreement to such modification of the automatic stay.

14. In the event Obligor shall have defaulted upon its obligations under the Agreement prior to a bankruptcy filing under Chapters 7, 11, or 13 of the Federal Bankruptcy Code, in consideration of the advances made by LCF to Obligor under the Purchase and Sale of Future Receivables Agreement and other good and valuable consideration, Obligor shall reimburse LCF for all of LCF's reasonable cost and expenses (including, without limitation, reasonable legal fees and expenses including, but not limited to, any liquidated legal fees provided for within the Agreement) in connection with or arising out of this Agreement or any Default, enforcement or collection proceeding resulting therefrom, including, without limitation, all manner of participation in: (a) bankruptcy, insolvency, receivership, foreclosure, winding up, or liquidation proceedings of the Obligor, (b) judicial or regulatory proceedings in connection with the collection of the Obligations, and (c) workout, restructuring, and other negotiations or proceedings (whether or not any transaction contemplated thereby is consummated) in connection with the collection of the Obligations.

15. To the extent permitted by law, Obligor hereby waives demand for payment, notice of dishonor or protest, and all other notices of any kind in connection with the Obligations except notices required hereby, by law or by any other agreement between Obligor and LCF. LCF may release, exchange, or modify any Collateral or security which It may from time to time hold and may release, surrender, or modify the liability of any third party without giving notice hereunder to Obligor. Such modifications, changes, renewals, releases, or other actions shall in no way affect any of the Obligations or Obligor's other obligations hereunder.

16. Obligor will pay, indemnify, and hold harmless LCF from and against all costs and expenses (including taxes, if any) arising out of or incurred in connection with any transfer of Collateral into or out of the name of LCF.

17. Obligor(s) each agree to execute any documents or take any action in connection with this Agreement as LCF deems necessary to perfect or maintain LCF's priority security interest in the Collateral, together with any Additional Collateral and Cross-Collateral as the case may be, including the execution of any account control agreements. Seller and Guarantor each hereby authorize Company to file any financing statements deemed necessary by Company to perfect or maintain Company's security interest, which financing statement may contain notification that Seller and Guarantor have granted a negative pledge to Company with respect to the Collateral, the Additional Collateral and the Cross-Collateral, and that any subsequent lien or may be tortiously interfering with Company's rights.

18. Except as otherwise provided in this Agreement, all notices and other communications hereunder shall be deemed to have been sufficiently given when sent via electronic mail to rtritinger@mazzonicenter.org and legal@thelcfgroup.com and/or when mailed, postage prepaid, by certified or registered mail, return receipt requested, and the sender shall have received such return receipt, or sent by trackable courier service, such notices or communications to be addressed as follows:

- If to LCF:

THE LCF GROUP, INC.
Attn: Legal Department
3000 Marcus Avenue, Suite 2W15
Lake Success, NY 11042
legal@thelcfgroup.com

- If to Obligor(s):

1348 Bainbridge Street,
Philadelphia, Pennsylvania 19147
rtritinger@mazzonicenter.org

or at such other address as the party to whom such notice or demand Is directed may have designated in writing to the other party hereto by notice as provided in this section 18. Each of the parties hereto shall have the right to rely on written notice sent by electronic mail as an original notice given hereunder. Each of the signatories to this Agreement

**Initials:** RT

Docusign Envelope ID: 25ECFEAC-339D-4068-A0FC-5C8C711960A3

irrevocably consents to service of process by Certified Mail at the address listed within this section. Each of the signatories to this Agreement agrees that its submission to jurisdiction and consent to service of process by mail is made for the express benefit of each of the other signatories to this Agreement.

19. No course of dealing between Obligor(s) and LCF, nor any delay in exercising, on the part of LCF, any right, power, or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies hereunder are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law or in equity, including, without limitation, the rights and remedies of a secured party under the Uniform Commercial Code. It is understood and agreed that all understandings and agreements heretofore had between the parties, if any, with respect to the subject matter hereof, are merged into this Security Agreement, which alone fully and completely expresses their agreement with respect thereto.

20. This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the laws of the State of New York. The state courts located In Nassau County, State of New York, and the federal courts of the Eastern District of New York, shall have exclusive jurisdiction over all legal proceedings relating to this Agreement.

21. This Agreement shall be binding upon, and inure to, the benefit of the parties hereto and their respective successors and assigns, including any other holder(s) of any obligations, provided, however, that Obligor(s) shall have no rights of assignment without the prior written consent of LCF. This Agreement may be executed in one or more counterparts, each of which shall together constitute the same agreement. The invalidity or unenforceability of any provision hereof shall in no way affect the validly or enforceability of any other provision hereof. No modification, recission, waiver, release, or amendment of this Security Agreement shall be made except by a written agreement executed by Obliger and LCF. A copy of this Agreement may be accepted as an original.

22. USE OF IDENTIFYING INFORMATION. It is expressly agreed and understood that in conjunction with this provision, Company may disclose identifying information including, but not limited to, the FEIN Number or Social Security Number of Seller or any Guarantor(s) to third parties with which Company communicates in its exercising of any remedies available to Company.

23. JURY TRIAL WAIVER. The parties hereto waive trial by jury in any court in any suit, action, or proceeding on any matter arising in connection with or in any way related to the transactions of which this Agreement is a part or the enforcement hereof. The parties hereto acknowledge that each makes this waiver knowingly, willingly, voluntarily, and without duress, and only after extensive consideration of the ramifications of this waiver with their attorneys.

24. CLASS ACTION WAIVER. The parties hereto waive any right

to assert any claims against the other party as a representative or member in any class, representative, or collective action, except where such waiver is prohibited by law as against public policy. To the extent either party is permitted by law or court of law to proceed with a class, representative, or collective action against the other, the parties hereby agree that: (1) the prevailing party shall not be entitled to recover attorneys' fees or costs associated with pursuing the class or representative action (notwithstanding any other provision in this Agreement); and (2) the party who initiates or participates as a member of the class will not submit a claim or otherwise participate in any recovery secured through the class or representative action. The parties hereto acknowledge that each makes this waiver knowingly, willingly, voluntarily, and without duress, and only after extensive consideration of the ramifications of this waiver with their attorneys.

25. WAIVER OF COUNTERCLAIMS. Seller waives the right to interpose any counterclaim in any court in any suit, action, or proceeding on any matter arising in connection with or in any way related to the transactions of which this Agreement is a part or the enforcement hereof. Seller acknowledges that it makes this waiver knowingly, willingly, voluntarily, and without duress, and only after extensive consideration of the ramifications of this waiver with their attorneys.

26. ARBITRATION. Notwithstanding the foregoing, any dispute, claim, or controversy arising out of or relating to this Agreement, the Security Agreement or the guaranty(s) herein, or the breach of any of the said Agreement, Security Agreement or the guaranty(s), shall be, at the election of either party, settled by arbitration administered by Mediation and Civil Arbitration, Inc. d/b/a RapidRuling (www.rapidruling.com) in accordance with its Arbitration Rules & Procedures effective at the time a claim is made, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. An election to arbitrate by either party shall be deemed effective by the commencement of an arbitration proceeding with Mediation and Civil Arbitration, Inc. d/b/a RapidRuling. The parties' consent to electronic service of process, with service to be made to the following email addresses rtritinger@mazzonicenter.org and legal@thelcfgroup.com and/or when mailed, postage prepaid, via 2-3-day shipping through a nationally recognized courier, including, but not limited to, the USPS, FedEx or UPS, such notices or communications to be sent to the addresses provided in section 18 hereof. The parties agree that, in the event of confirmation and enforcement,

[Remainder of Page Intentionally Left Blank]

Initials: RT

Docusign Envelope ID: 25ECFEAC-339D-4068-A0FC-5C6C711960A3

the delinquent party will be responsible for any attorney, court, or other fees associated with such action. The parties agree to split all Mediation and Civil Arbitration, Inc. d/b/a RapidRuling fees evenly and the commencing party shall be entitled to any unreimbursed monies paid on behalf of the non-commencing party within any award.

SELLER #1     *Rachelle Tritinger (Owner 1)*

By:_____
Signature
Rachelle Tritinger / Owner
_____
Print Name and Title


OWNER/GUARANTOR #1     *Rachelle Tritinger (Owner 1)*

By: _____
Signature
Rachelle Tritinger / Owner
_____
Print Name and Title


THE LCF GROUP, INC.

