**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MAZZONI CENTER**, et al., | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 24-5921-KSM** |
| **LCF GROUP, INC.**, et al., | |
| Defendants. | |

**MEMORANDUM**[1]

**MARSTON, J.**                                          **November 18, 2024**

Plaintiffs Mazzoni Center and 1334-48 Bainbridge Street LLC challenge the validity of two contracts that the Center's now-former Executive Financial Officer, Rachelle Tritinger, entered with Defendants LCF Group, Inc. ("LCF") and AKF, Inc., doing business as FundKite ("FundKite") in September 2024.[2] Plaintiffs allege that each contract was actually a usurious loan and the resulting debts are unlawful under the Racketeer Influenced and Corrupt Organizations ("RICO") Act and New York law. (Doc. No. 1 at 20–35.) With their Complaint, Plaintiffs filed a motion for temporary restraining order ("TRO") and preliminary injunction. (Doc. No. 2.) Plaintiffs ask the Court to preclude LCF and FundKite from attempting to collect under the contracts and to enjoin the companies from, among other things, asserting Uniform Commercial Code ("UCC") liens against the Center's accounts receivable, freezing the Center's

---

[1] This memorandum constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a)(2).

[2] Plaintiffs also bring this action against various officers with each entity. Defendant Robert Kleiber is LCF's Chief Operating Office ("COO") and Defendant Andrew Parker is LCF's Chief Executive Officer ("CEO"). (Doc. No. 1 at ¶¶ 11–12.) Defendant Aleksander Shvarts (incorrectly identified in the Complaint as "Aleksander Shvartz") is FundKite's CEO. (*Id.* at ¶ 14.)

accounts, and prosecuting any legal action against Plaintiffs to enforce the agreements. (*See id.* at 1–2.) Defendants oppose the motion. (*See* Doc. Nos. 14, 15, 17.) For the reasons discussed below, the Court denies Plaintiffs' request for a TRO and preliminary injunction.

## I.    FACTUAL BACKGROUND

The material facts in this case are not in dispute.

### A.    The Mazzoni Center

The Mazzoni Center is a 501(c)(3) non-profit corporation located in Philadelphia, Pennsylvania. (Doc. No. 1 at ¶ 8.) The organization, which was recently designated a Federally Qualified Health Center look-alike, "has served the health and wellness needs of the LGBTQIA+ community and other underserved communities in the Philadelphia region and beyond for over forty years." (*Id.* at ¶¶ 16–17; *see also* Hr'g. Tr. at 6:1–7:10.) Among other services, the organization offers "primary health care, behavioral health services, HIV and STI community testing and treatment, psychiatry, and other ancillary health and wellness services." (Doc. No 1 at ¶ 18; *see also* Hr'g. Tr. at 6:1–7:10.) It also "runs a housing program, an education program, a free legal services program, and a food bank for food insecure community members." (Doc. No 1 at ¶ 18; *see also* Hr'g. Tr. at 6:1–7:10.)

"[T]o support the free and reduced cost care it offers," the Center "relies on grant funding, government reimbursements, third party billing, and revenue from the federal 340(b) drug program." (Doc. No. 1 at ¶ 19; *see also* Hr'g. Tr. at 8:4–19.) And any "income earned is reinvested into its programming and to pay operating expenses such as payroll, employee benefits, and overhead." (Doc. No. 1 at ¶ 19.) The Center's greatest expense is payroll, which costs roughly $400,000 every two weeks. (Hr'g. Tr. at 14:22–16:8.) The Center alleges that it "faced financial difficulties during and in the aftermath of the COVID-19 pandemic," and that it "has continued in 2024 to struggle with cash flow issues." (Doc. No. 1 at ¶ 20.)

By the end of August 2024, the Center lacked sufficient funds to make its payroll requirements.  (Hr'g. Tr. at 39:10–16.)  The organization's payroll vender, ADP, agreed to pay the payroll with the understanding that the Center would have sufficient funds in their bank account within days.  (*Id.* at 39:10–40:3.)  But after the funds were outstanding for two weeks, the Center was told that ADP would not offer this concession again.  (*Id.*)  On September 11, 2024, when the next payroll was due, the Center's accounts remained short, and it lacked the funds to pay both the past payroll and the current payroll.  (*Id.*  at 18:13–19:25, 39:10–16.)

The Center's then-Executive Financial Officer, Rachelle Tritinger, did not share with her immediate supervisor, President and Executive Officer Sultan Shakir, that the organization was in financial straits.  (*Id.* at 19:11–21, 20:19–22, 51:16–23, 62:23–63:5.)  Instead, she turned to Defendants LCF and FundKite in search of the necessary funds.  Defendants are not affiliated with each other, but they both operate in the "merchant cash advance ('MCA') industry," offering cash-strapped businesses immediate access to cash in exchange for an interest in their future accounts receivable.  (Doc. No. 1 at ¶ 21.)  On September 11, 2024, Tritinger signed an MCA agreement with each company, purportedly on the Center's behalf.  (Doc. No. 2-3 at 9.)