_____

_____
By: Robert Klieber
Title: Chief Operating Officer

Docusign Envelope ID: 25ECFEAC-339D-4068-A0FC-5C6C711960A3

# POWER OF ATTORNEY

***KNOWN ALL BY THESE PRESENTS*** *that I, Rachelle Tritinger, principal and/or sole proprietor of Mazzoni Center, doing business as Mazzoni Center, at 1348 Bainbridge Street, Philadelphia, Pennsylvania 19147 (hereinafter 'Mazzoni Center'), does hereby appoint THE LCF GROUP, INC., (hereinafter, '"LCF") as my true and lawful attorney in fact:*

1. To have full power and authority to direct any Merchant Processor being used by Mazzoni Center to make payments to LCF as contemplated under the Agreement dated September 11, 2024 (the "Agreement") between Mazzoni Center and LCF;

2. To have full power and authority to direct any Merchant Processor being used by Mazzoni Center to direct the entirety of Mazzoni Center's credit card receivables to LCF in order to satisfy amounts due to LCF under the Agreement;

3. To have full power and authority to direct Bank of America - Bank and any and all other Banks in which Mazzoni Center or Rachelle Tritinger holds an account to direct payment(s) to LCF as contemplated under the ACH/ADF Authorization Agreement between Mazzoni Center and LCF;

4. To communicate with Bank of America - Bank and any and all other Banks to obtain information regarding the business accounts of Mazzoni Center, including without limitation, obtaining balances, account numbers, and copies of all statements and/or banking transactions;

5. To enter into, make, sign, execute, endorse, accept, and deliver any and all documents, agreements, contracts, or other writings, or to perform any other act, deed, matter, or thing to effectuate the intent of the Agreement dated September 11, 2024 between Mazzoni Center and LCF;

6. To obtain and adjust insurance at LCF's expense;

7. To withdraw any monies held on account with any debt settlement companies;

8. To receive, endorse, negotiate, and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection any amounts due to LCF as contemplated under the Agreement dated September 11, 2024 (the "Agreement") between Mazzoni Center and LCF;

9. To cancel, modify, repudiate, or terminate any agreement(s) with any vendor, consultant, or service provider of Mazzoni Center;

10. To sign Mazzoni Center 's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to LCF;

11. To file any claims or take any action or institute any proceeding which Company may deem necessary for the collection of any of the undelivered Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount;

12. To create and negotiate a check or draft in Seller's name utilizing any account information on file in satisfaction of Seller's obligations to Company, Company's designee, or Company's nominee; and

13. To institute a wire transfer of funds from Seller's deposit account(s) to Company, Company's designee, or Company's nominee.

Initials: RT

Docusign Envelope ID: 25ECFEAC-339D-4068-A0FC-5C6C711960A3

I HAVE RECEIVED A COPY OF THIS POWER OF ATTORNEY AND I DO HEREBY STATE AND DECLARE THAT THIS POWER OF ATTORNEY SHALL NOT BE AFFECTED BY MY SUBSEQUENT DISABILITY OR INCOMPETENCE; AND FURTHER, I DO HEREBY RATIFY AND CONFIRM ALL WHATSOEVER MY SAID ATTORNEY SHALL DO OR CAUSE TO BE DONE BY VIRTUE OF THIS POWER OF ATTORNEY.

**This Power of Attorney shall be used only upon Seller's violation of any of the terms of the Agreement dated September 11, 2024 between Mazzoni Center and LCF.**

**IN WITNESS WHEREOF,** the said Mazzoni Center has caused this instrument to be signed, sealed and acknowledged by its duly authorized qualified officer, Rachelle Tritinger this 11 day of September, 2024.

**KNOW ALL BY THESE PRESENTS:**

SELLER #1     *Rachelle Tritinger (Owner 1 )*

By:_____
Signature
Rachelle Tritinger / Owner
Print Name and Title


Mazzoni Center
Company

THE LCF GROUP, INC.

By: Robert Klieber
Title: Chief Operating Officer

Initials: RT

# EXHIBIT I

**From:** llg-notices@stripe.com <llg-notices@stripe.com>
**Sent:** Monday, October 28, 2024 5:23 AM
**To:** Sultan Shakir (He/Him) <sshakir@mazzonicenter.org>

11/2/24, 3:00 PM

**Subject:** [EXTERNAL] UCC Lien Notice on your Stripe Account for Mazzoni Center d/b/a Mazzoni Center / Mazzoni Center Our Health. Our Lives. Our Community., 1334-48 Bain Bridge Street Llc, Mazzoni Center d/b/a Mazzoni Center - Washington West

Hi there,

This message is to notify you that Stripe received the attached notice regarding your Stripe account. The notice seeks to have Stripe turn over funds in your Stripe account to the Creditor.

Until you resolve the situation with the Creditor, Stripe will hold a reserve for the amount sought by the Creditor.

This is solely a notice of our receipt of the lien. We strongly encourage you to promptly reach out to the Creditor to discuss the nature of this notice.

Best,
Stripe



October 1, 2024

**Stripe, Inc.**
Attn: Legal Order Processing

<u>**UCC** LIEN **&** NOTICE OF ASSIGNMENT</u>

RE:   **Mazzoni Center d/b/a Mazzoni Center / Mazzoni Center Our Health. Our Lives. Our Community., 1334-48 Bain Bridge Street Llc, Mazzoni Center d/b/a Mazzoni Center - Washington West**

**EIN:**

**Rachelle Denise Tritinger**
SSN: XXX-XX-

**Additional Entities:**
Mazzoni Center d/b/a Mazzoni Center / Mazzoni Center Our Health. Our Lives. Our Community., 1334-48 Bain Bridge Street Llc, Mazzoni Center d/b/a Mazzoni Center - Washington West

**Balance due to AKF Inc. DBA Fundkite: $690,000.00**

**Default Date**:     9/19/2024
**Balance Due**:      $690,000.00

To Whom It May Concern:

This notice is being sent pursuant to Uniform Commercial Code (UCC) Sections 9-406 and 9-607, as it has come to our attention that Stripe, Inc. has been conducting business with, and forwarding receivables to, Mazzoni Center d/b/a Mazzoni Center / Mazzoni Center Our Health. Our Lives. Our Community., 1334-48 Bain Bridge Street Llc, Mazzoni Center d/b/a Mazzoni Center - Washington West (the "Merchant"), located at 1348 Bainbridge Street, Philadelphia, PA 19147., which and owes receivables in the amount of $690,000.00 to AKF Inc. d/b/a FundKite ("<u>FundKite</u>") pursuant to a Revenue Purchase Agreement dated 9/11/2024 (the "<u>Agreement</u>"), under which the Merchant has defaulted. A copy of the Agreement is enclosed for your reference.

According to the Agreement, FundKite purchased the Merchant's future accounts-receivable, whereby FundKite would receive a percentage of all Merchant's receivables. AKF Inc. d/b/a FundKite has a properly perfected security interest in the receivables it purchased from the Merchant pursuant to UCC §9-309.

Pursuant to UCC §§ 9-406[1] and 9-607, you are directed to make payment of all amounts due to the Merchant by Stripe, Inc. to AKF Inc. d/b/a FundKite as such amounts become due. Making your payment directly to AKF Inc. d/b/a FundKite is the only way to assume that your payment is, in fact, credited to your account obligations to the Merchant. Please understand that no representative of the Merchant has any authority to collect or receive your payment. Payment made to the Merchant will not discharge your obligation as described above and will result in you paying the obligation twice as pursuant to UCC §§9-406 and 9-607, once an account debtor[2] has been notified of an assignment of an account, the account debtor may not discharge the obligation by payment to the assignor (in this case, the Merchant). Thus, remitting payment to anyone other than AKF Inc. d/b/a FundKite will still result in you still having to pay AKF Inc. d/b/a FundKite.

Payments shall be sent by WIRE to:

> FundKite
> 88 Pine Street, Suite 2430
> New York, NY 10005
>
> BankUnited, N.A.
> Routing Number:
> Account Number:
> Ref:  Mazzoni Center

CHECK by MAIL:

> FundKite
> Attn: Legal Department
> 2 S. Biscayne Blvd, Suite 2350
> Miami FL 33131
> Ref:  Mazzoni Center

---

[1] UCC 9-406(a) states, in relevant part, that "an account debtor Stripe, Inc. on an account, chattel paper, or a payment intangible may discharge its obligation by paying the assignor [the Merchant] until, but not after, the account debtor receives a notification... that the amount due or to become due has been assigned and that payment is to be made to the assignee [AKF, Inc. d/b/a FundKite]. After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor."