### B.    The LCF Agreement

Under the LCF Agreement, LCF agreed to pay the Center $234,570—the "Purchase Price" of $250,000 minus origination fees totaling $15,430—in exchange for 12% of the Center's future receivables up until the "Purchased Amount" of $362,500 was paid off.  (Doc. No. 2-3 at 9–10.)[3]  Based on the financial documents that Tritinger shared with LCF, the initial "Daily Remittance" was listed as $6,041.67.  (*Id.* at 9 ("Daily Remittance represents a good faith estimate of the monetary value of the purchased percentage of daily receipts based upon

---

[3] The "Purchased Price" reflects the amount of future receivables to which LCF is entitled.

historical information provided by Seller . . . .").)  This amount was, however, "subject to adjustment," in that "[o]nce every fifteen (15) calendar days, in good faith," the Center or LCF could "request a reconciliation of the Daily Remittance to more closely reflect the [Center's] actual Receipts multiplied by the Purchased Percentage."  (*Id.* at 9, 13.)

The LCF Agreement, which was labeled an "agreement for purchase and sale of future receivables," repeatedly emphasized that the Center was "selling a portion of its future receipts to [LCF] at a discount, not borrowing money from the company."  (Doc. No. 2-3 at 9, 14.)  The agreement did, however, identify both Tritinger and the Center's parent company, Plaintiff 1334-48 Bainbridge Street LLC, as "Guarantors."  (*Id.* at 26.)  It also included choice of law and venue provisions, stating that it was to be "governed by and construed in accordance with the procedural and substantive laws of New York," and that any suit arising under the agreement or for the "interpretation, performance or breach" of the agreement was to be instituted in Nassau County, New York.  (*Id.* at 19.)

With the primary LCF Agreement, Tritinger signed two authorizations.  The first was titled, an "Authorization Agreement for Direct Deposits (ACH Credits) and Direct Payments (ACH Debits)," which authorized LCF to disburse the Daily Remittance from the Center's bank account.  (*Id.* at 34.)  To that end, the ACH/ADH Authorization listed the Center's account number and routing number.  (*Id.*)

The second authorization was labeled, "Power of Attorney," and it purported to appoint LCF as the Center's "true and lawful attorney in fact" and to give LCF the authority to, among other things, direct:

- "any Merchant Processor being used by Mazzoni Center to make payments to LCF as contemplated under the [LCF] Agreement,"

- "any Merchant Processor being used by Mazzoni Center to direct the entirety of Mazzoni Center's credit card receivables to LCF in order to satisfy amounts due to LCF under the Agreement," and

- "Bank of America – Bank and any and all other Banks in which Mazzoni Center or Rachelle Tritinger holds an account to direct payment(s) to LCF as contemplated under the ACH/ADF Authorization Agreement."

(*Id.* at 32.)  These and the other powers granted by the Power of Attorney were to be used "only upon [the Center's] violation of any terms of the [LCF] Agreement."  (*Id.* at 33.)

For each document—the LCF Agreement, the ACH/ADF Authorization, and the Power of Attorney—Tritinger purported to sign on the Center's behalf.  Although the Center is a non-profit organization and has no owners, Tritinger identified herself as "Owner 1" in the signature line of each document.  (*Id.* at 12, 21, 31, 34.)  It was only on the Power of Attorney that Tritinger also included her proper title, Executive Financial Officer.  (*Id.* at 34.)

### C.    The FundKite Agreement

The FundKite Agreement is identical in many respects.  It was similarly titled a "Revenue Purchase Agreement," and the body of the agreement repeatedly emphasized that it was "not a loan," but an agreement for the "purchase and sale of future receipts."  (Doc. No. 2-3 at 42–43.)  Specifically, FundKite agreed to pay the Center $479,815—the "Purchase Price" of $500,000 minus fees totaling $20,185—in exchange for 9% of the Center's future receivables up until the "Purchased Amount" of $690,000 was paid off.  (*Id.* at 42–43.)  The initial weekly remittance amount was set at $24,642.86, which was framed as "an accurate estimate of the Remittance Percentage [9%] of [the Center's] actual Receipts prior to the date of this Agreement."  (*Id.* at 44.)  That remittance amount was subject to monthly reconciliation (*id.* at 43), and the Center could request additional reconciliations, which FundKite was required to perform within three days of receiving the necessary banking records (*id.* at 44).

5

Like the LCF Agreement, the FundKite Agreement included choice of law and venue provisions, stating that it "shall be governed by or constructed in accordance with the laws of the state of New York," and that any disputes among the parties or arising out of the Agreement were to "be instituted in any court sitting in New York State." (*Id.* at 48–49.) The one caveat being that upon written notice by either party, the other party agreed "to arbitrate all disputes and claims arising out of or relating to this agreement." (*Id.* at 49–50.)

As before, Tritinger identified herself as an owner of the Center in various parts of the agreement. Unlike the LCF Agreement, however, Tritinger also repeatedly included her proper title of Executive Financial Officer or its equivalents, Chief Financial Officer and CFO. (*Id.* at 42, 52, 68.) Adding to the confusion, in the Business Funding Application that Tritinger submitted on September 9, 2024, she listed her title as "Executive" and claimed she owned 100% of the Center. (*Id.* at 62.) She also signed under the line labeled, "Principal Owner," but included her proper title of "Executive Financial Officer." (*Id.* at 64.) Finally, she confirmed that she was "a majority owner of Mazzoni Center" on the form labeled, "Funding Checkout." (*Id.* at 65.)