[2] UCC 9-102(a)(3): "**Account debtor**" means a person obligated on an account, chattel paper, or general intangible."

We trust that you share AKF Inc. d/b/a FundKite's desire to avoid the time, expense and inconvenience which would inevitably accompany formal legal proceedings and will, therefore, promptly forward full payment in order to amicably resolve this situation.

Please comply with the above immediately and feel free to contact me at (305) 845-0446 and/or at legalgroup@fundkite.com if you have any questions regarding this notice. We thank you in advance for your anticipated cooperation in this matter.

Very truly yours,
**AKF, Inc. d/b/a FundKite**

By: _Justin Verger_
Justin Verger, VP Treasury

cc:    Legal Dept.

 


**COMMONWEALTH OF PENNSYLVANIA**
*Department of State*
*Bureau of Corporations and Charitable Organizations*
PO Box 8721
Harrisburg, Pennsylvania 17105-8721
**UCC1 FINANCING STATEMENT**
Fee: $84

| Pennsylvania Department of State |
|---|
| **-FILED-** |
| File #: 20240912218151 |
| Date Filed: 9/12/2024 |

**Submitter contact information**

| | |
|---|---|
| Contact Name | CORPORATION SERVICE COMPANY |
| Phone Number | 1-800-858-5294 |
| Email Address | SPRFiling@cscglobal.com |

**Submitter information**

| | |
|---|---|
| Name | CORPORATION SERVICE COMPANY |
| Address | 801 ADLAI STEVENSON DRIVE SPRINGFIELD, IL 62703 |

**Debtors**

| DEBTOR'S NAME | MAILING ADDRESS |
|---|---|
| MAZZONI CENTER | 1348 BAINBRIDGE ST PHILADELPHIA, PA 19147 |
| MAZZONI CENTER OUR HEALTH. OUR LIVES. OUR COMMUNITY. | 1348 BAINBRIDGE ST PHILADELPHIA, PA 19147 |
| 1334-48 BAIN BRIDGE STREET LLC | 1348 BAINBRIDGE STREET PHILADELPHIA, PA 19147 |
| MAZZONI CENTER | 1201 LOCUST ST PHILADELPHIA, PA 19107 |
| MAZZONI CENTER - WASHINGTON WEST | 1201 LOCUST ST PHILADELPHIA, PA 19107 |

**Secured Parties**

| SECURED PARTY'S NAME | MAILING ADDRESS | Assignor |
|---|---|---|
| CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | PO BOX BOX 2576 SPRINGFIELD, IL 62708 | ☐ |

**Collateral**

Secured Party has purchased certain "Receipts" from Debtor. "Receipts" means  payments received by Debtor, or its right to receive such payments, whether received in cash, check, electronic transfer, or other form of monetary payment and includes all payments made by a credit card, debit card, bank card, charge card.

"Receipts" includes accounts and payment intangibles as defined under the Uniform Commercial Code.

Debtor and Secured Party intend that the sale of Receipts is a sale and not an assignment for security.

Notice:  Pursuant to the agreement between Debtor and Secured Party, Debtor is prohibited from further encumbering the Receipts.  In the event that any entity is granted a security interest in Debtor's Receipts contrary to the above, the Secured Party asserts a claim to any proceeds thereof received by such entity.

**Designations**

| | |
|---|---|
| Select the designation which describes this financing statement | Not Applicable |
| Select an additional designation which describes this financing statement | Not Applicable |

**Alternative Designations**

| | |
|---|---|
| Select the alternative designation which describes this financing statement | Not Applicable |

| Optional Submitter Reference Data | 2925 24091 |
|---|---|

B0736-5833 09/12/2024 9:54 AM Received by Pennsylvania Department of State



# REVENUE PURCHASE AGREEMENT
## PURCHASE AND SALE OF FUTURE RECEIPTS (the "Agreement")

Dated SEPTEMBER 11, 2024, Between AKF Inc, DBA FundKite, located at 88 Pine Street, 24th Floor, New York NY 10005 hereafter known as ("BUYER"), the ("SELLER") listed below and each guarantor identified below (each a "Guarantor")

("THE SELLER")
MERCHANT INFORMATION

SELLER's Legal Name: **MAZZONI CENTER** DBA: **MAZZONI CENTER / MAZZONI CENTER OUR HEALTH. OUR LIVES. OUR COMMUNITY.**

Physical Address: **1348 BAINBRIDGE ST, PHILADELPHIA, PA 19147**

Mailing Address: **1348 BAINBRIDGE ST, PHILADELPHIA, PA 19147**

Primary Telephone: ███████████ Business Website: **https://www.mazzonicenter.org/**

Type of Entity: **Corporation** State of Incorporation: **PA**

Tax Id Number: Date Business Started: **07/20/1981**

Name of Primary Authorized Signer: **RACHELLE DENISE TRITINGER** Position or Title: **CFO**

Email for Owner: ███████████████████

Purchase Price: **$500,000.00**
(The agreed upon Purchase Price for the Receipts sold by SELLER to BUYER)

Fees Deducted: **$20,185.00**
(See Appendix A for breakdown of fees)

Disbursement Amount: **$479,815.00**
(The dollar amount BUYER will pay to SELLER after deducting the Fees Deducted)

Purchased Amount: **$690,000.00**
(The dollar value of the Receipts being sold and remitted to BUYER from SELLER)

Remittance Percentage: **9%**
(The percentage of Receipts SELLER agrees to remit to BUYER **each week**.

Initial Estimated Remittance Amount (Weekly): **$24,642.86**
(The dollar amount to be debited **each week**. from the SELLER's bank account as described below, subject to reconciliation)

Reconciliation Frequency: **Monthly**
*Reconciliation may result in an adjustment to the Initial Estimated Remittance Amount.

Designated Bank Account (the "Designated Account")

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

Name of Bank: ▮▮▮▮▮▮    ABA Transit/Routing #: ▮▮▮▮▮▮    Checking Account # ▮▮▮▮▮▮

Upon the terms and subject to the conditions set forth in this Agreement,  DBA MAZZONI CENTER / MAZZONI CENTER OUR HEALTH. OUR LIVES. OUR COMMUNITY.  hereby sells, assigns and transfers to AKF Inc. DBA Fundkite ("FUNDKITE" and "BUYER") in consideration for the funds provided (the "PURCHASE PRICE"), all of SELLER's future sales, accounts, contract rights and other obligations and entitlements arising from or relating to the payment of monies from SELLER's customers and/or third-party payers and the proceeds thereof including, but not limited to all payments made by cash, check, electronic transfer or other form of monetary payment in the course of the Seller's business (the "Receipts"), in the amount specified above (the "Purchased Amount") to be remitted by the percentage of Receipts specified above (the "Remittance Percentage") until the Purchased Amount has been remitted by SELLER to BUYER. (SELLER, BUYER and each Guarantor shall collectively be referred hereinafter to as the "PARTIES").

SELLER shall remit the Remittance Percentage of Receipts to BUYER, until such time as BUYER receives full remittance of the Purchased Amount and any outstanding fees in accordance with Appendix A hereto. SELLER hereby authorizes BUYER to ACH Debit the initial estimated and adjusted remittance amounts from the Designated Account stated above (each a "Remittance Date") and will provide BUYER with access codes and monthly bank statements thereto. BUYER is not responsible for any overdrafts or rejected transactions that may result from BUYER ACH debiting the specified remittances under the terms of this Agreement.

BUYER has calculated the Initial Estimated Remittance Amount based on SELLER'S actual Receipts prior to the date of this Agreement, determined by BUYER based on a review of Banking Records provided by SELLER. SELLER acknowledges and agrees that the Initial Estimated Remittance Amount is an accurate estimate of the Remittance Percentage of SELLER's actual Receipts prior to the date of this Agreement.

A list of all fees applicable under this Agreement is outlined in Appendix A. SELLER agrees to pay all fees as described therein.

# I. TERMS OF ENROLLMENT IN PROGRAM

1.1 SELLER Deposit Account. SELLER shall deposit all Receipts into the Designated Account with a bank acceptable to BUYER. SELLER authorizes BUYER and/or its agent to withdraw the Remittance Percentage or Initial Estimated/Adjusted Remittance Amount from the Designated Account. The authorization shall be irrevocable without the written consent of the BUYER. For the duration of this Agreement, SELLER shall have the use and enjoyment of Receipts above the Remittance Percentage to be remitted to BUYER. Additionally, the Remittance Percentage of Receipts are to be held in trust in the Designated Account for the benefit of BUYER and SELLER shall have no legal or equitable interest in said Receipts.