As in the LCF agreement, Tritinger listed herself and 1334-48 Bainbridge Street LLC as guarantors to the FundKite Agreement, guaranteeing that the Center would promptly deposit all receipts in the designated account, would not interfere with FundKite's ability to access the account, and would not enter any other arrangements that may encumber the Center's future receivables. (*Id.* at 52–53, 57–58.)

### D.    The Aftermath

On the evening of September 11, 2024, President and Executive Officer Shakir saw that the LCF funds had entered the Center's business account earlier that day and then been paid to the organization's payroll vendor. (Hr'g. Tr. at 36:14–18, 37:20–22, 40:5–15, 63:6–8.) The next

morning, September 12, Shakir asked Tritinger about the money, and she told him that "it was a loan from a bank." (*Id.* at 34:22–24, 37:12–18.)  Surprised, he asked her if there was anything he should know about the organization's financial situation, and Tritinger responded, "there is nothing else that she could recall that [Shakir] should know about." (*Id.* at 35:23–36:4, 37:12–18, 40:16–24.)  Later that day, the FundKite funds similarly entered the organization's account, and again, almost immediately left the account to pay payroll. (*Id.* at 40:25–41:20.)  Shakir spoke with Tritinger again and asked her to provide all the documents related to the transactions. (*Id.* at 41:24–42:22, 44:3–24.)  By the end of the day, her employment with the Center had been terminated. (*Id.* at 42:13.)

The next morning, the Center revoked LCF's and FundKite's abilities to access the Center's bank accounts.  The Center was able to preserve around $70,000 of the borrowed funds, which were set aside in a secure account. (Doc. No. 1-3 at 4; Hr'g. Tr. at 25:10–14.)  But most of the money had already been spent.  Although the Center and Shakir have known since September 12, 2024 that the LCF and FundKite deposits were used for the organization's benefit, none of the funds have been repaid. (Hr'g. Tr. at 43:8–21.)  Instead, all revenue has gone to pay the Center's business expenses, including payroll obligations every two weeks since then. (*Id.*)

On September 23, 2024, LCF filed a breach of contract action against Plaintiffs and Tritinger in the New York Supreme Court for Nassau County. (Doc. No. 2-3 at 72–83.)  That same day, FundKite sent the Center a notice of event of breach, which explained that "FundKite received notice that its scheduled ACH debit of Receipts from the business bank account . . . was blocked," and asked a representative from the Center to contact FundKite immediately to "discuss curing Merchant's breach of the Agreement." (*Id.* at 70.)  FundKite later initiated an arbitration action against the Center. (*Id.* at 85.)

7

In October 2024, Plaintiffs learned that Defendants were also asserting UCC liens against the Center and sending notices to the organization's business partners:

- On October 14 and 21, 2024, insurance carrier CIGNA informed the Center that it had diverted payments to LCF.

- On October 17, 2024, the City of Philadelphia notified the Center that it was withholding the organization's invoice payments because it received a lien notice from FundKite.[4]

- On October 21, 2024, Walgreens informed the Center that it had received a lien notice, directing it to divert funds owed to LCF.

- On October 28, 2024, Stripe, Inc. notified the Center that it was withholding funds due to a directive from FundKite.[5]

(Doc. No. 1-3 at 5, 86–87, 90–99, 101–26, 128–29.)  To date, these liens have resulted in the withholding of almost $800,000 in funds owed to the Center and the diversion to LCF of around $3,000.  (*See* Hr'g. Tr. at 69:3–9.)

### E.    This Action

Plaintiffs filed this action on November 5, 2024.  (*See* Doc. No. 1.)  They claim LCF and its principals, which the Complaint refers to collectively as the "LCF Enterprise," violated various provisions of the RICO Act when they sought to collect on the LCF Agreement and made calls and sent letters as part of their collection efforts.  (*Id.* at 20–27.)  Similarly, FundKite and its principal, which the Complaint refers to collectively as the "FundKite Enterprise," violated various provisions of the RICO Act when they sought to collect on the FundKite Agreement and made calls and sent letters as part of their collection efforts.  (*Id.* at 28–35.)  In

---

[4] Although Shakir's declaration states that LCF sent the lien notice to the City, he clarified at the November 12, 2024 hearing that the notice was actually sent by FundKite.  (Hr'g. Tr. at 67:10–13.)

[5] Although Shakir's declaration states that LCF sent the lien notice to Stripe, the attachments to that declaration show that the notice was actually sent by FundKite.  (Doc. No. 1-3 at 103; *see also* Hr'g. Tr. at 67:17–21.)

addition to the RICO claims, the Center seeks a declaratory judgment that the LCF Agreement and FundKite Agreement are unenforceable because the agreements are usurious loans under New York law and because Tritinger lacked the authority to enter the agreements on the Center's behalf.  (*Id.* at 36–37.)

With their Complaint, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction.  (Doc. No. 2.)  Plaintiffs ask the Court to enjoin Defendants from: (1) "withdrawing or attempting to withdraw funds from Plaintiffs' financial accounts," (2) "freezing Plaintiffs' current and future accounts, assets, and receivables," (3) "asserting UCC Liens or other purported security interests against Plaintiffs' current and future assets and accounts receivable," (4) "prosecuting any and all legal actions, including court actions and private arbitration actions, against Plaintiffs to enforce the illegal agreements at issue in this matter."  (*Id.* at 1.)  The motion also asks the Court to "direct[ ] Defendants to retract any and all UCC Lien letters sent to third parties regarding or relating to Plaintiffs."  (*Id.* at 1–2.)