1.2 Non-Recourse Sale of Future Receipts (THIS IS NOT A LOAN). SELLER is selling a portion of Receipts to BUYER at a discount, not borrowing money from BUYER. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by BUYER. BUYER is taking the risk that Receipts may be remitted more slowly than BUYER may have anticipated or projected because SELLER's business has slowed down, or the full Purchased Amount may never be remitted because SELLER's business filed a Chapter 7 liquidation or otherwise ceased operations in the ordinary course of business. BUYER is buying the Purchased Amount of Receipts knowing the risks that SELLER's business, despite SELLER's reasonable efforts, may slow down or fail, and BUYER assumes these risks based on SELLER's representations, warranties, and covenants in this Agreement that are designed to give BUYER a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, SELLER transfers to BUYER full and complete ownership of the Purchased Amount of Receipts and BUYER retains no legal or equitable interest therein. SELLER will treat the Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns. BUYER is entitled to audit SELLER's accounting records upon reasonable notice in order to verify compliance. SELLER waives any rights of privacy, confidentiality or taxpayer privilege in any litigation or

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

arbitration in which SELLER asserts that this transaction is anything other than a purchase and sale of future Receipts.

<u>1.3 Reconciliation (IMPORTANT PROTECTION FOR SELLER).</u> SELLER acknowledges and agrees that the Initial Estimated Remittance Amount is an accurate estimate of the Remittance Percentage of SELLER's actual Receipts prior to the date of this Agreement.  SELLER has the right to obtain reconciliations to ensure that the Remittance Amount continues to be an accurate estimate of the Remittance Percentage of SELLER's actual Receipts over the course of this Agreement.

a) Periodic Reconciliation. BUYER shall perform periodic reconciliations according to the agreed Reconciliation Frequency.

b) SELLER May Obtain Additional Reconciliations. SELLER may obtain additional reconciliations between any periodic reconciliations by sending a written request by email to customerservice@fundkite.com.

c) Banking Records.  SELLER agrees to provide Banking Records requested by BUYER to complete each reconciliation.  As used in this Agreement, "Banking Records" means bank statements, accounts receivable reports, credit card receipts, view-only access to SELLER's business bank accounts, and other business or banking records reasonably likely to provide evidence of SELLER's actual Receipts for the applicable reconciliation period.  BUYER will calculate SELLER's actual Receipts based solely upon a review of the requested Banking Records. BUYER is not obligated to complete any reconciliation for which requested Banking Records are unavailable or not provided.

d) Adjusting the Remittance Amount.  No later than three (3) business days following BUYER's receipt of the requested Banking Records, BUYER shall adjust the Remittance Amount so that subsequent withdrawals from the Designated Account are equal to the Remittance Percentage of the actual Receipts collected by SELLER during the reconciliation period, as reasonably determined by BUYER .

e) Failure to Provide Reconciliation Information.  If SELLER fails to provide requested Banking Records within seven (7) calendar days after written notice from BUYER, BUYER may adjust the Remittance Amount to the Initial Estimated Remittance Amount.

<u>1.4 Processing Trial and BUYER'S Acceptance of Agreement.</u> Prior to paying the Disbursement Amount to SELLER, BUYER shall have the right to instruct the credit/debit card processor used by SELLER for conducting its business to conduct a processing trial (a "Processing Trial") to determine whether settlement amounts of Receipts will be processed, reported and paid as contemplated under this Agreement. SELLER agrees that BUYER will make its final decision, in its sole and absolute discretion and with or without regard for the results of the Processing Trial, whether to purchase the Purchased Amount of Receipts after completing the Processing Trial or opting not to conduct a Processing Trial, and any underwriting conducted by BUYER. If BUYER elects to purchase the Purchased Amount of Receipts, BUYER will pay the Disbursement Amount to SELLER, and SELLER's obligations hereunder to remit the Purchased Amount shall commence immediately. The obligation of BUYER under this Agreement will not be effective unless and until BUYER has completed its review of the SELLER and has accepted this Agreement by delivering the Disbursement Amount.

<u>1.5 Financial Condition.</u> SELLER authorizes BUYER and its agents to investigate their financial responsibility and history, and will provide to BUYER any financial or bank statements, tax returns, credit card statements and accounts receivable reports, and view-only access to any business bank account maintained by SELLER, as BUYER deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. BUYER is authorized to require Seller to provide updated information and financial profiles from time to time as it deems appropriate.

<u>1.6 Transactional History.</u> SELLER authorizes BUYER to obtain SELLER's banking records, payment processing transaction records and records of activity with any online seller or marketplace to verify information provided by SELLER in connection with the performance of this program.

<u>1.7 Indemnification.</u> SELLER indemnifies and hold harmless BUYER, Processor, any and each of SELLER's, and any

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

Account Debtors, their officers, directors, attorneys, assigns, agents and shareholders against all loses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred, resulting from (a) all claims asserted by BUYER and its agents for amounts owed to BUYER from SELLER and (b) actions taken by Processor, SELLER's Banks and Account Debtors in reliance upon any information or instructions provided by BUYER and (c) litigation with SELLER and Guarantor(s). SELLER agrees to indemnify and hold harmless BUYER its officers, directors, attorneys, assigns, agents and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney's fees) that they may have of any kind arising out of or related to the Agreement and enforcement of BUYER's remedies thereunder.

1.8 No Liability. In no event will BUYER and its agents, attorneys, assigns or affiliates be liable for any claims asserted by SELLER or Guarantor(s) under any legal theory for lost profits, lost revenue, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is knowingly and voluntarily waived by SELLER or Guarantor(s). In the event these claims are nonetheless raised, SELLER and Guarantor(s) will be jointly liable for all of BUYER's attorney's fees and expenses resulting therefrom.

1.9 Reliance on Terms. Notwithstanding the fact that Processor, SELLER's bank, Guarantor(s)'s bank and Account Debtors, and their affiliates, are not parties to this Agreement, Sections 1.1, 1.2, 1.3, 1.4, 1.5 1.6, 1.7, 1.8, 1.9, 1.10, 1.13, 1.14, 2.3, 2.5, 2.6, and 2.7 of this Agreement are also for the benefit of BUYER, SELLER's bank and Guarantor(s)'s bank, Account Debtors and Processor, and each of their respective officers, directors, attorneys, assigns, agents and shareholders, and these parties may rely upon these terms and raise them as a defense in any action.

1.10 Disclosure of Information. SELLER, Guarantor(s) and each person signing this Agreement on behalf of SELLER and/or as Owner or Guarantor(s), in respect of himself or herself personally authorizes BUYER to disclose information concerning SELLER, Guarantor(s)'s and each Owner's credit standing (including credit bureau reports that BUYER obtains) and business conduct to agents, affiliate subsidiaries, and credit reporting bureaus. SELLER and each Owner and Guarantor(s) hereby waive to the maximum extent permitted by law any claim for damages against BUYER or any of its affiliates relating to any (i) investigation undertaken by or on behalf of BUYER as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

1.11 D/B/A's. SELLER, Guarantor(s), and each Owner acknowledges that BUYER may be using "doing business as" or "d/b/a" names or authorized agents in connection with various matters relating to the transaction between BUYER and SELLER, including the filing of UCC-1 financing statements and other notices or filing.

1.12 Bank Holidays and Other Bank Closures. BUYER will debit the Initial Estimated/Adjusted Remittance Amount only on each weekday on which SELLER's bank is open and able to process ACH transactions.

1.13 ACH Authorization. If an ACH transaction is rejected by SELLER's financial institution for any reason other than a stop payment order placed by SELLER with its financial institution, including without limitation insufficient funds, SELLER agrees that BUYER may resubmit up to two times any ACH transaction that is dishonored. SELLER's bank may charge SELLER fees for unsuccessful ACH entries. SELLER agrees that BUYER has no liability to SELLER for such fees. In the event BUYER makes an error in processing any payment or credit, SELLER authorizes BUYER to initiate ACH entries to or from the Designated Account or bank account to correct the error. SELLER acknowledges that the origination of ACH entries to and from the Designated Account or bank account must comply with applicable law and applicable network rules. SELLER agrees to be bound by the Rules and Operating Guidelines of NACHA. SELLER will not dispute any ACH transaction initiated pursuant to this Authorization, provided the transaction corresponds to the terms of this Authorization. SELLER requests the financial institution that holds the Designated Account and bank account to honor all ACH entries initiated in accordance with this Authorization.