After holding telephone status conferences on November 5 and 7, 2024, the Court ordered expedited briefing on the motion (*see* Doc. No. 9), and on November 9, 2024, Defendants submitted opposition briefs (*see* Doc. Nos. 14, 15).  The Center submitted a reply brief on November 10, 2024.  (*See* Doc. No. 16.)  And on November 12, 2024, FundKite submitted supplemental authority.  (*See* Doc. No. 17.)  Later that afternoon, the Court held oral argument, during which Plaintiffs presented the testimony of President and Executive Officer Shakir.  At the conclusion of oral argument, the Court denied Plaintiffs' motion.  The Court now gives the reasons for that denial.

## II.    LEGAL STANDARDS

A party seeking a temporary restraining order or preliminary injunction must demonstrate:  (1) a likelihood of success on the merits; (2) that the movant is likely to suffer

irreparable harm without relief; (3) that the injunction would not cause greater harm to the nonmovant than the harm that would befall the movant if relief was denied; and (4) that granting relief would serve the public interest. *Miller v. Mitchell*, 598 F.3d 139, 147 (3d Cir. 2010); *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). The movant must "meet the threshold for the first two 'most critical' factors," and "if these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

As for procedure, "[i]t is well established that 'a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than a trial on the merits.'" *Kos Pharms., Inc.*, 369 F.3d at 718 (citation omitted). Accordingly, this Court is not strictly bound by the Federal Rules of Evidence and may consider affidavits and other hearsay materials, to the extent appropriate. *See, e.g.*, *id.* ("District courts must exercise their discretion in 'weighing all the attendant factors, including the need for expedition,' to assess whether, and to what extent, affidavits or other hearsay materials are 'appropriate given the character and objectives of the injunctive proceeding.'" (citation omitted)); *Stein v. Cortes*, 223 F. Supp. 3d 423, 431 (E.D. Pa. 2016).

## III.    DISCUSSION

The Court's analysis begins and ends with the first preliminary injunction factor: likelihood of success on the merits.[6] In analyzing this factor, we are mindful that a plaintiff need

---

[6] Defendants assert that the legal issues surrounding contract formation and interpretation are not appropriately before this Court and can only be raised in the pending New York litigation and arbitration. (Hr'g. Tr. at 97:21–99:5, 101:5–7, 107:1–18. *But see id.* at 102:4–6 (LCF asserting that "[f]or the purposes of a TRO and injunction, Your Honor can look at these terms, apply the case law and make that determination yourself").) The Court shares Defendants' concerns and is particularly cautious given the venue and arbitration clauses included in the agreements. At this time, however, neither Defendant has

only show a reasonable probability of success on the merits.  *See, e.g.*, *Am. Ex. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012); *see also Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) ("[T]he plaintiff in [TRO and preliminary injunction contexts] need only to show a likelihood of success on the merits (that is, a reasonable chance, or probability, of winning) to be granted relief.  A likelihood does not mean more likely than not.").

Here, Plaintiffs have not demonstrated a likelihood of success on their RICO Act claims or their claims for declaratory judgment.

### A.    RICO Act Claims

Plaintiffs assert three claims against each set of Defendants under the RICO Act, 18 U.S.C. § 1962:  one for the collection of an unlawful debt, one for a pattern of racketeering activity (wire fraud), and one for unlawful conspiracy.  (*See* Doc. No. 1 at 20–35.)  Section 1962(c) renders it "unlawful for any person . . . associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).  Section 1962(d), in turn, renders it "unlawful for any person to conspire to violate" subsection (c).  *Id*. § 1962(d); *see also Zavala v. Wal Mart Stores, Inc.*, 691 F.3d 527, 539 (3d Cir. 2012) ("RICO conspiracy is not mere conspiracy to commit the underlying predicate acts.  It is a conspiracy *to violate RICO*—that is, to conduct or participate in the activities of a corrupt enterprise.").  Because a § 1962(d) conspiracy claim "necessarily must fail if the substantive [§ 1962(c)] claims are themselves deficient," *see Kolar v. Preferred Real*

---

moved to transfer this case, dismiss the pending claims, or compel arbitration, so the Court reserves ruling on these issues until they are squarely before us.

*Estate Investments, Inc.*, 361 F. App'x 354, 366 (3d Cir. 2010), our analysis focuses on Plaintiffs' claims under § 1962(c).

Plaintiffs claim that the LCF Defendants and FundKite Defendants are liable under both avenues of § 1962(c).  First, Plaintiffs claim the LCF Agreement and FundKite Agreement are usurious loans, and thus, "unlawful debt[s]" the collections of which violate § 1962(c).  (Doc. No. 1 at ¶¶ 127, 143); *see also* 18 U.S.C. § 1961(6)(B) (defining "unlawful debt" as "a debt . . . which was incurred in connection with the . . . business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.").  Second, Plaintiffs claim that each attempt by LCF and FundKite to collect on the unlawful debts—by sending letters and making calls representing that the underlying agreements are lawful—is an instance of wire fraud, such that, when viewed collectively, they demonstrate a "pattern of racketeering activity" in violation of § 1962(c).  (Doc. No. 1 at ¶¶ 128, 144–45); *see also* 18 U.S.C. § 1343 ("Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses . . . transmits . . . by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."); *id.* § 1961(1)(B) (defining "racketeering activity" to include "wire fraud" under § 1343).