# II. REPRESENTATIONS, WARRANTIES, AND COVENANTS

SELLER represents, warrants and covenants that as of this date and, unless expressly stated otherwise, during the

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

course of this Agreement:

2.1 Accounts Receivables and Financial Information. SELLER's accounts receivables and payable reports, bank and financial statements, copies of which have been furnished to BUYER, and future statements which will be furnished hereafter at the discretion of BUYER, fairly represent the performance and financial condition of SELLER at the dates the statements are provided. All performance and financial information provided to BUYER by SELLER and any Guarantor(s) is truthful, complete and accurate as of the date of this Agreement. BUYER may request Banking Records at any time during the performance of this Agreement and the SELLER shall provide them to BUYER within five business days. SELLER's failure to do so is a material breach of this Agreement.

2.2 Government Approvals. SELLER is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own operate and lease its properties and to conduct the business in which it is presently engaged.

2.3 Authorization. SELLER, and the persons(s) signing this Agreement on behalf of SELLER and Guarantor(s), have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4 No Diversion of Receipts. SELLER must deposit all Receipts into the Designated Account on a daily basis and must instruct SELLER'S credit card processor to deposit all Receipts of Seller into the Designated Account on a daily basis. SELLER agrees not to (i) change the Designated Account, (ii) add an additional business bank account into which SELLER deposits Receipts without the express written consent of BUYER, (iii) revoke BUYER'S authorization to debit the Designated Account, (iv) close the Designated Account without the express written consent of BUYER or, (v) take any other action with the intent to interfere with BUYER'S right to collect the purchased Receipts.

2.5 Change of Name, Location or Type of Business. SELLER will not conduct SELLER's business, or any similar business, under any name other than as disclosed to the Processor and BUYER or change the type of business it operates or any of its places of business without prior written consent from BUYER. Such change made without the prior written consent of BUYER shall be a material breach of this Agreement.

2.6 Estoppel Certificate. SELLER will at any time, and from time to time, upon at least one (1) day's prior notice from BUYER to SELLER execute, acknowledge and deliver to BUYER and/or to any other person, firm or corporation specified to BUYER a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, the same is in full force and effect as modified and stating the modifications) and stating the dates on which the Purchased Amount or any portion thereof has been remitted.

2.7 No Bankruptcy or Assignment. As of the date of this Agreement, SELLER does not contemplate and has not filed any petition for bankruptcy protection or assignment for the benefit of creditors, and there has been no involuntary petition or receivership brought or pending against SELLER. SELLER further warrants that as of the date of this Agreement, SELLER does not anticipate filing any such bankruptcy petition and has no knowledge of or reason to believe any creditor has any cause to file an involuntary petition or receivership as against SELLER.

2.8 Working Capital Funding. At any time either contemporaneous with or after the execution of this Agreement, SELLER shall not, unless permitted in writing by BUYER, enter into any arrangement, agreement, or a loan that relates to or encumbers Seller's Receipts or future revenue with any party other than BUYER.

2.9 Unencumbered Receipts. SELLER warrants that, unless otherwise disclosed in writing to BUYER prior to the date of this Agreement, SELLER has good, complete and marketable title to all of its Receipts free and clear of any and all liabilities, liens, claims, changes, restriction, conditions, options, rights, mortgages, security, interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of BUYER. SELLER shall not voluntarily transfer or sell all or substantially all of its assets, shares and/or membership interests without prior written consent of BUYER.

2.10 Business Purposes. SELLER is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and SELLER is entering into this Agreement for business purposes and not for consumer,

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

personal, family or household purposes.

2.11 Defaults Under Other Contracts. SELLER's execution of and/or performance under this Agreement will not cause or create an event of default by SELLER under any contract with another person or entity.

2.12 Bank Account. SELLER represents and warrants that (i) any bank account disclosed by SELLER (including but not limited to the Designated Account) provided to BUYER is SELLER's bank account; (ii) the person executing this Authorization on behalf of SELLER is an authorized signer on the bank account and has the power and authority to authorize BUYER to initiate ACH transactions to and from the bank account; and (iii) the bank account is a legitimate, open, and active bank account used solely for business purposes and not for personal, family or household purposes.

# III. REMEDIES FOR SELLER'S BREACH OF THIS AGREEMENT

3.1 Remedies. If SELLER violates any term or covenant in this Agreement or if any representation or warranty by SELLER in this Agreement proves to have been incorrect, false or misleading in any material respect when made, BUYER may proceed to protect and enforce its rights including, but not limited to, the following:

a) The Remittance Percentage shall equal 100%. The full unremitted Purchased Amount plus all fees and charges (including legal fees) assessed under this Agreement will become due and payable in full immediately.

b) BUYER may enforce the provisions of the Guaranty of Performance against each Guarantor.

c) SELLER shall pay to BUYER all reasonable costs associated with SELLER'S breach, including a Breach Administration Fee, as set forth and defined in the Appendix A. Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which BUYER shall recover judgment against SELLER, SELLER shall be liable for all of BUYER's costs, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of BUYER under this provision shall be limited as provided in the arbitration provision set forth below.

d) BUYER may debit depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on any of SELLER'S bank accounts for all sums due to BUYER.

3.2 Remedies Are Cumulative, Subject to Arbitration. Subject to Arbitration as provided in Section 4.14 of this Agreement, all rights, powers, and remedies of BUYER in connection with this Agreement may be exercised at any time by BUYER after the occurrence of a breach, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.3 Required Notifications. SELLER is required to give BUYER three (3) days prior written notice of intent to change the Designated Account with updated account information attached to the notice. SELLER is required to give BUYER ten (10) days' written notice of the intent to sell, assign or transfer all or substantially all of the SELLER's assets or stock and shall provide BUYER in writing the name, address, phone number, email address and facsimile number of the proposed assignee, transferee or BUYER's legal representative or owner.

3.4 Security Interest. The Parties agree and understand this purchase and sale transaction is governed by Article 9 of the Uniform Commercial Code (the "UCC") and BUYER has a security interest in the Receipts purchased. The Receipts purchased are Accounts and General Intangibles pursuant to UCC Article 9, and BUYER has a security interest in all (a) SELLER's present and future Accounts, and General Intangibles, as such terms are defined in the UCC, now owned or hereafter owned or acquired by SELLER; and (b) all proceeds, as that term is defined in Article 9 of the UCC (a and b collectively, the "Collateral"). The security interests created by this transaction and evidenced by this Agreement shall secure all of the BUYER's entitlements under this or any other agreement now existing or later entered into between SELLER and BUYER or an affiliate of BUYER. SELLER authorizes BUYER to file one or more UCC-1 forms consistent with the UCC in order to give notice that the Purchased Amount of Future Receipts is the sole property of BUYER. BUYER may

notify Account Debtors and/or other persons obligated on the Receipts or Accounts, of SELLER's sale of the Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of BUYER. SELLER authorizes BUYER to debit the Designated Account and all other business bank accounts of SELLER for all costs incurred by BUYER associated with the filing, amendment or termination of any UCC filings.

3.5 Negative Pledge. SELLER agrees not to create, incur, or assume, directly or indirectly, any lien on or with respect to any of the Collateral (as defined in section 3.4 above), as applicable.

# IV. MISCELLANEOUS.

4.1 Modifications. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by BUYER.

4.2 Assignment. BUYER may assign, transfer or sell its right to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part. The Parties have entered into this Agreement in the State of New York and the Parties further agree that BUYER is the absolute owner of Receipts in consideration of the funds provided. Fundkite may act as the lead purchaser for itself and other co-investors making FUNDKITE on behalf of itself and all co-investors collectively "FUNDKITE" and "BUYER".

4.3 Notices. All notices as required by Section 3.3 hereunder shall be delivered by certified mail; return receipt requested to the respective Parties to this Agreement at the addresses set forth in this Agreement and shall become effective only upon receipt. All other notices, requests, consent, demands, and other communications may be made in writing sent by regular mail and/or electronic mail to SELLER at rtritinger@mazzonicenter.org  and to BUYER at customerservice@fundkite.com.