Both violations are premised on Plaintiffs' assertion that the LCF Agreement and FundKite Agreement are usurious loans under New York law.[7]  (*See* Doc. No. 2-2 at 10–14); *see also Spin Capital, LLC v. Golden Foothill Ins. Servs., LLC*, Nos. 650582/2022, 595367/2022,

---

[7] All parties agree that the law of New York governs the dispute.  (*See* Hr'g. Tr. at 71:22–24, 96:11–14, 106:4–6.)

2023 WL 2265717, at *2 (N.Y. Sup. Ct. Feb. 28, 2023); ("To state a RICO claim for collection

of an unlawful debt, the Counterclaim Plaintiffs must allege that (i) the debt was unenforceable

in whole or in part because of state or federal laws relating to usury, (ii) the debt was incurred in

connection with the business of lending money at a usurious rate, and (iii) the usurious rate was

at least twice the enforceable rate."); *id.* at *4 ("[T]o allege predicate racketeering, the

Counterclaim Plaintiffs must allege (i) a scheme to defraud, (ii) money or property that is the

object of the scheme, and (iii) the use of the wires to further the scheme." (citations omitted)); *cf.*

*Singh v. The LCF Grp., Inc.*, No. 601297-23, 2023 WL 5760139, at *7 (N.Y. Sup. Ct. July 25,

2023) (analyzing RICO claims in connection with similar LCF agreements and explaining that

"[t]he central question in this action is whether the parties' MCA Agreements are usurious loans

concealed in the sheep's clothing of a purchase of future receivables").

    LCF and FundKite vehemently disagree with Plaintiffs' characterization, arguing that the

agreements are not loans—usurious or otherwise—but lawful contracts for the sale of future

receivables.  (*See* Doc. No. 14 at 14–17; Doc. No. 15 at 7–8.)

### 1.    <u>Legal Standard</u>

    "The rudimentary element of usury is the existence of a loan or forbearance of money,

and where there is no loan, there can be no usury, however unconscionable the contract may be."

*LG Funding LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 665 (N.Y. App. Div.

2020).  To determine "whether a funding agreement constitutes a loan or is a sale of future

receivables" the court must analyze "whether repayment is absolute or contingent."  *Lateral*

*Recovery, LLC v. Capital Merchant Servs., LLC*, 632 F. Supp. 3d 402, 452 (S.D.N.Y. 2022).

Three criteria guide this analysis:  "(1) whether there is a reconciliation provision in the

agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse

should the merchant declare bankruptcy."  *Id.* (quoting *Fleetwood Servs., LLC v. RAM Capital*

*Fund., LLC*, No. 20-cv-5120 (LJL), 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022)).  In applying these factors, the court looks to "familiar principles of contract interpretation" and "substance—not form—controls."  *Id.*  In other words, it is "not sufficient that the agreement is stated to have a reconciliation provision, an indefinite term, and be non-recourse if those provisions are illusory."  *Id.* (collecting cases).

### 2.    The LCF Agreement

To start, Plaintiffs have not shown that they are likely to succeed in showing that the LCF Agreement is a loan.

First, the agreement's reconciliation provision is mandatory, not discretionary:  "[LCF] *shall* provide a reconciliation within three (3) business days after receiving a Reconciliation Request and all reasonable information requested."  (Doc. No. 2-3 at 13 (emphasis added)); *cf. Lateral Recovery, LLC*, 632 F. Supp. 3d at 456 (finding purchase agreement was in fact a loan where, among other things, the "reconciliation provision [wa]s wholly discretionary").  The Center may seek a reconciliation every 15 calendar days, a time frame with which Plaintiffs do not take issue.  (Doc. No. 2-3 at 13); *cf. Singh*, 2023 WL 5760139, at *8 ("The Court acknowledges that the time limitations in the Reconciliation Provision"—allowing one reconciliation request every 30 days—"impose a hardship, but balances that portion of the provision against the fact that the Reconciliation Provision is not discretionary.").  The Center never requested a reconciliation, so there is nothing to suggest that LCF would refuse to honor these terms.  *See Spin Capital, LLC*, 2023 WL 2265717, at *3 ("[I]t does not appear that there is any basis for the allegation that the reconciliation process was a sham and that the defendants would not have received an appropriate credit, because on the record before the Court, it does not appear that the Counterclaim Plaintiffs even allege that they requested a reconciliation or adjustment of the payments and that it was done improperly.").

Plaintiffs argue that the reconciliation provision is nevertheless illusory because it required action by the Center as opposed to fluctuating in real time. (*See* Doc. No. 16 at 2; *see also* Hr'g. Tr. at 73:4–12.) But nothing in the case law stands for that proposition. Instead, courts have considered whether, despite the existence of a nominal reconciliation provision, the merchant is, in practice, absolutely foreclosed from seeking reconciliation or would be forced to default under the agreement before it could submit such a request. *Cf. Lateral Recovery, LLC*, 632 F. Supp. 3d at 457 ("The agreement nominally has a reconciliation provision pursuant to which the fixed amount could be changed and adjusted based on the receivables the merchant receives, but that provision is purely illusory. It can be invoked only at the discretion of the funder and, even then, because it can be invoked only five business days after the end of the calendar month, the provision may well become meaningless" given the provisions governing defaults.). Here, nothing in the agreement or in practice suggests that the Center would have been absolutely foreclosed from seeking reconciliation or would be forced to default under the agreement before it could do so.