4.4 Waiver of Remedies. No failure on the part of BUYER to exercise and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any other right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. Subject to Arbitration, as provided in section 4.14 of this Agreement, the remedies provided hereunder are cumulative and not exclusive to any remedies provided by law or equity.

4.5 Phone Recordings and Contact. SELLER and each Guarantor(s) agree that any call between them and BUYER and its owners, managers, employees and agents may be recorded and/or monitored. Furthermore, SELLER and Guarantor(s) acknowledge and agree that: (i) they have an established business relationship with BUYER, its managers, employees and agents (collectively, the "BUYER Parties") and that SELLER and Guarantor(s) may be contacted by any of the BUYER Parties from time-to-time regarding SELLER's performance of its obligations under this Agreement or regarding other business transactions; (ii) they will not claim that such communications and contacts are unsolicited or inconvenient; and (iii) any such contact may be made by any of the BUYER Parties in person or at any phone number (including mobile phone number), email addresses, or facsimile number belonging to SELLER and Guarantor(s)'s office, or its owners, managers, officers, or employees.

4.6 Binding Effect. This Agreement shall be binding upon and inure to the benefit of SELLER, BUYER, and their respective successors and assigns, except that SELLER shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of BUYER which consent may be withheld in BUYER's sole discretion. BUYER reserves the right to assign this Agreement with or without prior written notice to SELLER.

4.7 Governing Law, Venue, and Jurisdiction. Except as set forth in the Arbitration section, this Agreement shall be governed by or constructed in accordance with the laws of the state of New York, without regard to any applicable principles of conflicts of law. Any suit, action, or proceeding arising out of any disputes between the SELLER, Guarantor(s) and the BUYER, its affiliates agents, attorneys and assigns herein, or arising out of the Agreement hereunder, or the interpretation, performance or breach hereof, shall if BUYER so elects, be instituted in any court sitting in New York State, (the "Acceptable Forums"). SELLER and each Guarantor(s) agree that the Acceptable Forums

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

are convenient to it/them and submit to the jurisdiction of the Acceptable Forums and waive any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, SELLER and each Guarantor(s) waive any right to oppose any motion or application made by BUYER to transfer and/or dismiss such proceeding.

<u>4.8 Survival of Representation, etc.</u> All representations, warranties and covenants herein shall survive the full execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

<u>4.9 Severability.</u> In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions of this Agreement.

<u>4.10 Entire Agreement.</u> This Agreement and any Guaranty embody the entire agreement between SELLER and BUYER and Guarantor(s) and supersede all prior agreements and understanding relating to the subject matter hereof.

<u>4.11 JURY TRIAL WAIVER.</u> THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART, OR THE ENFORCEMENT THEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH PARTY AGREES TO THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

<u>4.12 CLASS ACTION WAIVER.</u> THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

<u>4.13 SERVICE OF PROCESS.</u> SELLER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES PERSONAL SERVICE OF LEGAL PROCESS AND ANY OBJECTION TO THE ABSENCE OF PERSONAL SERVICE OF PROCESS AND HEREBY AGREES TO ACCEPT SERVICE OF LEGAL PROCESS BY (I) ELECTRONIC MAIL SENT TO SELLER'S EMAIL ADDRESS PROVIDED TO BUYER BY SELLER ("LAST KNOWN EMAIL ADDRESS OF SELLER"), (II) UNITED STATES POSTAL SERVICES FIRST CLASS OR CERTIFIED MAIL SENT TO SELLER'S MAILING ADDRESS PROVIDED TO BUYER BY SELLER ("LAST KNOWN ADDRESS OF SELLER"), OR (III) BY ANY OTHER MEANS PERMITTED BY NEW YORK LAW. SELLER UNDERSTANDS AND AGREES THAT AN ACTION, LAWSUIT, OR CONTROVERSY MAY BE TAKEN UP AND CONSIDERED BY A COURT WITHOUT ANY FURTHER NOTICE. SERVICE OF PROCESS SHALL BE EFFECTIVE UPON SENDING / MAILING OF SERVICE OF PROCESS BY BUYER ("SERVICE DATE"). SELLER SHALL NOTIFY BUYER OF ANY CHANGE TO ITS LAST KNOWN EMAIL ADDRESS OR ITS LAST KNOWN ADDRESS FOR SERVICE. UNLESS BUYER IS NOTIFIED OF A CHANGE, BUYER'S LAST KNOWN EMAIL ADDRESS OR ITS LAST KNOWN ADDRESS SHALL BE PRESUMED TO BE ACCURATE AND VALID FOR THE PURPOSES OF SERVICE OF PROCESS AND NOTICES. THIS PROVISION SHALL SUPERSEDE ANY NOTICE REQUIREMENTS IN THE CONTRACT WITH RESPECT TO SERVICE OF PROCESS. SELLER WILL HAVE THIRTY (30) CALENDAR DAYS FROM THE SERVICE DATE OF THE SERVICE OF PROCESS HEREUNDER IN WHICH TO RESPOND. FURTHERMORE, SELLER EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT.

<u>4.14 ARBITRATION.</u> IF BUYER, SELLER OR ANY GUARANTOR(S) REQUESTS, THE OTHER PARTIES AGREE TO

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR(S) SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR(S) DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR(S) MAY COMMENCE AN ARBITRATION PROCEEDING WITH MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING ("RAPID") OR, IN CASE RAPID IS UNAVAILABLE AS ARBITRATOR AT THE TIME WHEN THE INTENT TO ARBITRATE ARISES, THE PARTIES HERETO MAY COMMENCE AN ARBITRATION PROCEEDING WITH JAMS, FORMERLY KNOWN AS JUDICIAL ARBITRATION AND MEDIATION SERVICES, INC. ("JAMS"), OR, ALTERNATIVELY, THE PARTY INTENDING TO ARBITRATE A DISPUTE BETWEEN THE PARTIES HERETO MAY SEEK COURT'S APPOINTMENT OF AN ARBITRATOR TO ARBITRATE A DISPUTE BETWEEN THE PARTIES HERETO. BUYER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR(S) FOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND THE GUARANTOR(S) MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR(S) OR THE RELIEF SOUGHT BY SELLER OR THE GUARANTOR(S) IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY RAPID OR JAMS RULES. SELLER AND THE GUARANTOR(S) AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR(S) MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR(S) AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. ANY ARBITRATION DECISION RENDERED PURSUANT TO THIS ARBITRATION AGREEMENT MAY BE ENFORCED IN ANY COURT WITH JURISDICTION. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

4.15 RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S)(S) MAY OPT OUT OF THIS ARBITRATION CLAUSE. TO OPT OUT OF THIS ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR(S) MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR(S) DOES NOT WANT THIS ARBITRATION CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR(S) MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT:

ARBITRATION OPT OUT,
FundKite, 88 Pine St, 24th Floor New York NY 10005.

4.16 Facsimile Acceptance. Facsimile signatures shall be deemed acceptable for all purposes.

4.17 Electronic Signatures. Electronic (digital) signatures and "DocuSign" signatures shall be deemed acceptable for all purposes.

4.18 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement. Electronic signatures complying with the New York Electronic Signatures and Records Act (N.Y. State Tech. §§ 301-309), as amended from time to time, or other applicable law will be deemed original signatures for purposes of this Agreement. Transmission by telecopy, electronic mail or other transmission method of an executed counterpart of this Agreement will constitute due

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

and sufficient delivery of such counterpart.

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

THE "TERMS OF ENROLLMENT IN PROGRAM", APPENDIX "A" AND "GUARANTY OF PERFORMANCE" ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.

Agreement of SELLER: By signing below SELLER agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the preceding and following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes, and SELLER will use all funds received from BUYER to operate or grow its business.

**SELLER: MAZZONI CENTER**

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
**09-11-2024 2:06 pm**

Agreed to by: Signature

it's **CFO**  (Title)

Agreement of Each Owner Guarantor(s) and Affiliated Business Guarantor(s): Each Owner, Guarantor and Affiliated Business Guarantor signing below agrees to the terms of this Agreement, including those terms and conditions on the preceding and following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes, and SELLER will use all funds received from BUYER to operate or grow its business.