Second, the LCF Agreement lacks a finite term. Indeed, the agreement states that LCF "has purchased the [Purchased Amount] on a 'non-recourse' basis, such that *there is no set term* wherein [LCF] expects to receive the [Purchased Amount]. [LCF] recognizes that the time within which the RTR will be recovered may be indefinite or, in the event of a good faith cessation of Seller's business operations, *not at all*." (*Id.* (citation omitted) (emphases added); *see also id.* at 14 ("There is . . . no time period during which the purchase amount must be collected by the company.").)

Last, the LCF Agreement repeatedly states that "a bankruptcy or insolvency filing by seller shall not, in and of itself, constitute a default." (Doc. No. 2-3 at 14, 18.) Again, Plaintiffs

argue that these terms are "fully illusory," because the guarantors—Tritinger and 1334-48 Bainbridge Street LLC—are still required to pay the outstanding debt.  (Hr'g. Tr. at 73:21–25.) But the guaranty provisions confirm that an event of bankruptcy is not an event of default that can trigger recovery from either guarantor.  (Doc. No. 2-3 at 22.)  And if bankruptcy itself is not an event of default, then any repayment remains owed by the Center and is tied to the Center's receivables, which would presumably be little or nothing in the case of bankruptcy.  As such, the Court does not find the bankruptcy provisions are the kinds of illusory promises that courts have struck down. *Cf. Lateral Recovery, LLC*, 632 F. Supp. 3d at 455 (finding purchase agreement was in fact a loan where it provided, among other things, that "if the merchant declares bankruptcy, it is still bound by its obligations under the agreement, and the guarantor's obligations become due").

        In short, it appears that all three criteria are satisfied.  This suggests repayment under the LCF Agreement is contingent, not mandatory, and that the agreement is not a loan subject to New York's usury laws.  *See, e.g.*, *Spin Capital, LLC*, 2023 WL 2265717, at *3 ("The BMF and HI Bar revenue purchase agreements meet all three criteria: (i) they all contained mandatory reconciliation provisions to ensure that payments were based on the *specific percentage* of the accounts receivable that were sold in the Purchase Agreements, (ii) the Purchase Agreements did not have a finite term because the reconciliation provisions ensured that the amounts due were contingent on the sales and as such the terms of the agreement would fluctuate based on the amount earned, and (iii) the Purchase Agreements all contained provisions expressly stating that a declaration of bankruptcy did not constitute an event of default."); *cf. Davis v. Richmond Capital Grp., LLC*, 194 A.d.3d 516, 517 (N.Y. App. Div. 2021) ("Plaintiffs also allege sufficiently that the subject [MCA] agreements were loans subject to usury laws, to wit, the

discretionary nature of the reconciliation provisions, the allegations that defendants refused to permit reconciliation, the selection of daily payment rates that did not appear to represent a good faith estimate of receivables, provisions making rejection of an automated debit on two or three occasions without prior notice an event of default entitling defendants to immediate repayment of the full uncollected purchased amount, and provisions authorizing defendants to collect on the personal guaranty in the event of plaintiff business's inability to pay or bankruptcy.").

### 3.    **The FundKite Agreement**

The FundKite Agreement is much the same.  Again, the reconciliation period is mandatory, not permissive.  Indeed, it requires reconciliation every month, regardless of whether the Center has requested reconciliation.  (Doc. No. 2-3 at 42 (defining the "Reconciliation Frequency" as "monthly"); *id.* at 44 ("[FundKite] *shall* perform periodic reconciliations according to the agreed Reconciliation Frequency." (emphasis added)).)  In addition to these periodic reconciliations, the Center may also request additional reconciliations, and FundKite "*shall* adjust" the remittance amount to ensure all "subsequent withdrawals . . . are equal to the Remittance Percentage."  (*Id.* at 44 (emphasis added).)  As with the LCF Agreement, there is nothing to suggest the Center ever requested a reconciliation or that FundKite failed to perform a reconciliation as required by the agreement.  *See Spin Capital, LLC*, 2023 WL 2265717, at *3.

Turning to the second criteria, the FundKite Agreement repeatedly emphasizes that it is not for a given period, stating there is "*no time period* during which the Purchased Amount must be collected by [FundKite]."  (Doc. No. 2-3 at 43 (emphasis added).)  The FundKite Agreement goes one step further than the LCF Agreement, explaining that the undetermined timeline means FundKite "is taking the risk that Receipts may be remitted more slowly than [FundKite] may have anticipated or projected because [the Center's] business has slowed down."  (*Id.*)  Indeed, "the full Purchased Amount may never be remitted because [the Center] filed a Chapter 7

liquidation or otherwise ceased operations in the ordinary course of business." (*Id.*)  Although the agreement does not explicitly state that bankruptcy will not result in default—a consideration under the third factor—that is also the most logical conclusion given this provision and the other provisions that explicitly tie FundKite's recovery to the amount of the Center's receipts.

Thus, it appears that all three criteria are satisfied, suggesting repayment under the FundKite Agreement is contingent, not mandatory, and that the agreement is not a loan subject to New York's usury laws. *See, e.g.*, *Spin Capital, LLC*, 2023 WL 2265717, at *3.