**Sign as Owner:**

Print Name: RACHELLE DENISE TRITINGER

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
**09-11-2024 2:04 pm**

Signature

**Individual Guarantors**
**Guarantor**

Print Name: **RACHELLE DENISE TRITINGER**

Social Security Number: ███████████

Driver's License:            State Issued: **Pennsylvania**

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
**09-11-2024 2:04 pm**

Signature

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

# Affiliated Business Guarantors

**Guarantor:** 1334-48 BAIN BRIDGE STREET LLC

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
09-11-2024 2:05 pm

by Signature

**Address:** 1348 BAINBRIDGE STREET, PHILADELPHIA, PA 19147
**Tax Id#:** - **State of Incorporation:** Pennsylvania

---

**Guarantor:** MAZZONI CENTER D/B/A Mazzoni Center - Washington West

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
09-11-2024 2:05 pm

by Signature

**Address:** 1201 Locust St, Philadelphia, PA 19107
**Tax Id#:**                 **State of Incorporation:** Pennsylvania

---

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

# GUARANTY OF PERFORMANCE

A. BUYER has purchased Future Receipts of SELLER, pursuant to that REVENUE PURCHASE AGREEMENT Purchase and Sale of Future Receipts (the "Agreement") dated, incorporated herein.

B. The undersigned Guarantor(s) hereby are parties to the Agreement and each agrees to irrevocably, absolutely and unconditionally guarantee to BUYER, SELLER's prompt and complete performance of the following "Guaranteed Obligations":

> 1. SELLER'S obligation to deposit all Receipts into the Designated Account on a daily basis and instruct SELLER'S credit card processor to deposit all Receipts of SELLER into the Designated Account on a daily basis.

> 2. SELLER'S obligation not to (i) change the Designated Account, (ii) add an additional business bank account, (iii) revoke BUYER's authorization to debit the Designated Account, (iv) close the Designated Account without the express written consent of BUYER or, (v) take any other action with the intent to interfere with BUYER's right to collect the purchased Receipts.

> 3. SELLER's obligation not to enter into any arrangement, agreement, or a loan that relates to or encumbers SELLER'S Receipts of future revenue with any party other than BYUER, unless permitted in writing by BUYER;

> 4. SELLER's representations, covenants and warranties shall be truthful, accurate and complete and shall not be misleading in any material respect when made;

> 5. SELLER's obligation to provide Banking Records to BUYER in accordance with the Agreement;

> 6. SELLER's obligation to not voluntarily transfer or sell all or substantially all of its assets, shares and/or membership interests without prior written consent of BUYER;

<u>Indemnification.</u> Guarantor indemnifies and hold harmless BUYER against all loses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred, resulting from SELLER's failure to perform any of the Guaranteed Obligations.

<u>Guarantor(s) Waivers.</u> In the event that the SELLER fails to perform any of the Guaranteed Obligations, BUYER may enforce its rights under this Guaranty against any and all Guarantor(s) without first seeking to obtain performance from SELLER or any other Guarantor(s). BUYER is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Guaranty if it is not notified of: (i) SELLER's default, or failure to perform any obligations under the Agreement; (ii) BUYER's acceptance of the Agreement or this Guaranty; and (iii) any renewal, extension or other modification of the Agreement or SELLER'S other obligations to BUYER. In addition, BUYER may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Guaranty: (i) renew, extend or otherwise modify the Agreement or SELLER's other obligations to BUYER; and (ii) release SELLER from its obligations to BUYER. Until SELLER's obligations to BUYER under the Agreement are satisfied in full, Guarantor(s) shall not seek reimbursement from SELLER or any other Guarantor(s) for any amounts paid by it under this Guaranty.

Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against the SELLER, any other Guarantor(s), or any collateral provided by SELLER or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this agreement: (i) subrogation; (ii)reimbursement; (iii)performance; (iv) indemnification; or (v) contribution. In the event that BUYER must return any amount paid by or on behalf of SELLER or any other Guarantor(s) including but not limited to, a proceeding filed under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this agreement shall include any such amounts.

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

<u>Acknowledgment of Purchase.</u> Guarantor(s) acknowledges and agrees that the Purchase Price paid by BUYER to SELLER in exchange for the Purchased Amount of Receipts is a purchase of the Purchased Amount of Receipts and is not intended to be treated as a loan or financial accommodation from BUYER to SELLER. Guarantor(s) specifically acknowledges that BUYER is not a lender, bank or credit card processor, and that BUYER has not offered any loans to SELLER. Guarantor(s) acknowledges the Receipts Purchase Price paid to SELLER is good and valuable consideration for the sale of the Purchased Amount of Receipts.

Joint and Several Liability. The obligations hereunder of the persons or entities constituting Guarantor(s) under this Agreement are joint and several.

<u>JURY TRIAL WAIVER.</u> THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT THEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH PARTY AGREES TO THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

<u>CLASS ACTION WAIVER.</u> THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

<u>ARBITRATION.</u> IF BUYER, SELLER OR ANY GUARANTOR(S) REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR(S) SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR(S) DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR(S) MAY COMMENCE AN ARBITRATION PROCEEDING WITH MEDIATION AND CIVIL ARBITRATION, INC. D/B/A RAPIDRULING ("RAPID") OR, IN CASE RAPID IS UNAVAILABLE AS ARBITRATOR AT THE TIME WHEN THE INTENT TO ARBITRATE ARISES, THE PARTIES HERETO MAY COMMENCE AN ARBITRATION PROCEEDING WITH JAMS, FORMERLY KNOWN AS JUDICIAL ARBITRATION AND MEDIATION SERVICES, INC. ("JAMS"), OR, ALTERNATIVELY, THE PARTY INTENDING TO ARBITRATE A DISPUTE BETWEEN THE PARTIES HERETO MAY SEEK COURT'S APPOINTMENT OF AN ARBITRATOR TO ARBITRATE A DISPUTE BETWEEN THE PARTIES HERETO. BUYER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR(S) FOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND THE GUARANTOR(S) MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR(S) OR THE RELIEF SOUGHT BY SELLER OR THE GUARANTOR(S) IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY RAPID OR JAMS RULES. SELLER AND THE GUARANTOR(S) AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR(S) MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR(S) AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. ANY ARBITRATION DECISION RENDERED PURSUANT TO THIS ARBITRATION AGREEMENT MAY BE ENFORCED IN ANY COURT WITH JURISDICTION. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.

RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THIS ARBITRATION CLAUSE. TO OPT OUT OF THIS ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR(S) MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR(S) DOES NOT WANT THIS CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR(S) MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN FOURTEEN 14 DAYS AFTER THE DATE OF THIS AGREEMENT:

ARBITRATION OPT OUT,
FundKite, 88 Pine Street, 24th Floor Street New York NY 10005.

SERVICE OF PROCESS. EACH GUARANTOR(S) HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES PERSONAL SERVICE OF LEGAL PROCESS AND ANY OBJECTION TO THE ABSENCE OF PERSONAL SERVICE OF PROCESS AND HEREBY AGREES TO ACCEPT SERVICE OF LEGAL PROCESS BY (I) ELECTRONIC MAIL SENT TO GUARANTOR'S EMAIL ADDRESS PROVIDED TO BUYER BY GUARANTOR ("LAST KNOWN EMAIL ADDRESS OF GUARANTOR"), (II) UNITED STATES POSTAL SERVICES CERTIFIED MAIL SENT TO GUARANTOR'S MAILING ADDRESS PROVIDED TO BUYER BY GUARANTOR ("LAST KNOWN ADDRESS OF GUARANTOR"), OR (III) BY ANY OTHER MEANS PERMITTED BY NEW YORK LAW. GUARANTOR UNDERSTANDS AND AGREES THAT AN ACTION, LAWSUIT, OR CONTROVERSY MAY BE TAKEN UP AND CONSIDERED BY A COURT WITHOUT ANY FURTHER NOTICE. SERVICE OF PROCESS SHALL BE EFFECTIVE UPON SENDING / MAILING OF SERVICE OF PROCESS BY BUYER ("SERVICE DATE"). GUARANTOR SHALL NOTIFY BUYER OF ANY CHANGE TO ITS LAST KNOWN EMAIL ADDRESS OR ITS LAST KNOWN ADDRESS FOR SERVICE. UNLESS BUYER IS NOTIFIED OF A CHANGE, BUYER'S LAST KNOWN EMAIL ADDRESS OR ITS LAST KNOWN ADDRESS SHALL BE PRESUMED TO BE ACCURATE AND VALID FOR THE PURPOSES OF SERVICE OF PROCESS AND NOTICES. THIS PROVISION SHALL SUPERSEDE ANY NOTICE REQUIREMENTS IN THE CONTRACT WITH RESPECT TO SERVICE OF PROCESS. EACH GUARANTOR(S) WILL HAVE THIRTY (30) CALENDAR DAYS FROM THE SERVICE DATE OF THE SERVICE OF PROCESS HEREUNDER IN WHICH TO RESPOND. FURTHERMORE, EACH GUARANTOR(S) EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT.