\*    \*    \*

In sum, at this stage, the Court cannot find that either the LCF Agreement or the FundKite Agreement is in actuality a usurious loan under New York law.[8]  As such, Plaintiffs have failed to show that they are likely to succeed in showing that either LCF or FundKite was attempting to collect on an unlawful debt or engaged in wire fraud (let alone a pattern of racketeering activity) under § 1962(c).  Because a § 1962(d) conspiracy claim "necessarily must fail if the substantive [§ 1962(c)] claims are themselves deficient," *see Kolar, Inc.*, 361 F. App'x at 366, Plaintiffs have also failed to show that they are likely to succeed on their conspiracy claims.

---

[8] The Court is sympathetic to Plaintiffs' concerns and in many respects, troubled by the nature of the agreements.  But as one New York court analyzing a similar LCF agreement explained:

> To be sure, there are aspects of the transactions that are troubling, particularly the high interest rates alleged by Plaintiffs and the limitations on reconciliation in the MCA Agreements. Indeed, it is not lost on the Court that the Amended Complaint, at its core, presents the subject transactions as a Dickensian web of debt that ultimately resulted in bankruptcy. The Court also notes that several recent federal cases—many of them cited by Plaintiff—have applied what appears to be a heightened level of scrutiny to merchant cash advance agreements. But that is not the law of this state.

*Singh*, 2023 WL 5760139, at *10.

18

**B.    Declaratory Judgment**

That leaves Plaintiffs' claims for declaratory judgment, under which they ask the Court to

declare the LCF Agreement and FundKite Agreement unenforceable.  Plaintiffs argue that they

are likely to succeed on these claims because the agreements are usurious loans void as a matter

of New York law.  (Doc. No. 2-2 at 14.)  This argument fails for the same reasons that Plaintiffs'

RICO Act claims fail.  In the alternative, Plaintiffs argue that Tritinger lacked authority to enter

the agreements on the Center's behalf, such that neither agreement is enforceable against it.  (*Id.*

at 15.)  Defendants respond that Tritinger, at minimum, had apparent authority to enter the

agreements as the organization's executive financial officer.[9]  (Doc. No. 14 at 7 n.3, 22; Doc.

No. 15 at 6; Doc. No. 17.)

"The authority of an officer to act on behalf of a corporation may be express, implied or

apparent."  *Goldenberg v. Bartell Broadcasting Corp.*, 262 N.Y.S.2d 274, 279 (N.Y. Sup. Ct.

June 4, 1965).  "Essential to the creation of apparent authority are words or conduct of the

principal, communicated to a third party, that give rise to the appearance and belief that the agent

possesses authority to enter into a transaction."  *Hallock v. New York*, 474 N.E.2d 1178, 1181

(N.Y. App. Div. 1984); *accord Lisi v. N.Y. Ctr. for Rehab. & Nursing*, 225 A.D.3d 590 (N.Y.

App. Div. 2024).  And even then, "a third party with whom the agent deals may rely on an

appearance of authority only to the extent that such reliance is reasonable."  *Hallock*, 474 N.E.2d

---

[9] Plaintiffs argue that Tritinger lacked actual authority to bind the Center because the agreements required approval by Shakir and the Center's general counsel pursuant to the Center's internal policy. (Doc. No. 2-2 at 16.)  But even if true, that has no bearing on Defendants' argument that Tritinger had apparent authority to enter into the agreements.  *See Goldston v. Bandwidth Tech. Corp.*, 52 A.D.3d 360, 360 (N.Y. App. Div. 2008) ("[A]n agreement entered into within the exercise of a corporate officer's apparent authority is binding on the corporation without regard to the officer's lack of actual authority."); *id.* ("Even in the instance where a chief executive's actual authority to enter into a particular agreement without the approval of the board of directors is in doubt, no obligation is imposed on the other party to the transaction to show that the president did, in fact, consult the board.").

at 1181; *see also ER Holdings, LLC v. 122 W.P.R. Corp.*, 65 A.D.3d 1275, 1277 (N.Y. App. Div. 2009) ("One who deals with an agent does so at his or her peril, and must make the necessary effort to discover the actual scope of authority." (cleaned up)).

The record before the Court suggests Tritinger may have had apparent authority to enter into the agreements.  In both instances, Tritinger identified herself by her proper title, Executive Financial Officer.  (*See* Doc. No. 2-3 at 34, 42, 52, 68.)  In addition to holding that title, and appearing on the Center's website with that title, Tritinger used a Mazzoni email address and telephone number when she filled out her initial applications.  (Doc. No. 15-1 at 1.)  Some New York cases suggest this may be sufficient.  *See Goldston*, 52 A.D.3d at 360 (explaining that the "risk of loss from an unauthorized act of a dishonest employee falls on the corporation which appointed him to act on its behalf and not on the party who relies on his apparent authority" (quotation marks omitted)); *Finger & Finger v. Buckingham Owners, Inc.*, 165 A.D.3d 887, 888 (N.Y. App. Div. 2018) ("The plaintiff established, prima facie, that it was entitled to summary judgment on its breach of contract cause of action for legal fees based on a retainer agreement executed on September 8, 2008, by the then-president of the defendant's board of directors.  At all relevant times, the president was acting with apparent authority to engage the services of counsel."); *cf. Eaglebank v. BR Professional Sports Grp., Inc.*, 649 F. App'x 209, 213 (3d Cir. 2016) (applying Pennsylvania law and finding that "Stokes, by virtue of his position as the executive vice president and chief financial officer of VIP, was an agent cloaked with the authority to enter into contracts and obtain financing on behalf of VIP, the principal").