Guarantor(s) Acknowledgement. Guarantor(s) acknowledges that: (i) He/She understands the seriousness of provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "REVENUE PURCHASE AGREEMENT PURCHASE AND SALE OF FUTURE RECEIPTS" AND "TERMS OF ENROLLMENT IN PROGRAM" ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS PERFORMANCE GUARANTY**.


**Individual Guarantors**
**Guarantor**

Print Name: **RACHELLE DENISE TRITINGER**

Social Security Number: █████████

Driver's License:                    State Issued: **Pennsylvania**

Signed by: **Rachelle Tritinger**

*Rachelle Tritinger*

**09-11-2024 2:05 pm**

Signature

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

# Affiliated Business Guarantors

**Guarantor:** 1334-48 BAIN BRIDGE STREET LLC

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
09-11-2024 2:05 pm

by Signature 

**Address:** 1348 BAINBRIDGE STREET, PHILADELPHIA, PA 19147
**Tax Id#:** - **State of Incorporation:** Pennsylvania

---

**Guarantor:** MAZZONI CENTER D/B/A Mazzoni Center - Washington West

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
09-11-2024 2:05 pm

by Signature

**Address:** 1201 Locust St, Philadelphia, PA 19107
**Tax Id#:**                **State of Incorporation:** Pennsylvania

---

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224



# APPENDIX A: THE FEE STRUCTURE

A. <u>Service Fees</u>

- <u>Origination FEE</u> - $20,185.00 The Origination Fee is deducted from the Purchase Price.

B. <u>NSF Fee</u>  - $35.00.  The NSF Fee is due each time the BUYER'S debit ACH of the Account is rejected for insufficient funds. And will be debited from the SELLER'S account on the next available business day or added to the balance.

C. <u>Rejected ACH Fee</u>- $100.00.  The Rejected ACH Fee is due if SELLER directs the bank to reject BUYER'S debit ACH, and will be debited from the SELLER'S account on the next available business day or added to the balance.

D.  <u>Breach Administration Fee</u> -If SELLER violates any term or covenant in this Agreement, and such breach is not cured within and five  (5) calendar days of its first occurrence, SELLER shall pay the BUYER the amount of 25% of the total amount of Purchased Amount outstanding.

The Breach Administration Fee is intended to compensate the BUYER for the additional administrative costs associated with SELLER'S failure to comply with the terms of the Agreement. This amount will be added to the total amount to be remitted by SELLER effectively providing an additional discount to the BUYER. The parties agree that this fee is a good faith estimate of the damages caused by the breach of the Agreement in addition to BUYER'S other remedies specified in this Agreement, including the increased resources required to be expended by the BUYER to respond to the breach, as well as other damages and expenses caused by the breach.

**Agreement of Seller**
**MAZZONI CENTER**

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
**09-11-2024 2:05 pm**

Agreed to by: Signature                                                                                                          it's **CFO**  (Title)

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224



## AUTHORIZATION AGREEMENT
## FOR AUTOMATED CLEARING HOUSE TRANSACTIONS

MAZZONI CENTER ("SELLER") hereby authorizes AKF Inc, DBA FundKite ("FUNDER") to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other payments due to Funder from Seller under the terms of that Revenue Purchase Agreement (the "Agreement") dated SEPTEMBER 11, 2024 entered into between Seller and FUNDER, as it may be amended, supplemented or replaced from time to time. Seller also authorizes FUNDER to initiate additional entries (debits and credits) to correct any erroneous transfers. In addition, SELLER violates any term or covenant in this Agreement, Seller authorizes FUNDER to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to FUNDER from Seller under the terms of the Agreement. Seller agrees to be bound by the Rules and Operating Guidelines of NACHA and represents and warrants that the designated account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes. Seller authorizes FUNDER to contact Seller's financial institution to obtain available funds information and/or to verify any information Seller has provided about the designated checking account and to correct any missing, erroneous or out-of-date information. Seller understands and agrees that any revocation or attempted revocation of this Authorization will constitute an event of default under the Agreement. In the event that Seller closes the designated checking account, or the designated checking account has insufficient funds for any ACH transaction under this Authorization, Seller authorizes FUNDER to contact Seller's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller's financial institution, and to initiate ACH transactions under this Authorization to such additional account(s).

**Transfer Funds To/From:**
Name of Bank: ▓▓▓▓▓▓▓▓
ABA Transit/Routing #: ▓▓▓▓▓▓▓▓
Checking Account #: ▓▓▓▓▓▓▓▓

This authorization is to remain in full force and effect until all amounts due to Buyer under the Agreement have been paid in full, in such time and in such manner as to afford Buyer a reasonable opportunity to act on it.

**Seller Information:**
Seller's Name: **MAZZONI CENTER**
Contract ID: **70234927**
Merchant's Tax ID:
Print Name: **RACHELLE DENISE TRITINGER**
Signature of Authorized Representative:

Signed by: **Rachelle Tritinger**
*Rachelle Tritinger*
09-11-2024 2:05 pm

AKF Inc DBA FundKite © 2024 All Rights Reserved v041224

EXHIBIT J

# Russo & Gould LLP

### ATTORNEYS AT LAW
33 Whitehall Street, New York, New York 10004
Phone (212) 482-0001; Fax (212) 482-0002
www.russogould.com

Partner
Kevin G. Horbatiuk, esq
khorbatiuk@russogould.com
(212) 482-0001 x134

Mazzoni Center
1348 Bainbridge Street
Philadelphia, PA 19147

October 14, 2024

Re:        UCC Lien
Creditor:  LCF Group
Debtor:    Mazzoni Center
Filing #:  20240911217419
Our File No.: 815.492

Dear Sir or Madam:

We have been retained by Connecticut General Life Insurance Company, CIGNA Health and Life Insurance Company, and CIGNA Healthcare of New York regarding the abovementioned UCC Lien. Enclosed please find explanation of benefit forms with copies of seven (7) checks, that were recently redirected to LCF Group pursuant to the aforementioned UCC Lien. Please do not attempt to cash these checks. The copies are being forwarded to your attention so that your patient account records can be properly credited.

If you have any questions or comments in this regard, please do not hesitate to contact me.

Very truly yours,

*Kevin G. Horbatiuk*

Kevin G. Horbatiuk

**HARTFORD OFFICE**
100 Pearl Street, 14th Floor
Hartford, CT 06103
(860) 986-7845

**PENNSYLVANIA OFFICE**
100 South Juniper Street
Third Floor
Philadelphia, PA 19107
(215) 874-6816

**NEW JERSEY OFFICE**
10 Franklin Avenue
Edison, NJ 08837
(732) 738-5600

**STAMFORD OFFICE**
One Stamford Plaza
263 Tresser Blvd
Stamford, CT 06901
(203) 883-0800

**BUFFALO OFFICE**
12 Fountain Plaza, Ste 600
Buffalo, NY 14202
(716) 800-6389

# Russo & Gould LLP

## ATTORNEYS AT LAW

33 Whitehall Street, New York, New York 10004
Phone (212) 482-0001; Fax (212) 482-0002
www.russogould.com

Partner
Kevin G. Horbatiuk, esq
khorbatiuk@russogould.com
(212) 482-0001 x134

October 21, 2024

Mazzoni Center
1348 Bainbridge Street
Philadelphia, PA 19147

Re:         UCC Lien
Creditor:   LCF Group
Debtor:     Mazzoni Center
Filing #:   20240911217419
Our File No.: 815.492

Dear Sir or Madam:

We have been retained by Connecticut General Life Insurance Company, CIGNA Health and Life Insurance Company, and CIGNA Healthcare of New York regarding the abovementioned UCC Lien. Enclosed please find explanation of benefit forms with copies of twelve (12) checks, that were recently redirected to LCF Group pursuant to the aforementioned UCC Lien. Please do not attempt to cash these checks. The copies are being forwarded to your attention so that your patient account records can be properly credited.

If you have any questions or comments in this regard, please do not hesitate to contact me.

Very truly yours,

*Kevin G. Horbatiuk*

Kevin G. Horbatiuk