But even if that is not sufficient on its own, as to FundKite, there was more.  Notably, during the underwriting process, Tritinger provided a Certificate of Incumbency with a notarized signature by the Center's Board Secretary dated December 9, 2022.  (Doc. No. 15-1 at 2; *see*

*also* Hr'g. Tr. at 28:17–29:9.)  The Certificate confirmed Rachelle Tritinger's position as the Center's Executive Financial Officer, and it identified her as one of five officers "authorized and empowered . . . to execute any agreement or document as may be required to maintain or operate bank accounts at any financial institution on behalf of Mazzoni Center and 1334-48 Bainbridge Street LLC, and to sign contracts on behalf of Mazzoni Center and 1334-48 Bainbridge Street, LLC." (Doc. No. 15-1 at 2.)[10]  During underwriting, Tritinger also provided a copy of the Center's 2022 tax return, which was prepared in June 2024 and listed Tritinger as a signatory. (*Id.*; *see also* Hr'g. Tr. at 31:22–34:9.)  This further suggests Tritinger had authority to sign financial documents on the organization's behalf.

Plaintiffs make much of the fact that in the FundKite Agreement, Tritinger identified herself as an "owner," a representation which was questionable on its face given the Center's nonprofit status. (Doc. No. 2-2 at 16–17.)  But the Court is not convinced that a few stray references to Tritinger as an "owner" rendered it unreasonable for FundKite to rely on her apparent authority to bind the Center, especially given the Certificate of Incumbency's explicit language.  Moreover, FundKite's owner, Defendant Aleksander Shvarts, submitted an affidavit attesting that the "generic references in the template of the agreement to 'owner' were not relevant to contract formation and approval." (Doc. No. 15-1 at 2.)

In the alternative, even if there was insufficient evidence to show Tritinger had apparent authority to bind the Center, Defendants have shown that the Center likely ratified the

---

[10] Plaintiffs argue that the Certificate of Incumbency was insufficient to clothe Tritinger with apparent authority because it was signed in 2022 and some of the officers listed within it are no longer with the organization.  (*See* Hr'g. Tr. at 29:3–7.)  But at the November 12, 2024 hearing, Shakir conceded that when Tritinger signed the agreements, the organization's then-current Certificate of Incumbency was in all *material* respects the same as the 2022 Certificate—it identified Tritinger as the organization's Executive Financial Officer and said she has the authority to execute agreements that are necessary to maintain bank accounts and to sign contracts on the Center's behalf.  (*Id.* at 29:3–31:14.)

agreements when it spent the funds deposited by LCF and FundKite on organization business.
*See IRB-Brasil Resseguros, S.A. v. Inepar Invs., S.A.*, 83 A.D.3d 573, 575 (N.Y. App. Div. 2011)
("However, as in Indosuez, the transaction was implicitly ratified by IIC since, as a result of the
transaction, IIC's subsidiary received $30 million, which was used for investments undertaken
pursuant to a strategy set by IIC's administrative council.  IIC's acceptance of benefits flowing
from an agreement that it now asserts was unauthorized when executed constitutes an affirmance
of the agreement giving rise to a ratification."); *see also WebMD LLC v. Aid in Recovery, LLC*,
166 A.D.3d 447, (N.Y. App. Div. 2018) ("[E]ven if SantaCroce did not have apparent authority,
defendant ratified the agreement by its acceptance of benefits flowing therefrom."); *Finger &
Finger*, 165 A.D.3d at 888 ("[T]he defendant accepted the benefits of the legal work performed
by the plaintiff and thus is bound by the retainer agreement."); *Goldston*, 52 A.D.3d 360
("Moreover, on the record before us, it is clear that defendants accepted the benefits of legal
work performed by G&S and are therefore bound by the agreement, whether they authorized it or
not.").

Accordingly, the Court finds that Plaintiffs are unlikely to succeed on their declaratory
judgment claim.

## IV.    CONCLUSION

Because Plaintiffs have failed to show that they are likely to succeed on any of their
claims against Defendants, the motion for temporary restraining order and preliminary injunction
is denied.  The Court need not reach the remaining preliminary injunction factors.[11]  An
appropriate order follows.

---

[11] Although the Court does not reach the issue of immediate, irreparable injury, we have grave
doubts as to whether Plaintiffs could satisfy this second gateway factor.  Plaintiffs have shown that the
Center will be unable to make its next payroll so long as payments owed to it by third parties are withheld
pursuant to Defendants' UCC liens.  (Hr'g. Tr. at 17:6–18:10.)  But the Center's strapped financial

situation is, at most, only partially caused by Defendants.  Indeed, the evidence currently before the Court suggests that the Center is now in the same position it was in in September 2024 when Tritinger signed the agreements—unable to make payroll.  (*See id.* at 50:2–6 ("Q.  I want to make sure, though.  If you had not received this money in the bank accounts on September 11th, September 12th, you would probably be in the same position you are today?  A [Shakir].  Probably, yes.").)